Nos. 23-1633, 23-1634 and 23-1641

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

➤✄◄

DELAWARE STATE SPORTSMEN'S ASSOCIATION INC., ET AL. V. DELAWARE
DEPARTMENT OF SAFETY AND HOMELAND SECURITY, ET AL.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE*

Consolidated Case No. 1:22-cv-00951-RGA
The Honorable Richard G. Andrews, United States District Court Judge

# DEFENDANTS-APPELLEES'
# ANSWERING BRIEF

ROSS ARONSTAM & MORITZ LLP

David E. Ross
Garrett B. Moritz
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
dross@ramllp.com
gmoritz@ramllp.com

Dated: August 16, 2023

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

Kenneth L. Wan
Zi-Xiang Shen
Deputy Attorneys General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, Delaware 19801
(302) 577-8400
kenneth.wan@delaware.gov
zi-xiang.shen@delaware.gov

*Counsel for Defendants-Appellees Delaware Department of Safety and
Homeland Security; Nathaniel McQueen, Jr. in his official capacity as
Cabinet Secretary, Delaware Department of Safety and Homeland Security;
Melissa Zebley in her official capacity as superintendent of the Delaware
State Police; and Kathy Jennings, Attorney General of Delaware*

# TABLE OF CONTENTS

**Page**

COUNTERSTATEMENT OF ISSUES PRESENTED
FOR REVIEW ..................................................................... 1

RELATED CASES AND PROCEEDINGS ................................... 2

COUNTERSTATEMENT OF THE CASE .................................. 2

A.   DELAWARE RESPONDS TO MASS SHOOTINGS BY
     ENACTING THE STATUTES AT ISSUE ....................... 2

B.   AFTER WAITING MORE THAN FOUR MONTHS,
     PLAINTIFFS SEEK A PRELIMINARY INJUNCTION ............... 6

     1.   Plaintiffs acknowledge the importance of historical
          evidence ...................................................... 7

     2.   Defendants present a "robust" factual record,
          including extensive historical evidence ................. 8

     3.   Plaintiffs reverse course and claim that historical
          evidence is "immaterial" ................................ 11

C.   THE DISTRICT COURT DENIES PLAINTIFFS'
     MOTIONS ON MULTIPLE GROUNDS ....................... 11

SUMMARY OF ARGUMENT ................................................ 14

ARGUMENT ...................................................................... 17

I.   STANDARD OF REVIEW ............................................ 17

II.  THE DISTRICT COURT'S FINDING THAT PLAINTIFFS
     DID NOT ESTABLISH A LIKELIHOOD OF SUCCESS
     ON THE MERITS SHOULD BE AFFIRMED ............... 18

A.  Plaintiffs waived any attack on Defendants' experts or the district court's reliance upon them and are barred from presenting new evidence or arguments not presented below ............................................................. 18

B.  The district court did not err in finding that Plaintiffs failed to establish a likelihood of success on the merits ....... 22

    1.  The district court did not err in rejecting Plaintiffs' numerosity argument ................................... 22

    2.  The district court did not err in finding that assault weapons and LCMs implicate "unprecedented societal concerns" and "dramatic technological changes" ................................ 31

    3.  The district court did not err in finding that the statutes are consistent with the Nation's tradition of regulation .................................... 42

    4.  The district court did not err in finding that the historical analogues "impose comparable burdens on the right to armed self-defense, and those burdens are comparably justified" .............. 59

    5.  This Court may also affirm with respect to LCMs on the alternative grounds that LCMs are not "arms" ..................................................................... 61

III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT PLAINTIFFS FAILED TO DEMONSTRATE THAT THEY WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION .................................................................. 62

CONCLUSION ........................................................................ 68

# TABLE OF CITATIONS

**Cases**                                                                                                    **Page(s)**

*Adams v. Freedom Forge Corp.,*
  204 F.3d 475 (3d Cir. 2000) ............................................................... 16

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
  910 F.3d 106 (3d Cir. 2018) ........................................................ 12, 62

*Bevis v. City of Naperville, Ill.,*
  No. 22 C 4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ......... 56, 57

*Brightwell v. Lehman,*
  637 F.3d 187 (3d Cir. 2011) ............................................................... 61

*Caetano v. Mass.,*
  577 U.S. 411 (2016) ...................................................... 23, 25, 26, 27

*Chestnut Hill Sound Inc. v. Apple Inc.,*
  C.A. No. 15-261-RGA, 2015 WL 6870037
  (D. Del. Nov. 6, 2015) ..................................................................... 63

*Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.,*
  844 F.2d 117 (3d Cir. 1988) ............................................................... 17

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .................................................................. *passim*

*ECRI v. McGraw-Hill, Inc.,*
  809 F.2d 223 (3d Cir. 1987) ............................................................... 62

*Ezell v. City of Chi.,*
  651 F.3d 684 (7th Cir. 2011) ............................................................. 65

*Ferring Pharms., Inc. v. Watson Pharms., Inc.,*
  765 F.3d 205 (3d Cir. 2014) .........................................................62-63

*Friedman v. City of Highland Park, Ill.,*
  784 F.3d 406 (7th Cir. 2015) ........................................................29-30

*Hartford v. Ferguson*,
  C.A. No. 3:23-cv-05364-RJB, 2023 WL 3836230
  (W.D. Wash. June 6, 2023) ..................................................30, 57-58

*Herrera v. Raoul*,
  No. 23 CV 532, 2023 WL 3074799
  (N.D. Ill. Apr. 25, 2023) .......................................................57

*High Tech Med. Instrumentation, Inc. v. New Image Indus.,
  Inc.*, 49 F.3d 1551 (Fed. Cir. 1995)......................................64

*Hohe v. Casey*,
  868 F.2d 69 (3d Cir. 1989) .........................................1, 62, 64

*K.A. ex rel. Ayers v. Pocono Mountain School Dist.*,
  710 F.3d 99 (3d Cir. 2013) ...................................................65

*Lewis v. Kugler*,
  446 F.2d 1343 (3d Cir. 1971) ..............................................65

*Marinaccio v. E. Hanover Bd. Police Dep't*,
  No. 20-2677, 2022 WL 964000 (3d Cir. Mar. 30, 2022) ...............15, 19

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)..............................................................17

*Md. v. King*,
  567 U.S. 1301 (2012) ...........................................................66

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)................................................*passim*

*Nat'l Ass'n for Gun Rights v. City of Naperville*,
  No. 22-A948, 2023 WL 3212195 (U.S. Apr. 26, 2023) ........................66

*Nat'l Ass'n for Gun Rights v. City of Naperville*,
  143 S. Ct. 2489 (2023) (Order)............................................66

*Nat'l Ass'n for Gun Rights v. Lamont*,
  C.A. No. 3:22-1118 (JBA), 2023 WL 4975979
  (D. Conn. Aug. 3, 2023).............................................24-25, 58

*Ocean State Tactical, LLC v. State of R.I.*,
  No. 22-CV-246 JJM-PAS, 2022 WL 17721175
  (D.R.I. Dec. 14, 2022) ........................................................................ 61

*Or. Firearms Fed'n, Inc. v. Brown*,
  C.A. No. 2:22-cv-01815-IM, 2022 WL 17454829
  (D. Or. Dec. 6, 2022) ..................................................................... 30, 64

*Or. Firearms Fed'n v. Kotek*,
  C.A. No. 2:22-cv-01815-IM, *et al.*, 2023 WL 4541027
  (D. Or. July 14, 2023) ........................................................................ 58

*Peterson v. Martinez*,
  707 F.3d 1197 (10th Cir. 2013) .......................................................... 22

*Shire US Inc. v. Barr Labs., Inc.*,
  329 F.3d 348 (3d Cir. 2003) ............................................................... 17

*Staples v. United States*,
  511 U.S. 600 (1994) ........................................................................... 38

*Tracy Rifle & Pistol LLC v. Harris*,
  118 F. Supp. 3d 1182 (E.D. Cal. 2015) ..........................................66-67

*United States v. James*,
  955 F.3d 336 (3d Cir. 2020) .......................................................... 19, 20

*United States ex rel. Jones v. Franzen*,
  676 F.2d 261 (7th Cir. 1982) .............................................................. 21

*United States v. Miller*,
  307 U.S. 174 (1939) ........................................................................... 55

*United States v. One (1) Palmetto State Armory PA-15
  Machinegun Receiver/Frame*, 822 F.3d 136 (3d Cir. 2016) ............... 55

*Walters v. Kemp*,
  C.A. No. 1:20-cv-1624-SCJ, 2020 WL 9073550
  (N.D. Ga. May 5, 2020) ................................................................64-65

## Rules and Statutes

18 U.S.C. § 922 ................................................................................... 28

11 *Del. C.* §§ 1441, 1468-1469A ("SS 1 for SB 6") ........................... *passim*

11 *Del. C.* § 1444 ......................................................................... 39, 55

11 *Del. C.* §§ 1464-1467 ("HB 450") ................................................ *passim*

Conn. Gen. Stat. § 53-202 ............................................................. 5

Haw. Rev. Stat. § 134-8 ................................................................. 5

720 ILCS 5/24-1.10 ........................................................................ 5

13 Vt. Stat. Ann. § 4021 ................................................................. 5

Md. Code Ann., Crim. Law § 4-301 ................................................ 5

Mass. Gen. Laws ch. 140, § 121 .................................................... 5

Mass. Gen. Laws ch. 140, § 131M ................................................. 5

N.J.S.A. 2C:39-1 ........................................................................... 5

N.J.S.A. 2C:39-9 ........................................................................... 5

R.I. Gen. Laws § 11-47.1-2 ............................................................ 5

R.I. Gen. Laws § 11-47.1-3 ............................................................ 5

RCW 9.41 ...................................................................................... 5

## Other Authorities

21 Fed. Prac. & Proc. Evid. § 5039.2 ........................................... 22

Pub. L. 99-308 § 102, 100 Stat. 449 (May 19, 1986) ................... 28

## COUNTERSTATEMENT OF ISSUES
## PRESENTED FOR REVIEW

1.   Did Plaintiffs waive their right to challenge the district court's reliance on Defendants' experts by not proffering any experts and conceding that (1) the district court "should take every factual assertion that's in the five Defendant declarations as being true," and (2) "[t]o the extent [the court] get[s] into historical regulation, [it] do[es]n't have to go out and do [its] own independent histor[ical]" analysis?  SA938, SA975 (PI Tr.).[1]

2.   Did the district court err in finding that Defendants' unrebutted "robust" "historical evidence" demonstrated that the statutes at issue were "consistent with 'this Nation's historical tradition'" of regulating arms?

3.   Did the district court err in finding that Plaintiffs did not make the "clear showing of immediate irreparable injury," *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (citation omitted), required for an injunction?

---

[1] Citations to "*DSSA* Br." and "*Gray* Br." are to Plaintiffs-Appellants' Opening Briefs.  Citations to "A_" are to the Appendix filed by Plaintiffs-Appellants, and citations to "SA_" are to the Supplemental Appendix filed by Defendants-Appellees.

4.      Did the district court abuse its discretion in denying Plaintiffs' request for a preliminary injunction?

## RELATED CASES AND PROCEEDINGS

Defendants are not aware of any other related cases other than those mentioned in Plaintiffs' statements of Related Cases and Proceedings.

