Nos. 23-1633, 23-1634, 23-1641

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

DELAWARE STATE SPORTSMEN'S ASSOCIATION INC., et al.,

*Plaintiffs-Appellants*,

v.

DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Delaware (No. 1:22-cv-00951-RGA)

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Janet Carter
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8174
jcarter@everytown.org

August 23, 2023

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT ................................................................................ 2

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ................................ 2

    II.    The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations .................... 7

CONCLUSION ............................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*Caulkins v. Pritzker*,
  No. 129453, 2023 WL 5156850 (Ill. Aug. 11, 2023)............................................6

*Crawford v. Washington*,
  541 U.S. 36 (2004)....................................................................................23

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...................................................................2, 5, 10, 18

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) .........................................................................9

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011). ...........................................................10, 11, 13

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018)......................................................................11

*Hanson v. District of Columbia*,
  No. 1:22-cv-02256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023), *appeal docketed*,
  No. 23-7061 (D.C. Cir. May 17, 2023) .........................................................7, 20

*Heller v. District of Columbia* (*Heller II*),
  670 F.3d 1244 (D.C. Cir. 2011).................................................................19

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) .............................................................................4

*Lynch v. Donnelly*,
  465 U.S. 668 (1984)..................................................................................23

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
  No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No.
  23-1719 (4th Cir. July 10, 2023)...............................................................12

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)..........................................................................5, 10, 11

ii

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012) ..............................................................11

*Nat'l Ass'n for Gun Rts. v. Lamont,*
   No. 3:22-cv-01118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023), *appeal docketed,*
   No. 23-1162 (2d Cir. Aug. 16, 2023)..........................................passim

*Nat'l Rifle Ass'n v. Bondi,*
   61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc,* No. 21-12314, 2023
   WL 4542153 (July 14, 2023)...........................................................12, 13

*Nevada Comm'n on Ethics v. Carrigan,*
   564 U.S. 117 (2011) ............................................................................23

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ...............................................................passim

*Ocean State Tactical, LLC v. Rhode Island,*
   No. 1:22-cv-00246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022), *appeal docketed,*
   No. 23-1072 (1st Cir. Jan 18, 2023)...................................................6

*Oregon Firearms Fed'n v. Kotek,*
   No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed,*
   Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.) ..........4, 19

*Ramos v. Louisiana,*
   140 S. Ct. 1390 (2020) ........................................................................23

*Range v. Att'y Gen.,*
   69 F.4th 96 (3d Cir. 2023) (en banc)...........................................3, 8, 9

*Timbs v. Indiana,*
   139 S. Ct. 682 (2019) ..........................................................................23

*United States v. Alaniz,*
   No. 22-30141, __ F.4th __, 2023 WL 3961124 (9th Cir. June 13, 2023) .........3, 6

*United States v. Greeno,*
   679 F.3d 510 (6th Cir. 2012) ..............................................................11

iii

*United States v. Meyer,*
  No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)........................16

*United States v. Rowson,*
  No. 1:22-cr-00310, 2023 WL 431037 (S.D.N.Y. Jan. 27, 2023)........................20

*Wilson v. Arkansas,*
  514 U.S. 927 (1995)........................................................23

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ...............16, 17

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ....................................................17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)............................................17

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....14

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ...............................................13, 14

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .....16, 17

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ....................................................15

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008)....................................................14

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ....................................................14

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) .....................................14

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) .............................................................................................13

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Delaware's assault weapon and large-capacity magazine restrictions are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the State's brief, Dkt. 52 ("State Br."). Everytown submits this amicus brief to expand on two methodological points. *First*, on the initial, textual inquiry of the

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to its filing.

*Bruen* framework, Plaintiffs have the burden to establish that assault weapons and large-capacity magazines are protected "arms" within the meaning of the Second Amendment, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs, this is particularly so where, as here, the challenged law implicates "unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132.

## ARGUMENT

## I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is '"in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, No. 22-30141, __ F.4th __, 2023

WL 3961124, at *3 (9th Cir. June 13, 2023) (quoting *Bruen*, 142 S. Ct. at 2134-35).

If so, the court then moves on to ask whether the government has shown that its

regulation is "consistent with the Nation's historical tradition of firearm

regulation." *Bruen*, 142 S. Ct. at 2130. *See generally id.* at 2134-38 (separating

application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry

ends: self-evidently, if people, weapons, or conduct are outside the Second

Amendment's protection, then the government may regulate them without

infringing the Second Amendment. *See Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir.