## COUNTERSTATEMENT OF THE CASE

## A.      DELAWARE RESPONDS TO MASS SHOOTINGS BY ENACTING THE STATUTES AT ISSUE.

On May 24, 2022, a gunman with an AR-15 style semi-automatic rifle and thirty-round magazines killed nineteen children and two teachers at an elementary school in Uvalde, Texas.  Reese Oxner, *Uvalde gunman legally bought AR rifles day before shooting, law enforcement says*, THE TEXAS TRIBUNE (May 25, 2022), https://bit.ly/3qqgW95 (cited below at SA81).  That tragedy occurred while the Nation was mourning the murder of ten people in Buffalo by a shooter who also chose an AR-15 style semi-automatic rifle, with a thirty-round magazine, because it was especially "effective at killing."  Cameron McWhirter, *Accused Buffalo Gunman Describes Why He Chose His Firearms, Body Armor*, WALL ST. J. (May 15, 2022), https://on.wsj.com/47B5bNR (cited below at SA81).

On June 30, 2022, citing these and "dozens" of other "mass shootings during the last decade," Delaware enacted a package of gun safety bills, including statutes regulating assault weapons, 11 *Del. C.* §§ 1464-1467 ("HB 450"), and large-capacity magazines ("LCMs"), 11 *Del. C.* §§ 1441, 1468-1469A ("SS 1 for SB 6," and collectively with HB 450, the "Statutes"), to further the State's "compelling interest to ensure the safety of Delawareans," A208-209 (HB 450, preamble).

**HB 450.** HB 450 makes certain "assault weapons" illegal, subject to some exceptions. In passing HB 450, Delaware's General Assembly observed that assault-style weapons, with their "immense killing power," were "designed solely for military use … and … were not intended for sport or self-defense." *Id.* The General Assembly concluded "that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this State," and that the risk of death or injury from these weapons "substantially outweigh[s]" any utility as sports or recreational firearms. 11 *Del. C.* § 1464.

Under HB 450, "assault weapons" include (i) "forty-four enumerated semi-automatic 'assault long gun[s],' including the AR-15, AK-47, and Uzi," (ii) "nineteen specifically identified semi-automatic

'assault pistol[s],'" and (iii) "copycat weapon[s]." A10 (Op.)[2] (quoting 11 *Del. C.* § 1465(2), (3) & (4)). "'Copycat weapon[s]' include semi-automatic, centerfire rifles that can accept a detachable magazine and which have one of five military features, semi-automatic pistols that can accept a detachable magazine and which have certain similar enhanced characteristics, and certain other semi-automatic weapons." *Id.* (footnote omitted) (citing 11 *Del. C.* § 1465(6)).

"HB 450 prohibits the manufacture, sale, offer to sell, purchase, receipt, transfer, possession or transportation of these weapons, subject to certain exceptions, including for military and law-enforcement personnel." *Id.* (citing 11 *Del. C.* §§ 1466(a), (c)). "People who possessed or purchased assault weapons before the statute became effective can continue to possess and transport them under certain conditions, including (i) at their residence and place of business, (ii) at a shooting range, (iii) at gun shows, and (iv) while traveling between any permitted places[,]" and may "transfer them to family members." *Id.* (citing 11 *Del. C.* § 1466(c)).

---

[2] The March 27, 2023 Memorandum Opinion issued below is cited as "A_ (Op.)."

**SS 1 for SB 6.** "SS 1 for SB 6 makes it illegal 'to manufacture, sell, offer for sale, purchase, receive, transfer, or possess a large-capacity magazine.'" A11 (Op.) (quoting 11 *Del. C.* § 1469(a)). "'Large-capacity magazine[s]' are those 'capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition.'" *Id.* (quoting 11 *Del. C.* § 1468(2)).[3] "The statute exempts many of the same individuals as HB 450, along with individuals who have a valid concealed carry permit." *Id.* (citing 11 *Del. C.* § 1469(c)). While "SS 1 for SB 6 does not grandfather any magazines," it does "require the State to implement a buy-back program." *Id.* (citing 11 *Del. C.* § 1469(d)).[4]

---

[3] Delaware permits magazines with larger capacities than other states. *Compare*, *e.g.*, Conn. Gen. Stat. §§ 53-202(d), (w) (ten rounds); D.C. Code § 7-2506.01 (same); Haw. Rev. Stat. § 134-8 (same); 720 ILCS 5/24-1.10 (ten rounds for long guns & fifteen rounds for handguns); 13 Vt. Stat. Ann. § 4021 (same); Md. Code Ann., Crim. Law § 4-301(h) (ten rounds); Mass. Gen. Laws ch. 140, §§ 121, 131M (same); N.J.S.A. 2C:39-1, 39-9 (same); R.I. Gen. Laws §§ 11-47.1-2, 1-3 (same); RCW 9.41, 9.41.010 (same).

[4] The claim that the statute "mandates confiscation without fair compensation" is thus erroneous. *DSSA* Br. at 5.

**B.    AFTER WAITING MORE THAN FOUR MONTHS, PLAINTIFFS SEEK A PRELIMINARY INJUNCTION.**

On July 20, 2022, Plaintiffs in *Delaware State Sportsmen's Association, Inc., et al. v. Delaware Department of Safety and Homeland Security, et al.*, C.A. No. 1:22-cv-00951-RGA, filed suit challenging HB 450.  A51.  On September 9, 2022, Plaintiffs filed an amended complaint that added claims challenging SS 1 for SB 6.  A108.  On November 15, 2022, Plaintiffs moved for a preliminary injunction barring the enforcement of the Statutes.  A283.

On November 16, 2022, Plaintiffs in *Gabriel Gray, et al. v. Kathy Jennings*, C.A. No. 1:22-cv-01500-MN, filed a complaint challenging HB 450.  A600.  On November 22, 2022, Plaintiffs moved for a preliminary and permanent injunction barring the enforcement of that statute. A629.

Four Plaintiffs submitted declarations claiming a threat of irreparable harm.  Three claimed that the Statutes prevented them from buying assault weapons and LCMs for "self-defense and other lawful purposes."  A286-287 (Clements ¶¶ 11, 13); A289-290 (Hague ¶¶ 9, 14); A296 (Taylor ¶ 8).  Two own assault weapons and LCMs, A286-287 (Clements ¶¶ 10, 12); A289-290 (Hague ¶¶ 8, 14), and the third is a gun

owner applying for concealed carry permits in Maryland and Delaware, A296 (Taylor ¶ 5). Beyond conclusory assertions, Plaintiffs never explained why their firearms and magazines, along with other available options, are inadequate. In addition, two Plaintiffs asserted that the Statutes restricted their ability to sell assault weapons and LCMs. A290-291 (Hague ¶¶ 12-13, 17-18); A293-294 (Jenkins ¶¶ 8-9).

The district court subsequently consolidated these cases. *DSSA* Action, D.I. 24; *Gray* Action, D.I. 12. Subsequently Plaintiffs in *Graham v. Jennings*, C.A. No. 23-00033-RGA, filed a complaint challenging SS 1 for SB 6. The district court subsequently consolidated that case with the *DSSA* and *Gray* actions. *DSSA* Action, D.I. 52.

## 1. Plaintiffs acknowledge the importance of historical evidence.

Plaintiffs initially recognized the "historical inquiry that [the district] court[] *must conduct*" in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). SA9 (quoting *Bruen*, 142 S. Ct. at 2132) (emphasis added); *id.* (*Bruen* "mandates" "relying on the historical understanding of the Amendment"). According to Plaintiffs, the relevant question was "whether the State can prove" that the

Statutes are "consistent with 'this Nation's historical tradition'" of regulation. SA11.

Plaintiffs did not submit evidence concerning this historical tradition. Instead, Plaintiffs declared "[t]here is no historical analogue" to the Statutes, SA12-13, SA15, SA17, and predicted that "the State will be incapable of citing any historical tradition or historical analogue," SA18.

### 2. Defendants present a "robust" factual record, including extensive historical evidence.

Defendants' opposition to Plaintiffs' motions "present[ed] a robust evidentiary record, including declarations from five expert witnesses." A8 n.2 (Op.). Together, these declarations and supporting exhibits totaled 1560 pages, and the 16 exhibits to Defendants' opposition totaled 279 pages. A298-594 (excerpts), SA129-902 (excerpts).

Defendants' experts included:

**Dr. Robert J. Spitzer**: A Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland, Dr. Spitzer's 54-page declaration explained the "historical relationship … between the development of new weapons technologies, their spread into society, and regulation by the government." A301 (¶ 8).

After detailing multiple examples "[t]hroughout American history," Dr. Spitzer found that statutes regulating assault weapons and LCMs "are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions," A302 (¶ 10), designed to "promote public safety, protect the public from harm, and limit weapons-related criminality and violence," A301 (¶ 8).

**Kevin M. Sweeney**:  Professor of History *emeritus* at Amherst College, Sweeney opined that in the 1700s and early 1800s, "most gun owners … possessed and used single shot, muzzle-loading, flintlock firearms."  A569 (¶ 5).  After analyzing historical evidence, Professor Sweeney also opined that in eighteenth-century America, repeating firearms were "extraordinarily rare" and unreliable "novelt[ies]."  A579-592 (¶¶ 20-42).

**Denis Baron:**  Professor Emeritus and Research Professor at the University of Illinois, Baron opined, among other things, that ammunition holders "were considered accoutrements and not arms during the Founding and Ratification Era."  SA394 (¶ 4).

**James Yurgealitis:**  A former federal law enforcement officer and Senior Special Agent/Program Manager for Forensic Services for the

Bureau of Alcohol, Tobacco, Firearms and Explosives, Mr. Yurgealitis's 61-page declaration (with 1,033 pages of exhibits) explained, among other things, the (1) military origins of assault weapons and LCMs, (2) dangerous features that distinguish assault weapons and LCMs, and (3) threats that they present to public safety.  SA423-902.

**Lucy Allen**:  Relying upon data from several sources, Ms. Allen, a Managing Director of NERA Economic Consulting, found that (1) "it is extremely rare for a person, when using firearms in self-defense, to fire more than seventeen rounds," (2) "citizens rarely use a firearm, and even less frequently use an assault rifle, to defend themselves during active shooter incidents," (3) "casualties were higher in the mass shootings that involved Assault Weapons than in other mass shootings," (4) "casualties were higher in the mass shootings that involved weapons with Large-Capacity Magazines than in other mass shootings," and (5) "casualties were higher in the mass shootings that involved both Assault Weapons *and* Large-Capacity Magazines."  SA331, 340, 350, 351 (¶¶ 9, 19, 34, 36, 37).

### 3.    Plaintiffs reverse course and claim that historical evidence is "immaterial."

Rather than respond to Defendants' submissions with contrary expert evidence or to seek to examine Defendants' experts, on reply Plaintiffs argued that "historical regulations [we]re immaterial." SA919. As a result, Plaintiffs left Defendants' evidentiary record unrebutted and claimed that the only relevant question was whether assault weapons and LCMs "are 'in common use' for lawful purposes." SA909.