2023) (en banc) (noting that the Court must "first decide" whether the text of

Second Amendment applies, and then, "[i]f it does," engages in a historical

analysis); *see also*, *e.g.*, *Alaniz*, 2023 WL 3961124, at *3 (describing step one as a

"threshold inquiry" and explaining that "[i]f the first step is satisfied, we proceed to

*Bruen* step two").

As the district court held and Plaintiffs conceded, *see* A13, the burden to

satisfy the initial, textual inquiry is on the plaintiff challenging a law. *Bruen* makes

this clear by indicating that a presumption that the Constitution protects a

plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied.

*See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government

throughout—in what would be an unusual departure from ordinary litigation

principles—the Court would have said so. Placing the initial burden on the plaintiff

also accords with the Court's approach to other constitutional rights. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, the district court below and multiple other courts have read *Bruen* to place the burden on plaintiffs to establish that the Second Amendment's plain text covers their conduct. A13; *see, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-01118, 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) (holding that "*Bruen* and *Heller* make clear that Plaintiffs have the burden of making the initial showing that they are seeking to possess or carry firearms that are "'in common use" today for self-defense' and are typically possessed by law-abiding citizens for that purpose"), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5 n.4 (D. Or. July 14, 2023) (concluding that "the burden is on the plaintiff … to show that the challenged law implicates conduct covered by the plain text of the Second Amendment," in light of *Bruen*'s language and "first principles of constitutional adjudication"), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.).

Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry, because they have failed to establish that assault weapons and large-capacity magazines are among the "arms" that the Second Amendment protects. To fall within the Second Amendment's text, *Heller* established that a weapon must not only be a "bearable arm" or "[w]eapon[] of offence," but must also be one "in common use" and "typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Heller*, 554 U.S. at 581-82, 625-27.[2] *Bruen* further confirmed that the inquiry should focus *specifically* on common use for the lawful purpose of self-defense.[3] Plaintiffs have not carried their burden here, as to either assault weapons

---

[2] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 581-82. But it then made clear that the Second Amendment applies only to weapons "in common use" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Id.* at 625-27; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned). And, as the Supreme Court subsequently explained its ruling, *Heller* "held that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense.*" *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010) (emphasis added).

[3] *Bruen* did not spell out the textual inquiry with respect to "arms" in much detail, because New York did not dispute either that the "people" in that case ("two ordinary, law-abiding, adult citizens") or the arms they sought to use ("handguns") fell within the Second Amendment's text. *See* 142 S. Ct. at 2134. But in applying that test, the Court's articulation—"[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense,*" *id.* (emphasis added)—indicated that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with the Supreme Court's repeated emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up) (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)); *see also id.* at 2132 (explaining that "the Second Amendment's

or large-capacity magazines. That alone is enough for this Court to affirm the denial of a preliminary injunction. *See Ocean State Tactical*, 2022 WL 17721175, at *2, *11-15 (denying motion for preliminary injunction in challenge to large-capacity magazine law because "plaintiffs have failed in their burden to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text" and "have failed to prove that LCMs are weapons relating to self-defense"); *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *2 (finding that plaintiffs failed to show that assault weapons and large-capacity magazines are "commonly sought out, purchased, and used for self-defense" and denying motion for preliminary injunction as to Connecticut laws); *see also Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL 3019777, at *12 (D.D.C. Apr. 20, 2023) (concluding, under textual inquiry of *Bruen*'s framework, that "the Second

---

definition of 'arms' … covers modern instruments that facilitate armed self-defense"); *Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246, 2022 WL 17721175, at *11 (D.R.I. Dec. 14, 2022) (noting, in a Second Amendment challenge to a state law prohibiting large-capacity magazines, that the focus under *Bruen*'s plain-text inquiry "must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense"), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023). The Ninth Circuit recently noted in a published opinion that the textual inquiry involves a determination whether the weapons at issue are "'in common use' today *for self-defense*." *Alaniz*, 2023 WL 3961124, at *3 (quoting *Bruen*, 142 S. Ct. at 2134) (emphasis added); *see also, e.g.*, *Caulkins v. Pritzker*, No. 129453, 2023 WL 5156850, at *4 (Ill. Aug. 11, 2023) (noting that Second Amendment inquiry asks "whether a plaintiff has shown that the regulated items fall in the category of 'bearable arms' that are 'commonly used' for self-defense today" (citation omitted)).