At oral argument, Plaintiffs conceded that the district court "should take every factual assertion that's in the five Defendant declarations as being true." SA938 (PI Tr.).  Plaintiffs further acknowledged that the court need not "go out and do [its] own independent histor[ical analysis]." SA975.  Instead, Plaintiffs told the court that it could rely upon Defendants' undisputed evidence. *Id.*

## C.    THE DISTRICT COURT DENIES PLAINTIFFS' MOTIONS ON MULTIPLE GROUNDS.

After analyzing the voluminous record established by Defendants, the district court found that Plaintiffs "failed to meet their burden of establishing the first two preliminary injunction factors:  (1) likelihood of success on the merits, and (2) irreparable harm in the absence of a

preliminary injunction." A12 (Op.). The court reached this conclusion despite making several findings and assumptions in Plaintiffs' favor.[5]

However, the court rejected Plaintiffs' argument that a weapon "'in common use' within the meaning of the Second Amendment … cannot be regulated, and no historical analysis is necessary." A23-24 (Op.).

Instead, after shifting to Defendants the burden to "demonstrat[e] that [the Statutes are] consistent with the Nation's historical tradition of firearm regulation," A12 (Op.) (quoting *Bruen*, 142 S. Ct. at 2129-30), the court found "that the [Statutes] implicate 'unprecedented societal concerns' and 'dramatic technological changes.'" A26 (Op.) (citation omitted). Relying upon Defendants' experts, the Court found that assault

---

[5] First, the court found that at least some covered assault weapons and LCMs are presumptively protected by the Second Amendment. A13, A21, A23 (Op.). While Plaintiffs dispute the finding that assault pistols and copycat weapons are not in common use and the allocation of the burden of proof on that issue, *Gray* Br. at 20, those had no effect on the outcome in light of the remainder of the opinion. Second, the court found that LCMs are "arms" notwithstanding other courts having found otherwise and "Defendants' evidence regarding the historical definition of 'arms,'" concluding that it was bound by a pre-*Bruen* opinion of this Court. A22 (Op.) (citing *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111). And as with assault weapons, the Court found that regardless of their suitability for self-defense, the large number of LCMs owned by individuals rendered them "not 'unusual'" and "'presumptively protect[ed]' by the Second Amendment." A23 (Op.).

rifles and LCMs "represent recent advances in technology" that only became available in "the beginning of the twentieth century." A26 (Op.). And based upon the uncontroverted evidence that (i) "suggests a rise in the yearly rate of public mass shootings," (ii) assault weapons and LCMs were frequently used in such shootings, and (iii) "mass shootings involving assault weapons and LCMs result in more fatalities and injuries than those that do not," the court found that "assault weapons and LCMs implicate unprecedented societal concerns." A27 (Op.).

With respect to dramatic technological changes, the court found that assault rifles and LCMs "are exceptionally dangerous" in light of their "'military' features," including their "high velocity," "rate of fire," and "range," which "'increase their lethality.'" A27-28 (Op).

Based upon "Defendants' evidence of historical regulations," the district court found "multiple historical analogues, including several from the Nation's early history." A29 (Op.). And because the Statutes "are consistent with the Nation's historical tradition of firearm regulation," Plaintiffs "failed to demonstrate a likelihood of success on the merits of their Second Amendment claim." A34 (Op.).

In so holding, the Court did not engage in an "interest-balancing, means-end analysis." A33 (Op.). Instead, it "consider[ed] 'how *and why* the regulations burden a law-abiding citizen's right to self-defense.'" A34 (Op.) (quoting *Bruen*, 142 S. Ct. at 2132-33 (emphasis added)).

The Court also found that in light of the lack of suitability of assault weapons and LCMs for self-defense, Plaintiffs failed to demonstrate "that irreparable harm is 'more likely than not.'" A34 (Op.). Because Plaintiffs did "not me[e]t the threshold for either of the first two factors," the Court did not consider the two remaining factors. A37 (Op.).

## <u>SUMMARY OF ARGUMENT</u>

Unhappy with their strategic choices below, Plaintiffs seek a do-over. In the district court, Plaintiffs did not attempt to rebut Defendants' expert witnesses. On appeal, however, Plaintiffs seek to manufacture a factual record in support of arguments they did not present below. And they do so while ignoring their concessions that (i) the district court "should take every factual assertion that's in the five Defendant declarations as being true," and (ii) "[t]o the extent [the court] get[s] into historical regulation, [it] do[es]n't have to go out and do [its] own independent histor[ical]" analysis. SA938, SA975 (PI Tr.).

14

As a result, this appeal turns primarily on the basic procedural rule that "this Court does not consider evidence or claims that were not first presented to the district court." *Marinaccio v. E. Hanover Bd. Police Dep't*, No. 20-2677, 2022 WL 964000, at *2 n.3 (3d Cir. Mar. 30, 2022). The bulk of Plaintiffs' briefs involve evidence and arguments not presented below.  Plaintiffs cite dozens of secondary sources for assertions not presented below.  Having neither offered this evidence nor made these arguments below, Plaintiffs are foreclosed from introducing them on appeal.  *See* Argument § II.A, *infra*.

Plaintiffs' sole preserved argument is that the Statutes constitute impermissible "categorical bans" in light of the number of assault weapons and LCMs owned.  But the Statutes are not "categorical bans." And in any event, a rule based solely upon the number of weapons owned suffers from fundamental flaws.  *See* Argument § II.B.1, *infra*.

This Court can end its review there.  But the broader Second Amendment analysis provides an independent basis for affirming the district court's decision.  As the district court found, the burdens imposed by the Statutes are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  Particularly considering

Defendants' unrebutted evidence below, Plaintiffs cannot demonstrate that decision is wrong, much less reversible error.  As such, Plaintiffs cannot show that the court abused its discretion in denying a preliminary injunction.  *See* Argument §§ II.B.2-4, *infra*.  And with respect to LCMs, this Court can affirm the decision below on the independent ground that they are not "arms" for purposes of the Second Amendment.  *See* Argument § II.B.5, *infra*.

Finally, a preliminary injunction may not be issued where a plaintiff "fail[s] to meet the essential irreparable harm requirement." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 480 (3d Cir. 2000) (vacating preliminary injunction).  Affirmance is thus further warranted as keeping the Statutes in place will not irreparably harm Plaintiffs.  *See* Argument § III, *infra*.

For these reasons, as discussed more fully below, the denial of Plaintiffs' motions for a preliminary injunction should be affirmed, and the case should proceed to trial.  There, Plaintiffs can seek—subject to discovery, cross-examination, and evidentiary rules—to properly present the evidence that they attempt to inject into this appeal.

# ARGUMENT

## I.   STANDARD OF REVIEW.

Plaintiffs seeking the "extraordinary and drastic" remedy of a preliminary injunction must make a "clear showing" that they are entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted).   Even then, whether to grant a preliminary injunction "is committed to the sound discretion of the [district] court." *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003) (citation omitted) (affirming decision denying preliminary injunction).

"This Court will affirm the … denial of a … preliminary injunction unless the district court abused its discretion, committed an error of law or made a clear mistake on the facts." *Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 119 (3d Cir. 1988) (affirming denial of preliminary injunction).

## II.   THE DISTRICT COURT'S FINDING THAT PLAINTIFFS DID NOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS SHOULD BE AFFIRMED.

### A.   Plaintiffs waived any attack on Defendants' experts or the district court's reliance upon them and are barred from presenting new evidence or arguments not presented below.

Plaintiffs repeatedly attack Defendants' experts and the district court's reliance upon them.  *See*, *e.g.*, *Gray* Br. at 1 (faulting court for "largely accept[ing] the state's expert's reading of history"); *id.* at 46 (discussing "the inaccurate report of the State's expert"); *DSSA* Br. at 17 (faulting court for "citing Spitzer's Declaration without carefully analyzing its contents").[6]  Plaintiffs also fault the district court for "not engag[ing] in any further [historical] analysis." *DSSA* Br. at 19.  Indeed, Plaintiffs claim that the court committed "clear error" in relying upon analogues offered by Defendants' experts.  *See id.* at 22.  In all, Plaintiffs spend twenty-four pages attacking the court's reliance on Defendants' historical experts.  *See Gray* Br. at 42-53; *DSSA* Br. at 12-23.

---

[6] Plaintiffs also attack the court's historical analysis without identifying any departure from Defendants' experts. *See*, *e.g.*, *Gray* Br. at 1 ("[T]he district court erred in its analysis of history."); *DSSA* Br. at 10 ("The District Court … erred by engaging in a flawed revisionist rewriting of the Nation's historical tradition of firearms regulation ….").

Below, however, Plaintiffs dismissed historical regulations as "immaterial," SA919 (PI Reply), then told the district court that it: (1) "should take every factual assertion that's in the five Defendant declarations as being true," SA938 (PI Tr.); and (2) was not required "to go out and do [its] own independent histor[ical analysis]" SA975 (PI Tr.).

As such, Plaintiffs waived for purposes of this appeal any attack on the historical evidence and the district court's reliance upon that evidence. "[T]his Court does not consider evidence or claims that were not first presented to the District Court." *Marinaccio*, 2022 WL 964000, at *2 & n.3 (refusing to consider argument). For example, in *United States v. James*, 955 F.3d 336, 344 (3d Cir. 2020), the defendant indicated that he had "no objection" to use of a demonstrative. Finding that this "was an 'intentional relinquishment'" of his right to object to the demonstrative, the Court noted that "[w]hen a right … is waived, 'an appeal … is precluded.'" *Id.* (citation omitted). This rule "is premised on the adversarial nature of our system of justice," where "litigants … choose the … arguments to present." *Id.* As such, "when a party clearly chooses a particular path, it will be respected and generally not further reviewed." *Id.* at 345. This rule "respect[s] the adversarial system,"

"promotes finality," and "promote[s] judicial efficiency and prevent[s] disturbing rulings based on grounds never argued to the district court." *Id.* Given defendant's waiver, the Court "conduct[ed] no further analysis of the claimed error." *Id.*

Here, Plaintiffs rely heavily upon purported factual assertions not presented below. Plaintiffs cite dozens of secondary sources—including multiple publications from "the firearm industry trade association," which "relentlessly advocates for measures on behalf of and works in defense of the firearm and ammunition industry" (https://bit.ly/3OWvBCw), a book published by a publisher who caters to "gun enthusiasts" (https://bit.ly/3Qt1CmI), multiple books published by an author who has written for the National Rifle Association (https://bit.ly/45uMkSN), and other advocacy pieces—for assertions that were not presented below.[7] For example, Plaintiffs argue about the historical development of multi-fire weapons, *Gray* Br. at 38-39, the lethality of the weapons at issue, *id.* at 39-42, and the history of mass

---

[7] This extensive new evidentiary material belies Plaintiffs' claim that "[a]ll the issues here are legal." *Gray* Br. at 12.

killings, *id.* at 37-38.[8]  Having presented no evidence on these points below, Plaintiffs cannot invoke those assertions and make those arguments on appeal.