Amendment does not cover LCMs because they are not typically possessed for self-defense"), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023).[4]

In sum, because Plaintiffs have failed to carry their burden to establish that assault weapons and large-capacity magazines are "arms" protected by the Second Amendment's text, this Court may affirm on alternative grounds without proceeding to a historical analysis.

## II. The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

Plaintiffs' claim fails under *Bruen*'s textual inquiry, and that should end the case. However, if the Court proceeds to the second, historical inquiry, it should first

---

[4] The court below erred in concluding that, with respect to "assault long guns" and large-capacity magazines, Plaintiffs had met their textual burden. *See* A21, A23. In finding that these weapons and accessories are in "common use" for self-defense, the district court relied in part on a firearms survey conducted by Professor William English. *See* A18. That survey is not reliable evidence. Its findings are unpublished and were not peer-reviewed, and it fails to disclose its funding sources or measurement tools. A different professor closely associated with gun rights advocacy—whom plaintiffs in other similar gun cases have often used as an expert witness—recently testified, in a challenge to a large-capacity magazine law in Oregon: "I don't think you can rely on" English's survey. He testified that English is "vague about exactly how he developed his sample. And there's nothing in his report to contradict the assumption that what he had was a self-selected sample …. And that's not a valid sample technique to generate a sample that's representative of the larger US population." When asked "without that information that is missing, you would not rely on that survey for any purpose?," he stated: "That is correct. I would not rely." *Or. Firearms Fed'n*, No. 2:22-cv-01815, Dkt. 175-7 at 12-13. And, even if relied on, as another district court recently concluded, this survey does not answer the relevant textual question in this case because it "does not demonstrate that assault weapons and LCMs possess characteristics that make them well-suited for self-defense." *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *21.

conclude that the most relevant time period for that inquiry centers around 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. And it should further conclude that the historical inquiry extends thereafter—including into the 20th century—given the "dramatic technological changes" and "unprecedented societal concerns," *Bruen*, 142 S. Ct. at 2132, present in this case.

As the State has explained, Delaware's restrictions are entirely consistent with the American tradition of firearms regulation regardless of which period this Court considers. The historical tradition—from the founding era, to the 19th century, through Reconstruction, into the 20th century, and even up to today—is consistent in demonstrating the constitutionality of restrictions on "dangerous and unusual" weapons "relevantly similar" to the restrictions challenged here. *See, e.g.*, State Br. 46-58 (describing relevant historical laws from before the founding and into the 20th century).[5] Where, as here, the inquiry into the public understanding in 1791 and 1868 yield the same result, the court need not resolve the issue of the correct time period. *See Bruen*, 142 S. Ct. at 2138 (2022); *see also, e.g.*, *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *30 n.46.[6] Nevertheless, if this Court wishes to

---

[5] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century and 20th-century history to clarify that meaning. *See infra* pp. 18-22.

[6] *Range* also did not resolve the time-period issue. *See Range*, 69 F.4th at 104

resolve the issue to guide district courts in future cases, it should hold that the inquiry centers on 1868.

To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The U.S. Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have

───────────────

(noting *Bruen*'s emphasis on "Founding- and Reconstruction-era sources" and concluding that, "[w]hatever timeframe the Supreme Court might establish in a future case," 1961 is too recent); *id.* at 112 (Ambro, J., concurring) (noting that "the Supreme Court has not yet decided whether individual rights are defined by their public understanding at the time of the ratification of the Bill of Rights in 1791 or the Fourteenth Amendment in 1868"); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved [the challenged] regulations[.]").

*when the people adopted them.*'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states would not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald*, 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

Several other circuits reached the same conclusion in analyzing the tradition of firearm regulation at the first, historical step of the then-applicable Second Amendment framework.[7] *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir.

---

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted

2012) (following *Ezell*); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).").[8] *Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").