Plaintiffs' sandbagging is particularly inappropriate given *Bruen*'s direction that, in our "adversarial system," "we follow the principle of party presentation," and cases are to be decided "based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6.  The district court relied upon this direction in reaching its decision.  A24 (Op.).  That, together with *Bruen*'s repeated references to "historical evidence" (and the nature of Plaintiffs' new sources), foreclose any

---

[8] Amici take a similar approach, relying extensively upon new evidence (including four declarations offered in other cases) and making (often unsupported) claims that are directly contrary to the district court's factual findings.  *See*, *e.g.*, D.I. 46 at 9 n.5 (discussing "alleged 'assault rifle' bullet traits"); *id.* at 18 n.13 (citing Heritage Foundation report to argue that assault weapon traits do not make them more lethal); D.I. 47 at 3 (arguing that "innocuous feature [] make" assault weapons "safer"); D.I. 49.  Amicus briefs are not a proper means for manufacturing the record that Plaintiffs failed to make below.  *See*, *e.g.*, *United States ex rel. Jones v. Franzen*, 676 F.2d 261, 266 & n.7 (7th Cir. 1982) (Amicus "numerous statements of fact not supported in an unchallenged record …. are improper"; "Amicus' felt necessity of going outside the record before us demonstrates the fallacy in its argument[.]"), *superseded by statute on other grounds as stated in Sanders v. Radtke*, 48 F.4th 502 (7th Cir. 2022).

argument that these new sources are legislative facts that may be considered for the first time on appeal.[9]

## B. The district court did not err in finding that Plaintiffs failed to establish a likelihood of success on the merits.

After finding that both assault weapons and LCMs are arms, the court shifted to Defendants "the burden … to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'"  A24 (Op.) (quoting *Bruen*, 142 S. Ct. at 2129-30). The district court's finding that Defendants did so should be affirmed.

### 1. The district court did not err in rejecting Plaintiffs' numerosity argument.

Plaintiffs claim that the only relevant fact is the number of weapons owned nationally.  Specifically, Plaintiffs claim that whether a weapon is "in common use" "is dispositive." *Gray* Br. at 10.  According to Plaintiffs, there is a "historical tradition allowing regulation of arms that are

---

[9] Even assuming there was some error in the district court's findings (and there was not), it would be "invited error"—i.e., "error that is not a cause for complaint because the error occurred through the fault of the party now complaining."  21 Fed. Prac. & Proc. Evid. § 5039.2; *see also Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) (refusing to consider new argument; "[i]n light of [appellant's] explicit statement" that he was not making a particular challenge, he "cannot be heard to complain of any alleged error he himself invited").

'dangerous and unusual' rather than 'in common use.'" *Id.* at 21. As a result, a weapon that is in common use may not be subject to "a flat ban." *Gray* Br. at 31. *See also DSSA* Br. at 21 (describing the Statutes as a "categorical ban"). In support of this position, Plaintiffs purport to invoke "[t]he Supreme Court's decision in *Caetano v. Massachusetts*," 577 U.S. 411 (2016). *Gray* Br. at 21.

This argument, which Plaintiffs made for the first time on reply below, fails for several reasons.

*First*, the Statutes are not "absolute ban[s]," "flat ban[s]," *Gray* Br. at 31, 32, or "categorical ban[s]." *DSSA* Br. at 21. The district court rightly rejected this claim. *See* A33 (Op.) ("HB 450 … is not a categorical ban"). Numerous guns of all types, including handguns, shotguns, and long guns—including semi-automatic versions—are permitted by the Statutes. Likewise, many magazines—including magazines capable of holding substantial amounts of ammunition—remain unaffected. And even with respect to covered assault weapons and LCMs, the Statutes provide multiple exceptions.

*Second*, under *Bruen*, numerosity is not dispositive. *Bruen* identified two separate questions under the Second Amendment. The

23

first is whether the conduct at issue is protected by its "plain text." A12

(Op.) (citing *Bruen*, 142. S. Ct. at 2129-30). If the answer is "yes," then

the court must determine whether the challenged statute "is consistent

with the Nation's historical tradition." *Id.* (citing 142. S. Ct. at 2130).[10]

Whether a firearm is "in common use" goes to the first question. In

*Bruen*, the Court answered the first question only after noting that it was

undisputed that "handguns are 'weapons in common use' today for self-

defense." *Bruen*, 142 S. Ct. at 2134-35. "*[T]hen*," after petitioners

established that handguns are in common use for self-defense, "the

burden f[e]ll[] to respondents to show that [the challenged provision] is

consistent with this Nation's historical tradition of firearm regulation."

*Id.* at 2119, 2130, 2134-35; *see also Nat'l Ass'n for Gun Rights v. Lamont*,

C.A. No. 3:22-1118 (JBA), 2023 WL 4975979, at *32 (D. Conn. Aug. 3,

---

[10] Plaintiffs jerry-rig two fragments of sentences ten pages apart in *Bruen* to attribute to the Supreme Court the direction that "the *only* way" to establish that a regulation is consistent with the Nation's historical tradition is to show that the a weapons is "dangerous and unusual." *Gray* Br. at 31 (emphasis in original). Both cited pages precede the Court's analysis of the tradition of regulation.

2023) (applying same analysis).[11]    Tellingly, Plaintiffs' quotations regarding "common use" come primarily from the portion of *Bruen* answering the first question.  *See Gray* Br. at 16, 27, 31, 32; *DSSA* Br. at 9, 13.

Thus, that a weapon is "in common use" only establishes that it is protected by "the Second Amendment's plain text."  At that point, a "court[] must conduct" a "historical inquiry."  *Bruen*, 142 S. Ct. at 2133. Even Plaintiffs' Amici recognize the need for a historical inquiry here. *See* D.I. 35 at 4 (criticizing the district court's performance of "the 'nuanced' [historical] inquiry *Bruen* requires").

*Third*, "the Supreme Court's decision in *Caetano*" provides no support for Plaintiffs.  In that pre-*Bruen* case, the Court issued a *per curiam* order vacating a decision upholding a state law banning possession of stun guns.  *Caetano*, 577 U.S. at 411.  The Court did not decide whether stun guns are constitutionally protected, and it made no reference to stun guns ownership figures.

---

[11] This explains why Plaintiffs' claims that the district court erred in allocating to them the burden to establish that the weapons are "in common use" fails.  *Gray* Br. at 20, 21.

What Plaintiffs rely upon is Justice Alito's concurrence, in which he expressed the view that since "approximately 200,000 civilians own[] stun guns," the ban "violates the Second Amendment." *Caetano*, 577 U.S. at 420 (internal quotation marks omitted). Neither *Heller* nor *Bruen* adopted this analysis.

*Fourth*, the district court properly found that Plaintiff's numbers-focused argument "would seem to 'upend settled law.'" A15 (Op.). Notably, "the National Firearms Act of 1934 … restricts civilian acquisition and circulation of fully automatic weapons, such as machine guns." *Id.* As the Supreme Court has noted, a suggestion that this could violate the Second Amendment would be "startling." *District of Columbia v. Heller*, 554 U.S. 570, at 624 (2008) ("*Heller I*"). Thus, "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Id.* at 627.

But as the district court recognized, an "unqualified 'common use' rule could render the National Firearms Act's machine gun restrictions constitutionally suspect." A16 (Op.). The record evidence indicates "that, as of 2016, there were nearly 176,000 legal civilian-owned machine guns

in the United States," which "comes close to the quantity of weapons that Plaintiffs … identify as sufficient" to immunize a weapon.  A15-16 (Op.).

In response, Plaintiffs claim—without any support—that 200,000 "may well represent the lower bar of constitutional protection," and that there *may be* a constitutionally significant difference between 200,000 and 176,000.  *Gray* Br. at 28 ("it is far from clear that an arm that is over 10 percent less common than the 200,000 stun guns" is protected).

Plaintiffs' inability to offer any more than the possibility that 176,000 machine guns *may not* be constitutionally protected is fundamentally incompatible with *Heller*'s unequivocal endorsement of the National Firearms Act's constitutionality.  *Heller I*, 554 U.S. at 624.

This is particularly true since Plaintiffs' speculation that 200,000 represents "the lower bar" for constitutional protection is simply made up.  Nothing in Justice Alito's concurrence suggested that.  On the contrary, Justice Alito equated 200,000 owners with being "widely owned and accepted."  *Caetano*, 577 U.S. at 420.  Plaintiffs' inability to reconcile their reading of Justice Alito's concurrence in *Caetano* with *Heller I* is telling.

Plaintiffs' attempt to distinguish machine guns on the grounds that they "have been tightly regulated since their creation" and "unlawful to purchase or possess since 1986" fares no better. *Gray* Br. at 28. As Professor Spitzer explained, machine gun regulation was not instantaneous. A327-328 (Spitzer ¶ 50). To the contrary, it took fourteen years from the patenting of the Thompson submachine gun until passage of the National Firearms Act, which imposed tax and registration requirements, A327-334 (¶¶ 50-61), and another fifty-two years before Congress made possessing machine guns illegal. Pub. L. 99-308 § 102, 100 Stat. 449 (May 19, 1986) (adopting 18 U.S.C. § 922(o), providing, subject to limited exceptions, that "it shall be unlawful for any person to transfer or possess a machinegun").

Plaintiffs' numbers-focused argument would render the constitutionality of weapons dependent upon a race between manufacturers and legislatures. Manufacturers would be highly incentivized to flood markets before legislatures could act. And legislatures would be punished for waiting to assess the need to act—prioritizing speed over reason.

Moreover, the constitutionality of statutes would depend upon the popularity of the weapons at issue at the time of challenge. The outcome of a challenge to a statute regulating a once-popular firearm could depend upon whether it was brought at the height of its popularity or after it fell out of favor. Similarly, a statute enacted before the introduction of a weapon could be safe from challenge because the weapon was never in common use. But the same statute, passed after that weapon became popular would be suspect.

These temporal-dependent outcomes are both illogical and inconsistent with the enduring nature of constitutional principles.

And Plaintiffs' numerosity focus leads to circular analyses. The National Firearms Act of 1934 and the 1986 Firearm Owners Protection Act could not be defended from challenge on the ground that machineguns are not in common use today—since the only reason that would be so is because of the statutes. *See Friedman v. City of Highland Park, Ill.,* 784 F.3d 406, 409 (7th Cir. 2015) ("[R]elying on how common a weapon is at the time of litigation would be circular to boot. Machine guns aren't commonly owned for lawful purposes today because they are illegal …. [I]t would be absurd to say that the reason why a particular

weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.").[12]

For these reasons, the district court's decision rejecting Plaintiffs' numerical argument should be affirmed. *See also Hartford v. Ferguson*, C.A. No. 3:23-cv-05364-RJB, 2023 WL 3836230, at *2-3 (W.D. Wash. June 6, 2023) (rejecting argument that a plaintiff "need only show that the 'arms' … are 'in common use' today"; this argument "misread[s] *Heller* and *Bruen*," which cases "do[] not hold that … all weapons 'in common use' are automatically entitled to Second Amendment protection without limitation").[13]

---

[12] Plaintiffs' criticisms of the district court's observation that "[i]f the standard were as Plaintiffs propose, then *Bruen* would need not have proceeded" to analyze the Nation's historical tradition of regulating arms is misplaced. *Gray* Br. at 31 (citing A24 (Op.)). Below, Plaintiffs argued that if a weapon was sufficiently popular "essentially the State can't regulate it." SA963.