A panel of the Eleventh Circuit recently reached the same conclusion post-*Bruen*, holding that, in cases involving state laws, where the understanding of the

---

conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

[8] As *Ezell* explained, "*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified." 651 F.3d at 702. An amicus brief submitted by the Delaware Association of Second Amendment Lawyers ("DASAL") argues that *Ezell* "simply made a mistake" in this analysis that it "corrected" in *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). *See* DASAL Br. 23, Dkt. 47. But *Ezell*'s analysis is sound, and *Moore* did not even mention this portion of *Ezell*, let alone disagree with it or purport to correct it. *Moore* referred to 1791, but it did not hold that 1791 is the only relevant time period for historical inquiry. Nor did it consider the implications for originalism of the fact that the Second Amendment did not apply against the states until 1868. Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See* 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765-66, 766 n.14). But that merely flags the issue that *Bruen* acknowledged, *see* 142 S. Ct. at 2137, before leaving open the question whether the 1868 or 1791 understanding should control, *see* 142 S. Ct. at 2138.

right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi* (*NRA v. Bondi*), 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains sound and consistent with originalist principles. As the panel explained:

> This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." … The opposite rule would be illogical.

61 F.4th at 1323-24 (alterations in original) (citations omitted); *see also Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023).

That the 1868 understanding of the Second Amendment right should apply in a case against a state is far from a radical position. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position leading scholars of originalist theory have taken. "Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *NRA v. Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see also* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for

applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"). Others who have endorsed this view include Michael Rappaport[9] and Stephen Siegel.[10] In sum, originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.[11]

---

[9] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008).

[10] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

[11] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen*

To be sure, if the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the

---

subsequently rejected the possibility of different standards for the state and federal governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 15-17.

relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g., United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[12]

---

[12] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that

More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[13]

---

"the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

[13] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869

Moreover, 1868 is neither a starting-line nor a cutoff; *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should

---

Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

recognize that later laws (and other historical evidence of regulatory authority) settle the meaning of the Second Amendment right and demonstrate that the challenged laws are constitutional.

Furthermore, *Bruen* recognized that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period.

That is precisely the situation in this case. As the State explains, the challenged measure was adopted in response to the exponential increase in the lethality of firearms and magazines—*i.e.*, "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at *36-39 (finding that "modern-day LCMs represent a dramatic technological change from the Founding and Reconstruction-era firearms" and

that "mass shootings related to LCMs are an unprecedented societal concern");

*Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *29 (reaching same conclusion in

denying plaintiffs' preliminary injunction motion as to Connecticut assault weapon

large-capacity magazine laws). A "more nuanced approach" to history, *Bruen*, 142

S. Ct. 2132, and "a broader search for historical analogies" is thus fully warranted,

*United States v. Rowson*, No. 1:22-cr-00310, 2023 WL 431037, at *24 (S.D.N.Y. Jan.

27, 2023).

Here, state and local laws from the period beginning around Reconstruction

and continuing into the 20th century—which are fully consistent with earlier

regulations—establish the meaning of the right to keep and bear arms at the time

of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of

Delaware's laws. *See* State Br. 51-55 (discussing late 19th- and early 20th-century

regulation of weapons and weapon capacity, which were consistent with earlier

laws restricting access to weapons and weapon features associated with crime); *Nat'l*

*Ass'n for Gun Rts.*, 2023 WL 4975979, at *26, *31-33 (upholding Connecticut's laws

restricting assault weapons and large-capacity magazines because they "pose a

comparable burden to relevantly similar historical analogues for comparably

justified reasons," and, in doing so, relying on both late 19th- and early 20th-

century weapons laws); *Hanson*, 2023 WL 3019777, at *12-17 (finding that D.C.'s

law restricting large-capacity magazines "is consistent with this country's historical

tradition of firearm regulation," and specifically noting that "it is appropriate to apply 20th century history" to the analysis because it "does not contradict any earlier evidence"). And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like Delaware's law.

The DASAL amicus brief contains nothing to undermine this analysis. It fails to address the central originalist issue—the fact that, in a case against a state, applying the 1868 understanding is the only way to satisfy the Supreme Court's mandate that constitutional rights "are enshrined with the scope they were understood to have *when the people adopted them*." *See supra* pp. 9-10 (quoting *Bruen* quoting *Heller*). Whereas *Bruen* marked the path for originalists to apply the 1868 understanding in federal cases too—by citing leading scholars who explain that the Fourteenth Amendment *updated* the meaning of the Second Amendment for the federal government as well as the states—DASAL's brief has no account to justify forcing on the states a 1791 understanding of the right to keep and bear arms that the 1868 generation did not share when they bound the states to respect that right.