[13] *See also Or. Firearms Fed'n, Inc. v. Brown*, C.A. No. 2:22-cv-01815-IM, 2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022) (finding that "Large-Capacity Magazines Implicate a Dramatic Change in Firearms Technology and Unprecedented Societal Concerns").

## 2. The district court did not err in finding that assault weapons and LCMs implicate "unprecedented societal concerns" and "dramatic technological changes."

After shifting the burden of proof to Defendants, the district court found that "the instant regulations implicate 'unprecedented societal concerns' and 'dramatic technological changes.'" A26 (Op.).  This finding was overwhelmingly supported by the record.

**Unprecedented Societal Concerns**

As a threshold matter, Plaintiffs' attempt to generalize the issue here as "firearm violence" and equate it to the concerns at issue in *Heller* and *Bruen* is meritless.  *Gray* Br. at 37.  That level of generalization is inappropriate.  As *Bruen* noted, the societal concern in those cases involved "'handgun violence,' primarily in 'urban area[s].'"  *Bruen*, 142 S. Ct. at 2131.  Here, in contrast, the relevant societal concern is mass shootings and increasing casualties in shootings involving assault weapons and LCMs, *see supra* at 3—which neither *Heller* nor *Bruen* mentions.

**Mass Shootings.**  As the preamble to HB 450 notes, assault weapons have been the weapons of choice in scores of deadly mass shootings, including in Uvalde, Buffalo, El Paso, Parkland, Las Vegas

and Sandy Hook.  A208-209 (HB 450, preamble).  Indeed, there has been "a rise in the yearly rate of public mass shootings over the past four decades."  A27 (Op.).[14]  Assault weapons and LCMs are frequently involved in those incidents.  SA350 (Allen ¶ 33) (assault weapons were used in 24% of incidents for which the type of weapon could be determined)[15]; SA351-354 (¶¶ 35, 38) (LCMs were involved in most incidents where magazine capacity could be determined).[16]  Moreover, the presence of assault weapons and LCMs "result[ed] in more fatalities and injuries" in these incidents.  A27 (Op.); *see also* SA351 (Allen ¶ 36) ("casualties [a]re higher in the mass shootings that involve[] weapons with Large-Capacity Magazines").

---

[14] The sole exception was between 1994 and 2004, when the federal assault weapon ban was in place.  During that time, "there were fewer than 20 mass shootings."  A208-209 (HB 450, preamble).

[15] Not only are Plaintiffs' new claims arguments regarding the prevalence of "mass killings" at the time of the Founding, *Gray* Br. at 37-38, improper, but there is no record evidence that any bearable arm at the time could enable a single person to quickly kill many people.

[16] *See also* Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, OFFICE OF JUSTICE PROGRAMS, at 87 (June 2004), https://bit.ly/47nF2C3 (cited below at SA102) ("[Assault weapons] account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.").

**Capacity to Inflict Catastrophic Wounds.**    In addition to technological features of assault weapons (discussed further below), one reason for the substantial increase in casualties associated with assault weapons and LCMs is the wounds that result.   A27-28 (Op.); *see also* SA305-310 (Mary Kekatos, *Surgeon who treated kids shot in Uvalde describes assault weapons' extreme trauma to victims' bodies*, ABC NEWS (May 27, 2022)) (describing "large destructive wounds"; "When a high-velocity firearm enters a body, it basically creates a wave and a blast …. So it looks like a body part got blown up … A handgun may create one small hole, whereas a high-velocity firearm will create a giant hole in the body that is with missing tissue. ..."); SA311-314 (Jason Hanna, *'Those Are Wartime Injuries':  Doctor Describes the Horrific Scene at the Highland Park Shooting*, CNN (July 5, 2022)) (victims "were blown up by that gunfire … blown up"); SA315-318 (Jennifer Henderson, *'There's Nothing to Repair': Emergency Docs on Injuries From Assault Weapons*, MEDPAGETODAY.COM (May 31, 2022)) (doctor who treated Columbine victims; "You have to see the damage that these weapons do to really respect and understand how dangerous these weapons are.… There's no way to cause the type of havoc that these people are looking to cause

without something of the power and speed of an assault weapon."); SA450-451, SA478-479 (Yurgealitis ¶¶ 42, 97-99) & SA663-668 (Ex. I).[17]

**Threat to Law Enforcement.**  As the district court recognized, the evidence confirmed that assault weapons and LCMs "pose a particularly high risk to law enforcement officers."  A28 (Op.).  Assault weapons can penetrate bullet-resistant vests.  SA473, SA478 (Yurgealitis ¶¶ 84 & 98).  This has led to multiple incidents in which criminals outgun police.  *See*, *e.g.*, *Connecticut candidates debate crime after police ambush*, AP News (Oct. 19, 2022) (widow of police officer:  "His revolver carries 13 rounds.  There's no chance for a police officer against someone who can fire 80 rounds in a matter of minutes ….  There is no reason for those weapons of war to be in our communities"), https://bit.ly/47qbXpx (cited below at SA101).

**Dramatic Technological Changes**

As the district court found, assault weapons and LCMs "represent recent advances in technology."  A26 (Op.).  They bear no resemblance to

---

[17] Plaintiffs' new claims regarding the purported destructive power of the covered weapons based upon "basic laws of physics," *Gray* Br. at 39-40, is foreclosed by the district court's factual findings regarding their "exceptional[]" destructive power.  A27 (Op.).

the "single-shot muzzle-loaded firearm[s]" that were "ubiquitous … well into the nineteenth century," A318-319 (Spitzer ¶ 36), whose loading "was a complicated and relatively slow process," and whose "accuracy and range were limited," A571-572 (Sweeney ¶¶ 8, 9).

**Assault Rifles.** The unrebutted expert evidence demonstrated that assault rifles were invented during the Second World War to enable swift and effective battlefield attacks, and that their features—and ultimate purpose—remain the same today.

The "Father of all [of] today's assault rifles" is the "Sturmgewehr,"[18] SA441-442 (Yurgealitis ¶ 28) developed by Nazi Germany to aid in Blitzkrieg battlefield assaults.[19] After observing the weapon's

---

[18] The literal translation is "storm rifle." SA463-464 (Yurgealitis ¶ 63). Translated lexically, it means "assault rifle." *Id.*; *see also* SA139 (J. David McFarland, AR-15, M16 ASSAULT RIFLE HANDBOOK (1985)). Plaintiffs' claim that "assault weapons" is a "political," "pejorative term," *Gray* Br. at 17, is false, SA463-464 (Yurgealitis ¶ 63). Indeed, that "term has long been used by the gun industry and government agencies." A8 at n. 3 (Op.).

[19] *See generally* SA90 (Hammad Junejo, University of Toronto, *The Birth of the World's First Assault Rifle: The Sturmgewehr 44*, https://bit.ly/3YmP6Hx); SA441-442 (Yurgealitis ¶ 28); SA510 (Ex. C at 243).

capabilities, the Allied powers developed their own assault rifles.  SA443-448, SA451 (¶¶ 30-38, 43).[20]

Assault rifles shares several traits that increase lethality, including pistol grips and barrel shrouds for maneuverability, detachable magazines for rapid firing, and intermediate-caliber rounds fired at a high velocity, which inflict severe wounds even over long distances. SA442-443, SA448-451 (Yurgealitis ¶¶ 29, 39-42).[21]

---

[20] Relying upon new factual assertions, Plaintiffs spend five pages attacking the district court's factual finding that the firearms at issue "implicate[] … 'dramatic technological changes.'" *Gray* Br. at 38; *DSSA* Br. at 24-25.  In doing so, Plaintiffs claim that multi-shot weapons were "widely used for over a hundred years." *Gray* Br. at 39.

In fact, Defendants' unrebutted expert evidence disposes of this new contention.  *See, e.g.*, A579 (Sweeney ¶ 20) (in eighteenth century repeating firearms were "in fact extraordinarily rare"); A583-585 (¶¶ 26-30) (following the 1777 letter with Continental Congress, "Belton and Congress failed to agree on a financial arrangement" and there is no evidence "indicating that Belton produced any of these firearms in 1777"); A588-589 (¶¶ 35-37) (Girandoni repeating "air gun" was a "rarity"; one was taken on the Lewis & Clark expedition "primarily to impress Natives that they encountered").  *See also* A592 (¶ 42); A322, A324-325 (Spitzer ¶¶ 42, 46).  Plaintiffs' claim below that the Girandoni multi-shot air rifle was in "common use," SA15 (at n.6), was disproved by Plaintiffs' own source, A26-27 (Op.).

[21] Plaintiffs waived their contrary factual arguments (that "these features" *reduce lethality* by "*improv[ing]*" the firearm's utility and safety," *Gray* Br. at 40, 41), by not presenting any evidence below and by stipulating to the district court's reliance upon the Declaration of James

Because they were developed for wartime offensives, assault weapons "were designed to be effective at battlefield ranges of up to 500 yards." SA472-473 (Yurgealitis ¶ 83). And because "the typical muzzle velocity of a .223 caliber bullet" used in an assault weapon "is 3,200 feet per second" compared to "less than half that" for common caliber handgun bullets, *id.*, assault weapon rounds easily pierce Level III body armor and can puncture 3/8" thick hardened steel from a nearly a quarter mile. SA473, SA478 (¶¶ 84, 98).[22]

As reported by the United States Army, the AR-15 (adopted as standard issue by the Army and Air Force using the moniker "M16") displayed a remarkable ability to inflict catastrophic wounds. SA446-447, SA450-451 (Yurgealitis ¶¶ 37, 42). In field tests in Vietnam, "extremity hits" were fatal. SA446-447 (¶ 37); SA552-607 (Ex. G). Hits to the head resulted in decapitation. SA574. Torso wounds caused "the abdominal cavity to explode." *Id.* "All confirmed casualties inflicted by

---

Yurgealitis. SA938. And in any event, as demonstrated by the record below, it is meritless.

[22] Because of the danger that they pose, law enforcement and military undergo extensive training and ongoing testing to use assault weapons. *See* SA474 (Yurgealitis ¶ 86) (describing ATF training).

the AR-15 … were fatal." SA567. Indeed, the AR-15 was "superior in virtually all respects to … the Thompson Sub-machine gun." SA447-448 (Yurgealitis ¶ 38).

Plaintiffs emphasize the lone difference between military assault weapons and their civilian counterparts—the rate of fire—calling any comparison of them "disingenuous." SA61.[23] But as Defendants' expert explained, the Army views "rapid semi-automatic fire" as "[t]he most important firing technique during modern, fast-moving combat" and, at times, "superior to automatic fire." SA478-479 (Yurgealitis ¶ 99) (quoting SA884 at 7-8). As a result, forces regularly use fully automatic weapons in semi-automatic mode. SA894 (at 8-17 to 8-22) (U.S. Army "rate of fire" standards often calling for semi-automatic fire).