DASAL's brief also fails to account for *Bruen*'s reliance, in discussing sensitive places, on "18th- *and 19th*-century" laws; it cannot seriously contend that the Court

had already identified a "wealth of authority" from the founding regarding these sensitive places and was pointing to 19th century laws as "mere confirmation." *See supra* p. 17; *cf.* DASAL Br. 26. Furthermore, the brief simply ignores *Bruen*'s recognition that later practice can "liquidate" indeterminate or unsettled meaning. *See supra* pp. 18-19. And it fails to recognize that the Court rejected reliance on late 19th- and early 20th-century evidence in *Bruen* only because that evidence "*contradicted*" what the Court understood to be affirmative earlier evidence of a right to bear arms in public for self-defense without showing special need. *See supra* p. 18; *see also, e.g.*, *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *31 n.51 (noting that "[n]owhere does *Bruen* forbid consideration of any regulations or history after the end of the 19th century," and that the Supreme Court "chose not to address the 20th century evidence submitted because it 'contradicts earlier evidence,' not because 20th century evidence is *per se* irrelevant"). Here, neither plaintiffs nor DASAL point to affirmative evidence that the founding generation (or any other generation) would have considered prohibiting assault weapons and large-capacity magazines to be unconstitutional.

DASAL's reliance on other Supreme Court cases that looked to founding-era history does not advance its position. *See* DASAL Br. 28-30. Most of the cited cases consult a wide range of history, including, in many, the Reconstruction era

and later periods, and none found a conflict between earlier and later history.[14]

Whether for that reason or because they simply never considered the implications of the Fourteenth Amendment's ratification for originalist methodology, none of the cases DASAL cites had occasion to resolve the time-period question that *Bruen* left open.

Finally, and extraordinarily, DASAL's brief contends that the period around 1868 "tells us nothing relevant about" the "original public understanding of the Second Amendment in 1791." DASAL Br. 20. But *even if* the meaning of the right is keyed to the public understanding in 1791, the actions of state legislatures in the decades around Reconstruction—starting *within the lifetimes* of some who were alive at the founding—are robust evidence of how the public understood the right to keep and bear arms at the founding. For DASAL to suggest that it has better

---

[14] *See, e.g.*, *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011) (in interpreting First Amendment, finding consistent tradition from founding era through twentieth century); *Lynch v. Donnelly*, 465 U.S. 668, 673-78 (1984) (in interpreting Establishment Clause, finding "unbroken history of official acknowledgment … of the role of religion in American life from at least 1789" and citing sources through nineteenth and twentieth centuries); *Wilson v. Arkansas*, 514 U.S. 927, 931-36 (1995) (looking to sources from 1603 to 1884 to interpret Fourth Amendment; finding no conflict over time); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395-96 (2020) (looking to sources from fourteenth through late nineteenth centuries to determine meaning of Sixth Amendment right to jury trial); *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (looking to sources from sixteenth through nineteenth centuries to determine meaning of Confrontation Clause); *Timbs v. Indiana*, 139 S. Ct. 682, 687-89 (2019) (looking to sources from Magna Carta to colonial era to Reconstruction to present day in interpreting Eighth Amendment excessive fines clause and finding that it applies against the states).

insight into the founding-era understanding of the Second Amendment right in 2023, 232 years distant from its ratification, than the Reconstruction generation had when 77 years distant, is nothing short of hubris.

## CONCLUSION

The Court should affirm the district court's decision.

Dated: August 23, 2023        Respectfully submitted,

                                /s/ Janet Carter
                                Janet Carter
                                Everytown Law
                                450 Lexington Avenue, P.O. Box 4184
                                New York, NY 10017
                                (646) 324-8215
                                jcarter@everytown.org

                                *Counsel for Amicus Curiae Everytown for Gun Safety*

## CERTIFICATIONS

I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,474 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

2.      I am a member of the bar of the U.S. Court of Appeals for the Third Circuit. My date of admission was August 11, 2021.

3.      A virus detection program, SentinelOne, was run on the electronic version of this brief, and no virus was detected.

4.      The text of the electronic version of the brief is identical to the text of the paper copies.

5.      On August 23, 2023, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system, which will send notice to all registered CM/ECF users.


August 23, 2023                         /s/ Janet Carter
                                        *Counsel for amicus curiae*
                                        *Everytown for Gun Safety*