Moreover, even in semi-automatic mode, a large-capacity magazine can be emptied in seconds, SA478-479 (Yurgealitis ¶ 99), and numerous

---

[23] Plaintiffs' invocation of *Staples v. United States*, 511 U.S. 600 (1994), to suggest that the status of semiautomatic weapons for Second Amendment purposes is resolved is inaccurate. *Gray* Br. at 17. In *Staples*, the Supreme Court held that to be criminally liable for possession of an unregistered machinegun, the government must prove actual knowledge of the characteristics that rendered the weapon illegal. 511 U.S. at 611. In doing so, it rejected the argument that anyone who possesses a gun is charged with constructive knowledge of its characteristics given its "potential for harm." *Id.*

inexpensive products, like the Hellfire Trigger System, Alamo-15 Trigger, Graves Star-Fire AR 15 trigger, and Wide Open Triggers Hard Reset Trigger (all cited below at SA93 with links to webpages), allow semi-automatic assault weapons to fire at rates approaching fully automatic weapons. Indeed, these products are marketed as providing fully automatic shooting capability. *See* https://bit.ly/3qq7QJq, cited below at SA94 ("If you have ever considered converting to FULL AUTO SELECT FIRE and red tape or jail time got in the way, then the Hell-Fire Trigger System is for you."). Although Delaware banned some rapid-fire conversion devices, *see* 11 *Del. C.* § 1444(a)(6), they remain available in most states, including those within a short drive. Plaintiffs and their Amici ignore the risk posed by weapons outfitted with these products.[24]

**Assault Pistols.** Like assault rifles, assault pistols were created for use by the military in combat. SA452 (Yurgealitis ¶ 44). "[B]ased on

---

[24] Indeed Plaintiffs criticize the district court for "in one breath" noting the potential rate of fire of assault weapons while "in the next breath" observing that they fire one round per trigger pull. *Gray* Br. at 40. However, their "cleaned up" citation excises the district court's observation that "Defendants provide[d] evidence of numerous, inexpensive products, available for purchase in most states, that allow AR-style rifles to fire at rates comparable to fully automatic weapons." A28 (Op.).

submachinegun designs," modern assault pistols "share many construction and design features with assault rifles," including pistol grips, detachable magazines, adjustable stocks, and barrel shrouds. SA452-453 (¶¶ 44, 48); SA497 (Ex. C at 18); SA501.

Given their shared features, there can be no serious dispute that assault weapons and assault pistols (particularly when equipped with LCMs) are capable of inflicting orders of magnitude more carnage than weapons that preceded them—particularly those that existed during as of the Founding and Ratification Era. A single shooter can empty multiple LCMs in less time that it took fire multiple shots from a single shot, muzzle-loading, flintlock firearm or reload a Colt revolver and do so with far greater accuracy and destructive power.

**Commercialization of Assault Weapons.** Following the Second World War, assault rifles and assault pistols gained popularity in militaries and law enforcement agencies worldwide. SA453 (Yurgealitis ¶ 50) & SA492-510 (Ex. C). As their reputation grew, weapons

manufacturers began producing versions for civilian purchase. SA455-457 (¶¶ 57 & 59); SA492-510 (Ex. C).[25]

These civilian versions retained (and retain) nearly all the features of their military equivalents, and their components "are completely interchangeable." SA456, SA465 (Yurgealitis ¶¶ 58, 65). Manufacturers use the miliary features of assault weapons as a selling point. *See, e.g.*, SA678-686 (AR-15 advertisements); SA147-151 (HK 91 & AR-15 advertisements).[26]

**LCMs**

While many modern semi-automatic firearms use detachable magazines, SA435-439, SA442-443 (Yurgealitis ¶¶ 24, 29), none "require a large-capacity magazine" to operate. SA453-454 (¶ 52). Like assault weapons, LCMs were developed for military use and "serve specific,

---

[25] These products have seen a substantial growth in sales within the last decade. *See* Nat'l Shooting Sports Foundation, The Firearm Industry Trade Ass'n, Estimated Modern Sporting Rifles in the United States 1990-2020, https://bit.ly/3s0sQHd (cited below at SA92).

[26] *See* Violence Policy Center, *VCP Backgrounder on Daniel Defense*, https://bit.ly/3KxhpNM (cited below at SA93); Michael Daly, *Uvalde Shooter's Gunmaker Hypes 'Revolutionary' New Killing Machine, 'Light-Weight, Heavy Hitting,'* THEDAILYBEAST.COM (June 8, 2022), https://bit.ly/3Kxta6C (cited below at SA93).

combat-functional ends."  H. Rep. No. 103-489, at 18 (cited at SA95);

SA718-722, SA755-757 (Yurgealitis Ex. R at 1-3, 36-38); SA454 (¶ 53).

Beginning in the First World War, militaries used "[m]agazine fed light

machine guns" with ammunition tubes.  SA454 (¶ 3).  These magazines

allowed soldiers to "fire an increased quantity of cartridges without

reloading," increasing their "lethality and effectiveness … in combat."

SA454-455 (¶ 55).

Like assault weapons, LCMs are marketed to civilians for their

military features.  For example, one manufacturer touted its 60-cartridge

magazine as providing "critical advantages in any firefight:  shoot more;

reload less …, increas[ing] initial firepower in ambush situations.  Fewer

reloads overall mean less downtime and target distraction.… *Twice the*

*violence of action.    Half the reloads.    Win-win.*"    [bit.ly/3KCIM99](bit.ly/3KCIM99)

(emphasis added) (cited below at SA96).

### 3. The district court did not err in finding that the statutes are consistent with the Nation's tradition of regulation.

The Supreme Court has held that "the right secured by the Second

Amendment is not unlimited."  *N.Y. State Rifle & Pistol Ass'n, Inc. v.*

*Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *Heller I*, 554 U.S. at 626).

"From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*[27]

Here, after reviewing "Defendants' evidence of historical regulations," the district court found that the Statutes "impose comparable burdens on the right to armed self-defense," and that those "burdens … are comparably justified." A29 (Op.). That conclusion is overwhelmingly supported by the record.

As a threshold matter, *Bruen* and *Heller* have not "already done the historical work here." *Gray* Br. at 11. Those cases focused on handguns; neither mentions "assault weapons" or "large capacity magazines," much less attempts to put them—and legislation affecting them—into historical context. Moreover, those cases involved blanket prohibitions applicable to the quintessential self-defense firearm, handguns. *See Bruen*, 142 S. Ct. at 2122, 2128, 2148 (the "handgun ban" at issue made it "a crime … to possess 'any firearm' without a license, whether inside

---

[27] "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

or outside the home" and "presume[d] that individuals have *no* public carry right"); *Heller I*, 554 U.S. at 628 ("the law at issue here … totally bans handgun possession in the home" and "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen" for "self-defense").  Here, in contrast, neither Statute imposed any blanket prohibition on even a category of weapons.

For purposes of the required historical analysis, neither 1791 nor 1868 is a cutoff.  *Heller I* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." *Heller I*, 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).  Such evidence may not be afforded meaningful weight only "when it contradicts earlier evidence." *Id.* at 2154 n.28.

In *Bruen*, the Supreme Court explained that "history guide[s] our consideration of modern ['arms'] regulations that were unimaginable at the founding." *Id.* at 2132.  "[C]ases implicating unprecedented societal concerns or dramatic technological changes," like the instant case, "may

require a more nuanced approach." *Id.* The historical inquiry should be guided by "reasoning by analogy." *Id.* at 2133.

"[W]hether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are '*relevantly similar*.'" *Bruen*, 142 S. Ct. at 2132 (emphasis added). *Bruen* identifies two "central" "metrics": "[1] whether modern and historical regulations impose a comparable burden on the right of armed self-defense and [2] whether that burden is comparably justified." *Id.* at 2133 (cleaned up).

Plaintiffs' claim that the only relevant historical statutes are "general arms bans" ignores that the Statutes are not general bans and misreads *Bruen*. *Gray* Br. at 32; *see also DSSA* Br. at 16. *Bruen* does not require a historical "twin." *Bruen*, 142 S. Ct. at 2133. Rather, "analogical reasoning requires only … a well-established and representative historical *analogue*." *Id.* (cleaned up and emphasis in original). As such, "even if a modern-day regulation is not a dead ringer for historical

precursors, it still may be analogous enough to pass constitutional muster." *Id.*[28]

Indeed, Plaintiffs tacitly admit the relevance of statutes that "did not … entirely forbid carriage of …. weapons" in their attempt to distinguish machine guns as "tightly regulated since their creation." *Gray* Br. at 46. Machine guns did not become "unlawful to purchase or possess [until] 1986." *Gray* Br. at 28. For more than fifty years, the federal government only imposed taxation and registration requirements on machine guns. A334. Plaintiffs' reliance upon regulations that "did not … entirely forbid carriage" of machine guns forecloses their suggestion that similar regulations of other weapons are irrelevant.

*    *    *

The district court properly found that throughout its history, this Nation has consistently regulated weapons. Those regulations included, but were not limited to, arms bans. "[T]he historical record that Defendants present[ed], when viewed as a whole, illustrate[d] a pattern: '[F]irearms and accessories, along with other dangerous weapons, were

---

[28] Analogical reasoning "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2162 (Kavanaugh, J., concurring).

subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality.'" A31 (Op.) (quoting Spitzer ¶ 10).

**Colonial and Founding Era America**

In the eighteenth and nineteenth centuries, most gun owners possessed and used single shot, muzzle-loading, flintlock firearms. A569-70 (Sweeney ¶¶ 5, 6). Compared to modern guns, these firearms took considerable time to load and fire and were less accurate, especially at long ranges. A571-572 (Sweeney ¶¶ 8-9). Loading required ready access to gunpowder, wadding, and a ball. A572 (¶ 9). The shooter poured black powder down the barrel, crammed in wadding and the ball with a ramrod, and then recovered and secured the ramrod under the barrel. *Id.* The firearm was then raised, placed on full cock, aimed, and fired. *Id.* Wind could dislodge and rain could dampen the black powder, affecting the gun's ability to fire. *Id.*

Unrebutted expert evidence submitted to the district court established that at this time, multi-shot (or repeating) firearms were "extraordinarily rare" and viewed as curiosities. A318-322 (Spitzer ¶¶ 36-42); A579 (Sweeney ¶ 20); SA394 (Baron ¶ 4). Not surprisingly

given their rarity, "repeaters" were not regulated.  But more common weapons were.

**Clubs, Bludgeons and Slungshots.**  Because the guns of the era were not associated with violence and crime, early in the Nation's history concern with violent crime focused on more rudimentary weapons such as clubs, bludgeons, fighting knives, and slungshots.  A305-311 (Spitzer ¶ 14-24).

From 1664 to the early 1900s, at least thirteen states barred the carrying of "clubs" generically.  A307 (Spitzer ¶ 17).  Between 1799 and the early 1900s, fifteen states barred carrying bludgeons.  A305 (¶ 15).  In addition, at least sixteen states passed anti-billy club laws between 1862 and the early 1900s.  A306 (¶ 16).  Anti-slungshot laws were enacted by forty-three states between 1850 and the early 1900s, with eighty-one laws enacted in the nineteenth and twentieth centuries.  A307 (¶ 18).  Finally, ten states enacted anti-sandbag laws between 1866 and the early 1900s.  A308 (¶ 20).[29]

---

[29] Plaintiffs identify limited statutes that targeted minorities.  *DSSA* Br. at 19 & n.10.  These deplorable exceptions are overwhelmed by the voluminous, generally applicable statutes cataloged by Defendants' experts.

**Bowie Knives.** During the antebellum nineteenth century, serious interpersonal violence became increasingly widespread. A304 (Spitzer ¶ 13). In the 1830s, fighting knives, including the Bowie knife, became popular and accounted for a rising number of homicides. A309-310 (¶¶ 22-23). Popularized by adventurer Jim Bowie in the notorious "Sandbar Duel," the Bowie knife and similar long, thin-bladed knives became a weapon used for fights and duels in the nineteenth century. *Id.*

States reacted to the widespread use of Bowie knives in homicides with anti-knife legislation. A310-311 (Spitzer ¶¶ 23-24). Between 1837 and 1925, twenty-nine states enacted laws to bar the concealed carry of Bowie knives; fifteen states categorically barred their carry; seven states enacted enhanced criminal penalties for those who used the knives to commit a crime; and other states regulated them through taxes or penalties. A314-315 (¶ 31).

Plaintiffs' effort on appeal to criticize Professor Spitzer's survey of more than 100 historical Bowie knife restrictions—after opting not to depose or cross-examine him—should be rejected as improper and waived. *See supra* at 18-22. And in any event, Plaintiffs are wrong. For example, while Plaintiffs suggest that many of the Bowie knife

regulations "merely banned concealed carry or open carry with intent to use the knife in a crime" or were similarly qualified, *Gray* Br. 43-45, Professor Spitzer accurately characterized the statutes. Indeed, it is Plaintiffs who omit that the Bowie knife laws surveyed included laws that criminalized any carry and imposed enhanced criminal penalties for using the knives, regulatory taxes, and anti-brandishing laws. *See* A314-A315 (Spitzer ¶ 31) ("29 states enacted laws to bar [Bowie knives'] concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax").[30]

The proliferation of nineteenth-century Bowie knife laws are a historical analogue to the Statutes. Like the nineteenth-century laws, the Statutes burden an individual's right to defend themselves with

---

[30]    Plaintiffs misread other historical regulations as well. *See, e.g.*, *Gray* Br. at 43 (reading nonexistent "intent" qualifier into Colo. Rev. Stat. 1774, § 248 (1881) (A466) and ignoring last sentence of George R. Donnan, Ann. Code of Crim. P. & Penal Code of the State of N.Y. as Amended 1882-5, § 410 (1885) (A512); *Gray* Br. at 45 (citing to *Nunn v. Georgia*, 1 Ga. 243 (1846), a case about a man carrying a pistol, not a Bowie knife, while failing to address relevant Bowie knife cases cited by Spitzer at A311-314); *Gray* Br. at 45 (ignoring anti-club bans cited by Spitzer at A478, 480-481, 514).

certain specific arms. In the case of the nineteenth-century laws, that burden was directed at weapons associated with violence and crime. So too here. While assault weapons are many times *more* dangerous than clubs, bludgeons, Bowie knives, and the like, legislatures in early America repeatedly imposed restrictions and prohibitions on those weapons based on concerns analogous to the Delaware General Assembly's modern-day concern with assault weapons and LCMs.

**Civil War and Reconstruction**

The latter half of the nineteenth century saw major advancements in the design, lethality, manufacturing, marketing, and distribution of guns and other weapons. Before the Civil War, multi-shot weapons were not viable or available in meaningful numbers.[31] A341-342 (Spitzer ¶ 74). After the war, new technologies became available in the civilian market, leading to increased gun violence followed by gun regulation. A325-326 (¶ 48).

---

[31] *See generally* A324-326 (Spitzer ¶¶ 46-48) (describing development of Winchester rifles, including that the repeating Winchester 1873 was designed as a military weapon, used sparingly in the Civil War, and available to civilians only on a limited basis thereafter).

**Revolver Pistols, Sword Canes, and Daggers.** After the Civil War, revolver pistols entered the civilian market. A323-324 (Spitzer ¶ 45). Their rise contributed to escalating interpersonal violence. A325-326 (¶ 48). Between 1865 and the end of the nineteenth century, many states enacted or strengthened laws targeting pistols, sword canes and daggers. *See* A410-414, A452-545 (Spitzer Decl. Exs. C & E). Almost every state prohibited or severely restricted concealed gun carrying. *Id.* At least a half-dozen states barred possession of multi-shot handguns outright. *Id.* And many states enacted or strengthened laws targeting other concealable weapons, like sword canes and daggers. *Id.*

These regulations burdened, to an extent, individuals' rights to armed self-defense. But individuals could utilize other arms that did not present the same risk. These regulations were thus in keeping with the Nation's history of regulating or banning certain weapons to protect public safety.

**Early 20th Century**

In the early twentieth century, new weapon technologies once again led to new regulations.

**Machine guns, semi-automatic weapons and ammunition feeding devices.** After World War I, the public availability of new submachine guns—notably the Tommy gun—was associated with a relatively small number of egregious mass shootings and homicides by gangsters and other criminals.[32] A329, A332 (Spitzer ¶¶ 52, 58). In response, between 1925 and 1934, at least 32 states enacted anti-machine gun laws, A333 (¶ 59), and at least seven states plus the District of Columbia also enacted laws restricting semi-automatic weapons. A335-336 (¶ 65). These restrictions "all appeared in the same statutes restricting fully automatic weapons." *Id.*

In 1934, Congress enacted the National Firearms Act, imposing restrictions, including tax and registration requirements, on civilian acquisition and circulation of machine guns. A334 (Spitzer ¶ 61).

In addition, from 1917 to 1934, roughly half of the states restricted various ammunition feeding devices, or guns that could accommodate

---

[32] Plaintiffs' new claim, based upon testimony from one witness during Congressional hearings, that machine guns were predominantly used by criminals is foreclosed for purposes of this appeal by the district court's factual finding, in reliance upon Defendants' experts, that "the Tommy gun and like firearms 'were actually used relatively infrequently by criminals.'" A30 (Op.).

them, based on the number of rounds (ranging from one to eighteen). A338, A346 (Spitzer ¶ 83, Table 1).[33]

State and federal laws restricting fully automatic and semi-automatic weapons and ammunition feeding devices are another historical analogue, as they reflect this country's historical tradition of restricting particular arms that present threats of outsized harm. Such regulations, of course, leave citizens free to defend themselves with arms that do not present the same concerns.

Moreover, the concern the Statutes seek to address—the threat of inordinately violent crime caused by military weapons technologies—is "relevantly similar" to the dangers addressed by the government's restrictions in the early twentieth century on fully automatic weapons, semi-automatic weapons, and ammunition feeding devices. And the Supreme Court has called the suggestion that these machine gun

---

[33] In 1989, California became the first state to ban assault weapons. A302 (Spitzer ¶ 11). In 1994, Congress passed the Federal Assault Weapons Ban, which banned for ten years the sale, transfer, manufacturing, and importation of new assault weapons and ammunition feeding devices capable of accepting more than ten rounds. A302, A350 (¶¶ 11, 91). While the Federal Assault Weapons Ban was in effect and after its sunset, multiple states banned assault weapons and LCMs. A302, A350-351 (¶¶ 11, 92).

restrictions "might be unconstitutional" "startling." *Heller I*, 554 U.S. at 624; *see also United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3d Cir. 2016) (applying *Heller I* and holding that "the Second Amendment does not protect the possession of machine guns").

**Short-barreled shotguns.** The early twentieth century also saw the proliferation of the sawed-off shotgun, whose shortened barrel widens the spray of the fire. A334 (Spitzer ¶ 61). These, too, were subject to taxation and registration requirements under the National Firearms Act of 1934. *Id.* Delaware also criminalizes possession of "sawed-off shotgun," defined in similar terms. 11 *Del. C.* § 1444(a)(4), (c)(3).

In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld the regulation of short-barreled shotguns, holding that they were not protected under the Second Amendment. There is no question that short-barreled shotguns are "not eligible for Second Amendment protection." *Heller I*, 554 U.S. at 622.

\*       \*       \*

Taken together, this history demonstrates a recurring pattern of weapons regulation: the invention and development of new weapons

technologies, followed by their spread into society and resulting regulation to promote public safety, protect the public from harm, and limit weapons-related criminality and violence. A301-A302, A341-A342 (Spitzer ¶¶ 8-10, 74-75). From Bowie knives and clubs to machine guns and sawed-off shotguns, the unrebutted historical record presented below shows that the Statutes have numerous analogues in the country's tradition of weapons regulations and restrictions.

The existence of historical analogues has been recognized by other courts. In *Bevis v. City of Naperville, Illinois*, No. 22 C 4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023), the district court declined to enjoin enforcement of an ordinance banning the sale of assault weapons and large capacity magazines. *Id.* at *2. Relying upon comparable evidence to that before the district court here (including an expert submission from Dr. Spitzer), the Court found the statute "constitutionally sound." *Id.* at *9.

Utilizing over fifty examples (including Bowie knives and clubs) ranging from the Colonial Era to the early 20th century, the court found that when new weapons became "prevalent," so too would "the laws governing the most dangerous of them." *Id.* at *10. From this evidence,

the district court concluded that "[t]he history of firearm regulation … establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)." *Id.* at *14-16. And based upon the evidence of the destructive injuries that semiautomatic weapons (which in many ways "mimic military-grade machine guns") cause and their "disproportionate[]" use in "mass shootings, police killings, and gang activity," the court concluded that assault weapons and LCMs "pose an exceptional danger." *Id.* at *14-15. *See also Herrera v. Raoul*, No. 23 CV 532, 2023 WL 3074799, at *4 (N.D. Ill. Apr. 25, 2023) (rejecting challenge to comparable Illinois statute and relying heavily upon *Bevis*; the statute was "consistent with 'the Nation's historical tradition of firearm regulation,' namely the history and tradition of regulating particularly 'dangerous' weapons").

Similarly, in *Hartford v. Ferguson*, the court—assuming that assault weapons were "in common use"—found (relying upon testimony Professor Spitzer), that "throughout our Nation's history," there is a "historical pattern" in which weapons (including bowie knives, clubs, slungshots and others) are "invented, perhaps for the military, bec[o]me

widely popular with civilians, … associated with criminal use, and … then regulated by the States."  2023 WL 3836230, at *3, 5.

The Court further found that assault weapons both "represent a significant technological change" (because of their rate of firing) and implicate "unprecedented social concerns … from the[ir] proliferation" (because they "are exceptionally dangerous," including due to their "use[] disproportionately in mass shootings, police killings, and gang activity"). *Id.* at *5.  Because these weapons "are rarely used for self-defense," the statute imposed "comparable burdens" ("slight") "on the right of armed self-defense," which "are 'comparably justified'" and "consistent with our Nation's history and tradition of exceptionally dangerous arms regulation."  *Id.* at *5-6; *see also Lamont*, 2023 WL 4975979, at *30-34 (refusing to preliminarily enjoin assault weapons and LCM statutes); *Or. Firearms Fed'n v. Kotek*, C.A. No. 2:22-cv-01815-IM, *et al.*, 2023 WL 4541027, *35-46 (D. Or. July 14, 2023) (granting defendants summary judgment in action challenging statute governing LCMs).

> **4. The district court did not err in finding that the historical analogues "impose comparable burdens on the right to armed self-defense, and those burdens are comparably justified."**

The district court's finding that these historical analogues are "relevantly similar" in several respects is likewise well-supported. A31-32 (Op.).

First, because assault weapons and LCMs are not well suited for self-defense, the burden imposed by the Statutes is slight. While handguns are "overwhelmingly chosen by American society for" self-defense (*Heller I*, 554 U.S. at 628), the record below confirmed that assault weapons and LCMs offer relatively little utility in self-defense. A32-33 (Op.); SA472-474 (Yurgealitis ¶¶ 82-87). Indeed, use of assault weapons in self-defense, particularly by untrained civilians, creates significant danger due to their design features, including the risk of bullets traveling through home materials. *Id.*

Unsurprisingly, the record below likewise confirmed that assault weapons are rarely used in defense situations. As an FBI database indicates, assault weapons were used for protective purposes in 0.2% of active shooter incidents between 2000 and 2021. SA341 (Allen ¶ 21). Similarly, the Heritage Foundation's "Defensive Gun Uses in the U.S."

database reflects that rifles of any type—let alone assault rifles—were used defensively in only 4% of incidents with a known gun type. SA344-345 (¶ 27).

As for LCMs, self-defense situations rarely involve lengthy shootouts. SA472-473 (Yurgealitis ¶ 83). It is rare for a person in self-defense to fire even ten rounds. SA331-332 (Allen ¶ 9). Instead, defenders fire an average of 2.2 shots. *Id.*

Contrary to Plaintiffs' suggestion, *Heller* does not "foreclose[] this line of reasoning." *Gray* Br. at 50. The statute at issue there imposed a "complete prohibition" on "the most popular weapon chosen by Americans for self-defense," handguns. *Heller*, 554 U.S. at 629. In that context, the existence of "other firearms (*i.e.*, long guns)" was insufficient to alleviate the substantial burden on the right of self-defense. *Id.*

Here, in contrast, the undisputed record evidence demonstrated that (1) "assault weapons are not the optimal firearms for self-defense," (2) "LCMs with more than 17 rounds are 'unnecessary for self-defense,'" and (3) "assault weapons … are rarely used [for self-defense]." A19, A23, A33 (Op.). Moreover, the Statutes do not affect the ability of individuals to use handguns, shotguns, and other long guns—including semi-

automatic versions—as well as LCMs with up to seventeen rounds for self-defense.  Given these distinctions, the district court's finding is both permissible and amply supported by the record.

And because both the Statutes and the analogous historical regulations "were enacted in response to pressing public safety concerns," the burdens imposed by the Statutes are comparably justified.  A33 (Op.).

> ### 5.     This Court may also affirm with respect to LCMs on the alternative grounds that LCMs are not "arms."

This Court "may affirm a district court for any reason supported by the record." *Brightwell v. Lehman*, 637 F.3d 187, 191 (3d Cir. 2011).  The denial of a preliminary injunction as to SS 1 for SB 6 could be affirmed on the ground that LCMs are not "arms" for purposes of the Second Amendment.  *See generally* SA393-422 (Declaration of Dennis Baron) (compiling and analyzing historical linguistic evidence from Founding era to conclude magazines were classified as "accessories" or "accoutrements" distinct from "arms"); SA96 (at nn.17-19) (collecting websites listing magazines as accessories).  *See also Ocean State Tactical, LLC v. State of R.I.*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *12-16 (D.R.I. Dec. 14, 2022) (holding that LCMs are not "arms").

Defendants' evidence on this point was unrebutted. Yet the district court found that it was precluded from so finding based upon this Court's holding in *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*, 910 F.3d 106 (3d Cir. 2018). But that pre-*Bruen* decision did not consider this argument, let alone any evidence regarding the historical usage of the word "arms." And while the Court in *ANJRPC* expressed concern about regulations that "ma[d]e it impossible to use firearms for their core purpose," *id.* at 116, Plaintiffs never claimed that SS 1 for SB 6 did so.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT PLAINTIFFS FAILED TO DEMONSTRATE THAT THEY WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

To obtain a preliminary injunction, a plaintiff must make a "clear showing of immediate irreparable injury." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (affirming decision denying preliminary injunction). "[A] risk of irreparable harm is not enough." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (vacating preliminary injunction where plaintiff failed to demonstrate irreparable harm). "[A]bsent a showing of irreparable harm, a plaintiff is not entitled to injunctive relief, even if the other three elements are found." *Ferring Pharms., Inc. v. Watson*

*Pharms., Inc.*, 765 F.3d 205, 219 (3d Cir. 2014) (affirming denial of preliminary injunction where district court "did not clearly err in finding" a lack of irreparable harm).

In the district court, Plaintiffs claimed that Statutes were irreparably harming them by (i) preventing them from buying assault weapons and LCMs for various purposes and (ii) restricting their ability to sell assault weapons and LCMs. *See supra* at 6-7. The district court properly rejected both arguments, and Plaintiffs have abandoned them.

Instead, Plaintiffs' sole argument is that the district court erred in its analysis and, as a result, the deprivation of their purported constitutional rights constitutes irreparable harm. *Gray* Br. at 52-53; *DSSA* Br. at 27-28.

Plaintiffs are incorrect. To begin, Plaintiffs' four-month delay in seeking a preliminary injunction undermines their claims of irreparable harm. "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *Chestnut Hill Sound Inc. v. Apple Inc.*, C.A. No. 15-261-RGA, 2015 WL 6870037, at *4 (D. Del. Nov. 6, 2015)

(quoting *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995)).[34]

And because the district court properly found that Plaintiffs had not established a likelihood of success on the merits, the predicate upon which irreparable harm argument rests fails.    In any event, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe*, 868 F.2d at 72-73 (affirming decision denying preliminary injunction; "the assertion of First Amendment rights does not automatically require a finding of irreparable injury").[35]   Neither the Supreme Court nor this Court has held that deprivation of Second Amendment rights constitutes irreparable harm.   *See Or. Firearms Fed'n*, 2022 WL 17454829, at *18 (declining to enjoin LCM regulation and noting the Supreme Court has never held that a deprivation of Second Amendment rights constitutes *per se* irreparable harm); *Walters*

---

[34] Below, Plaintiffs attributed their delay to the fact that the LCM buy-back program was not announced until October 26, 2022.  SA929-930. But Plaintiffs did not seek to enjoin that program, and they never explain their delay in seeking to enjoin HB 450.

[35] As such, this is not a case of "subjecting the Second Amendment to an 'entirely different body of rules.'"  *DSSA* Br. at 28 (citation omitted).

*v. Kemp*, C.A. No. 1:20-cv-1624-SCJ, 2020 WL 9073550, at *11 (N.D. Ga. May 5, 2020) (similar).

Plaintiffs, while ignoring *Hohe*, cite two cases from this Court that the district court easily distinguished. *K.A. ex rel. Ayers v. Pocono Mountain School Dist.*, 710 F.3d 99 (3d Cir. 2013), involved First Amendment rights, the deprivation of which the Supreme Court has found in some contexts to constitute irreparable harm. *Id.* at 113. And *Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971), relied in part upon the improbability of recovering meaningful damages from police officers for a Fourth Amendment violation. *Id.* at 1350. While the Court in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), found that an infringement of Second Amendment rights constituted irreparable harm, the statute at issue (which banned firing-ranges) "serious[ly] encroach[ed] on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." 651 F.3d at 708. As such, that statute threatened to eviscerate entirely the right to bear arms. No such risk exists here.

Indeed, the Supreme Court (acting through Justice Barrett) recently declined to stay enforcement of a similar statute pending

resolution of a lawsuit challenging its constitutionality. *See Nat'l Ass'n for Gun Rights v. City of Naperville*, 143 S. Ct. 2489 (2023) (Order). In doing so, it rejected Plaintiffs' arguments that the deprivation of Second Amendment rights constitutes irreparable injury. *Nat'l Ass'n for Gun Rights v. City of Naperville*, No. 22-A948, 2023 WL 3212195, at *27 (U.S. Apr. 26, 2023). And like Plaintiffs here, appellants there invoked *Ezell*. *Id.* at *28. Just as those arguments failed to there, they likewise fail here.

And while the district court did not need to reach the issue, the balance of the equities and public interest, which "merge when the Government" is a party, both weigh in favor of an injunction. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Md. v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted). Here, that harm is undermining public safety, as dangerous arms will proliferate absent an injunction. *See Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193-94 (E.D. Cal. 2015) (denying preliminary injunction; where potential harm involved gun violence, "the implications of being mistaken

… indicate it is in the public interest to deny the injunction"), *aff'd*, 637

F. App'x 401 (9th Cir. 2016).

## CONCLUSION

For the foregoing reasons, the decision of the district court should

be affirmed.

ROSS ARONSTAM & MORITZ LLP

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

*/s/ David E. Ross*

David E. Ross
Bradley R. Aronstam
Garrett B. Moritz
S. Reiko Rogozen
Roger S. Stronach
Holly E. Newell
Elizabeth M. Taylor
Thomas C. Mandracchia
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
baronstam@ramllp.com
gmoritz@ramllp.com
rrogozen@ramllp.com
rstronach@ramllp.com
hnewell@ramllp.com
etaylor@ramllp.com
tmandracchia@ramllp.com

*/s/ Zi-Xiang Shen*

Kenneth L. Wan
Zi-Xiang Shen
Deputy Attorneys General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, Delaware 19801
(302) 577-8400
kenneth.wan@delaware.gov
zi-xiang.shen@delaware.gov

Dated:  August 16, 2023

*Counsel for Defendants-Appellees Delaware Department of Safety and
Homeland Security; Nathaniel McQueen, Jr. in his official capacity as
Cabinet Secretary, Delaware Department of Safety and Homeland
Security; Melissa Zebley in her official capacity as superintendent of the
Delaware State Police; and Kathy Jennings, Attorney General of Delaware*

## COMBINED CERTIFICATIONS

## BAR MEMBERSHIP

I, David E. Ross, certify as follows:

1.     I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

## WORD COUNT AND TYPEFACE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief complies with the type-volume limitation of Rules 29(d) and 32(a)(7)(B) because it contains 12,829 words, excluding the parts of the Brief exempted by Rule 32(a)(7)(B)(iii).

2.     This Brief complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

## **IDENTICAL COMPLIANCE OF BRIEF AND VIRUS CHECK**

Pursuant to Third Circuit L.A.R. 31.1(c), I certify that the foregoing E-Brief and the hard copies of the Brief have identical text. I also certify that Windows Defender has been run on the file and that no virus was detected.

Dated: August 16, 2023

*/s/ David E. Ross*
*Counsel for Defendants-Appellees*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on August 16, 2023, I electronically filed the foregoing Defendants-Appellees' Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I also certify that seven (7) paper copies of the foregoing Defendants-Appellees' Answering Brief shall be filed by Federal Express to the Office of the Clerk, United States Court of Appeals for the Third Circuit, within 5 days of the date of electronic filing of the Brief.

Dated: August 16, 2023

*/s/ David E. Ross*
*Counsel for Defendants-Appellees*