IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

| DELAWARE STATE SPORTSMENS | ) Case Nos. 23-1633 |
| ASSOCIATION, INC., ET AL. | )              23-1634 |
| | )              23-1641 |
| Appellants, | ) |
| | ) |
| v. | ) 1:40 p.m. |
| | ) |
| DELAWARE DEPARTMENT OF | ) March 11, 2024 |
| SAFETY AND HOMELAND SECURITY, | ) |
| ET AL. | ) |
| | ) |
| Appellee. | ) |

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
HON. EVAN J. WALLACH, UNITED STATES DISTRICT JUDGE
CASE NOS. 23-1633, 23-1634, 23-1641

BEFORE APPELLATE PANEL:
HON. STEPHANOS BIBAS, Circuit Judge
HON. TAMIKA MONTGOMERY-REEVES, Circuit Judge
HON. JANE RICHARDS ROTH, Circuit Judge

APPEARANCES (see next page)

Veritext National Court Reporting Company
1801 Market Street
Suite 1800
Philadelphia PA 19103
(888)777-6690

```
 1   APPEARANCES:
 2   For the Appellants:
 3           JOHN D. OHLENDORF, ESQ.
             COOPER & KIRK
 4           1523 New Hampshire Avenue NW
             Washington, DC 20036
 5
             ERIN E. MURPHY, ESQ.
 6           CLEMENT & MURPHY
             706 Duke Street
 7           Alexandria, VA 22314
 8   Liaison Counsel:
 9           MARIEL A. BROOKINS, ESQ.
             CLEMENT & MURPHY
10           706 Duke Street
             Alexandria, VA 22314
11
     For the Appellee:
12
             DAVID E. ROSS, ESQ.
13           ROSS ARONSTAM & MORITZ
             1313 N Market Street
14           Suite 1001
             Wilmington, DE 19801
15
             JEREMY FEIGENBAUM, ESQ.
16           OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
             25 Market Street
17           Richard J. Hughes Justice Complex
             P.O. Box 112
18           Trenton, NJ 08625
19
20
21
22
23
24
25   Transcribed By:  Bridget Hearne
```

1                       P R O C E E D I N G S

2           THE CLERK:  Judge Roth, can you hear and see us?

3           JUDGE ROTH:  Yes, I can.

4           THE CLERK:  Very well.  With thanks for the parties'

5    patience, the first case to be called this afternoon is

6    Delaware State Sportsmens Association, et al.; numbers 23-1633,

7    1634, and 1641.

8           Mr. Ohlendorf for Appellants Gray, et al.

9           MR. OHLENDORF:  Good afternoon, Your Honor.  May it

10   please the Court, John Ohlendorf for the Gray and Graham (ph.)

11   appellants.  With the Court's permission, I would like to

12   reserve two minutes of time for rebuttal.

13          THE CLERK:  Great.

14          MR. OHLENDORF:   Your Honor, under the supreme

15   court's decisions in Heller and Bruen, this is a

16   straightforward case.  As a matter of the Second Amendment's

17   plain text and this Court's decision in the ANJRPC case, the

18   firearms and magazines at issue plainly qualify as bearable

19   arms.  And under Bruen, that shifts the burden to Delaware to

20   justify its bans as consistent with historical tradition.

21          Now, in Heller, the supreme court already looked at

22   the history and determined that a flat ban on certain types of

23   arms is consistent with historical tradition only if those arms

24   are not in common use for lawful purposes.  But the district

25   court here held that Delaware's laws do ban arms in common use.

Page 4

1   Indeed, the semi-automatic rifles banned by Delaware's law are

2   the second most popular firearm type on the market today and

3   the most popular rifle of all time.  That should have been the

4   end of the matter, and the district court's decision upholding

5   Delaware's bans anyway should be reversed.

6            JUDGE BIBAS:  Counsel, you have the burden of proof in

7   this proceeding, don't you?

8            MR. OHLENDORF:  We have the burden of proof, Judge

9   Bibas, on the initial Bruen text step.  I would submit that the

10  State has the burden on the second Bruen history inquiry,

11  even -- although the fact -- we're here on a preliminary

12  injunction.

13           JUDGE BIBAS:  Have the burden of proof on the

14  preliminary injunctive factors?

15           MR. OHLENDORF:  Well, under this Court's decision in

16  Reilly v. City of Harrisburg, the burden in a preliminary

17  injunction case tracks the burdens as they would lie at summary

18  judgment or trial.  And under Bruen, those burdens are

19  allocated such that we have the burden on the text step; they

20  have the burden on the history step.

21           JUDGE BIBAS:  Even if that's true as to the likelihood

22  of success on the merits, you have the burden on the other

23  injunctive factors?

24           MR. OHLENDORF:  That's correct, Judge Bibas.  That is

25  true for --

Page 5

1          JUDGE BIBAS:  And you put in no evidence, apart from

2     some declarations here?

3          MR. OHLENDORF:  On the irreparable harm factor, Judge

4     Bibas?

5          JUDGE BIBAS:  On irreparable harm, on balance of

6     equities of public interest, all you put in were four

7     declarations?

8          MR. OHLENDORF:  Yes, Judge Bibas.  And our

9     declarations show that our plaintiffs wish to obtain these

10    firearms and magazines.

11         JUDGE BIBAS:  Plaintiffs who already have firearms,

12    three of whom already have some of the assault weapons, so

13    called; and a large capacity of magazines, so called.

14         MR. OHLENDORF:  I don't know that our -- all of our

15    plaintiffs have the rifles or pistols that are banned by

16    Delaware, but they certainly want to acquire them.

17         JUDGE BIBAS:  Okay.  But all of them aver that they

18    currently do have firearms?

19         MR. OHLENDORF:  They do have firearms.  I wouldn't

20    dispute that, Judge Bibas.

21         JUDGE BIBAS:  So how are we supposed to infer from

22    these declarations that they're suffering an irreparable

23    injury?

24         MR. OHLENDORF:  Because the Second --

25         JUDGE BIBAS:  The only way we could do that is if we

1   adopt a blanket rule that any depravation of a Second Amendment

2   right for any period of time automatically counts as

3   irreparable injury.

4        MR. OHLENDORF:  I mean, I don't know if I would cast

5   it in those absolute terms, Judge Bibas.  But I would say that

6   a law preventing someone from obtaining arms protected by the

7   Second Amendment to keep and to bear -- I mean, this is a

8   going-forward ban, so I don't know we can call it temporary.

9   But yes, that law we would submit to you is a, per se,

10  violation of the Second Amendment, and per se, irreparable

11  injury.  Just as this Court --

12       JUDGE MONTGOMERY-REEVES:  Well, the moment you satisfy

13  the likelihood of success prong -- and there really is no

14  irreparable harm prong, right?  That's what you're essentially

15  telling us?

16       MR. OHLENDORF:  I'm essentially saying, Judge

17  Montgomery-Reeves, that just as in the First Amendment context,

18  if someone says, I would like to speak, this law is preventing

19  me from speaking.  I've spoken in the past, maybe I can speak

20  in other ways.  But I want to say this, the law prevents me

21  from saying it, this Court need not proceed any further in

22  determining whether there is irreparable harm, no.  And that is

23  common across the constellation of constitutional rights.

24       JUDGE BIBAS:  It's common across the constellation of

25  constitutional right.  I could find -- I found a Fourth

1    Amendment case from half a century ago, and that was it.  So I

2    think that's an overstatement to say it's common across rights.

3    What, apart from First Amendment cases and that Fourth

4    Amendment case from 1973, applies such a conclusive

5    presumption?

6         MR. OHLENDORF:  Your Honor, I don't know about this

7    Court's case law.  Certainly, in other cases -- in other

8    courts, due process violations equal protection violations;

9    those would all qualify for this, per se.

10        JUDGE BIBAS:  Okay.  Why should we collapse the four

11   factors into likelihood of success on the merits?  What about

12   all that language about PIs being extraordinary remedies being

13   granted sparingly?  What about the history of equity?  And what

14   about eBay v. MercExchange which suggests that we're not

15   supposed to adopt presumptions like that in the equitable -- I

16   mean, that was a permanent, not a preliminary injunction.  But

17   it does suggest that we're not supposed to just jump to the

18   merits.

19        MR. OHLENDORF:  In the great bulk of cases, Judge

20   Bibas, that is correct.  But in cases involving -- I mean, all

21   of those objections you have just raised would apply equally in

22   a First Amendment case.  And yet, the settled precedent is, in

23   First Amendment cases, we presume a constitutional violation --

24        JUDGE BIBAS:  We can --

25        MR. OHLENDORF:  -- where there's likelihood of success.

1        JUDGE BIBAS:  We can presume.  We don't require the

2    district court to.  And a lot of First Amendment cases involve

3    some very time-sensitive -- either you're going to speak --

4    during this election, or the election will be passed.  But this

5    dispute wouldn't go away.  You could have gone ahead to your

6    trial in November '23, and you chose not to.  We would have had

7    a trial record by now.

8        MR. OHLENDORF:  I mean, this case, yes, it's not going

9    to go away.  But every second of every day that Delaware's law

10   is enforced, it is preventing my plaintiffs from exercising

11   their Second Amendment rights.

12       JUDGE MONTGOMERY-REEVES:  Focusing on your argument --

13   your likelihood of success argument, not delving into the

14   substance of it -- but it's a legal argument, right?

15       MR. OHLENDORF:  That's correct, Judge Montgomery-

16   Reeves.

17       JUDGE MONTGOMERY-REEVES:  So if we agree with you on

18   the irreparable harm, wouldn't that mean that there is no

19   discretion?  I mean, if it's a legal argument, the answer is

20   just, yes, we think -- yes, they're going to win; or no,

21   they're not.  I mean, there's no discretion for the Court on a

22   preliminary injunction, is there?

23       MR. OHLENDORF:  I think, Judge Reeves, that is -- the

24   Court has discretion to determine whether there's a likelihood

25   of success.  But if they determine there's a likelihood of

Page 9

1   success, then it just follows from that determination.  And --

2         JUDGE BIBAS:  Then why do we have an abuse of

3   discretion standard of review?

4         MR. OHLENDORF:  Well, because -- I mean, many cases

5   involving requests for preliminary injunction, Judge Bibas,

6   don't involve constitutional rights or don't involve

7   constitutional rights that protect intangible interests like

8   this one.

9         JUDGE MONTGOMERY-REEVES:  So when it's a

10  constitutional right issue, then it's not discretionary.  Only

11  question is, answer the legal question, that's it.  Don't look

12  at the other prong.

13        MR. OHLENDORF:  I mean, the Court does have to

14  determine, of course, that the plaintiffs would like to

15  exercise their constitutional rights.  But yes, I mean, if the

16  plaintiffs can make that showing, which our declarations have

17  averred and have not been disputed, then no, I don't think

18  there is any discretion to conclude that the violation of

19  Second Amendment rights, just as in the First Amendment

20  context, does not constitute irreparable harm.

21        JUDGE MONTGOMERY-REEVES:  Let me ask you another

22  question.  So as I understand your argument, it's that Heller

23  decided that the government couldn't ban arms that are commonly

24  held for self-defense purposes.  But then Bruen went on and

25  devoted thirty-five pages in the United States Reporter and

1    more than twenty pages in the Supreme Court Reporter to

2    analyzing the history and tradition; whether or not the New

3    York law was consistent with the history and tradition.  If

4    Heller held the government can't ban arms that are commonly

5    held for self-defense, why did Bruen need to spend all that

6    time?

7            MR. OHLENDORF:  A very simple answer, Judge

8    Montgomery-Reeves.  Bruen did not involve a ban on possession

9    of arms.  Bruen involved a restriction on carrying firearms

10   outside the home.  It was disputed the extent to which that was

11   protected by the Second Amendment, the limits on the State's

12   ability to curtail that if it was protected under the Second

13   Amendment.  So yes, Bruen went through great lengths to

14   determine whether there was a historical tradition that would

15   allow greater infringements on the right to bear arms then

16   Heller countenanced of the right to keep them.  That question

17   wasn't resolved in Heller.  But it simply does not follow that

18   in a case involving an arms ban, a ban on certain types of

19   arms, that the Heller test does not apply.

20           JUDGE BIBAS:  Judge Roth, anything?

21           JUDGE ROTH:  I have nothing at this point.

22           JUDGE BIBAS:  All right.  Let's hear from Ms. Murphy,

23   and we'll get you back on rebuttal.

24           MS. MURPHY:  Good afternoon, Your Honor.  Erin

25   Murphy on behalf of the DSSA plaintiffs and Amicus - NSSF.  And

Page 11

1   with the Court's permission, I'd like to reserve four minutes

2   for rebuttal.

3          JUDGE BIBAS:  Granted.

4          MS. MURPHY:  Thank you.

5          Millions of law-abiding Americans own semi-automatic

6   rifles, pistols, and shotguns that Delaware has newly banned;

7   and millions more own the magazines that Delaware has

8   forbidden.  Under the supreme court's decision in Bruen, that

9   forecloses the State's effort to prohibit them, because Bruen

10  teaches that our historical tradition is one of protecting the

11  right of the people to keep and bear arms that are in common

12  use for lawful purposes like self-defense.  The State's efforts

13  to resist that conclusion rest on arguments that are just

14  fundamentally incompatible with Bruen, including many of the

15  same arguments that Bruen itself considered and many of the same

16  historical laws that Bruen itself considered.

17         To the extent the State begins by suggesting and the

18  State -- or its amici suggests that the firearms or

19  magazines here don't qualify as arms at all, that answer -- the

20  answer to that question comes from Heller and Bruen, both of

21  which teach that arms constitute anything that is a bearable

22  arm that can be used for self-defense.  And there's just not

23  any argument to be made that a firearm ceases to be an arm

24  simply because it has features, like semi-automatic

25  functionality and a detachable magazine.

1          JUDGE ROTH:  Let me ask you a question.  Is to be used

2     in self-defense a integral part of any arm?  In other words,

3     are arms used in self-defense not simply arms used in any

4     legal -- for any legal purpose?

5          MS. MURPHY:  So for purposes of the threshold textual

6     inquiry, I think all that matters is that something is capable

7     of being used for self-defense.  It's a bearable arm.  It

8     doesn't matter if it's commonly used, if it's predominantly

9     used, if that's its best use; it just has to be something

10    that's capable of being used for self-defense.  And when we get

11    to the historical tradition test, which we absolutely agree

12    with what you just heard, that common use --

13         JUDGE ROTH:  That does not -- that does not agree with

14    the language of Bruen and Heller, does it?  Bruen talks about a

15    arm -- an arm commonly used in self-defense.  Don't we have to

16    consider that description as one integral description of what

17    we're dealing with, not just capable of being?

18         MS. MURPHY:  I don't think that's part of the

19    threshold textual inquiry because Bruen says that the

20    definition of the word "arms" simply includes any bearable

21    arms.  Now, you are absolutely correct that common use becomes

22    relevant, and we would say dispositive, when you're analyzing

23    the historical tradition aspect of the Second Amendment

24    analysis.  Once something is an arm, that just tells you it's

25    presumptively protected by the Second Amendment.  You still

Page 13

1    have to then go on to answer the question of whether it's the

2    type of arm that, though qualifying as an arm, may be

3    restricted -- or here, banned -- consistent with the Second

4    Amendment.  And what Bruen and Heller teach is that whatever

5    else the States can do in terms of regulation, they cannot ban

6    arms that are in common use today for lawful purposes like

7    self-defense.  So we agree that when you get to historical

8    tradition, you have to look --

9        JUDGE ROTH:  Again, you're sliding off my question,

10   which is, which are used for lawful purposes like self-

11   defense, as opposed to which are used for self-defense.  I

12   think the distinction between those two is very important.

13       MS. MURPHY:  As I read Heller and Bruen, they say

14   lawful purposes like self-defense, including self-defense.  So

15   I don't think it's the only one, but I'm happy to take self-

16   defense as the one we need to prove because I think it's

17   easily, easily satisfied here, even setting aside the fact that

18   this is actually the State's burden of proof, not ours.

19   Because the types of arms and magazines that we're talking

20   about are commonly held.  They're owned by millions of

21   Americans -- millions of law-abiding Americans.  And the most

22   common reason that law-abiding Americans identify for owning

23   them is for self-defense and/or using them at things like

24   shooting ranges, where they are honing their skills.

25       JUDGE ROTH:  Are they in fact being used for self-

1   defense?  I understand from some of the reading I've done that

2   the percentage of times that these automatic weapons are used

3   for self-defense is miniscule compared to the other -- like,

4   for instance, handguns -- the other weapons that are used in

5   self-defense.  The fact that it's -- an atom bomb is capable of

6   being used in self-defense, but no one would use it.  And I

7   think that -- I feel that it is necessary, not just that they

8   are capable of being used in self-defense, but they actually

9   are being used in self-defense.  And I'm not sure about these

10  automatic assault weapons, whether they are being used in self-

11  defense.

12       MS. MURPHY:  Well, just to be clear, we're only

13  talking about semi-automatic arms here.  But I think it all

14  depends on what you mean by the term "use".  The State wants to

15  cabin it to how many times do I fire a particular arm or fire a

16  particular amount of rounds at a would-be attacker.  And that

17  is not a conception of use that's consistent even with the text

18  of the Second Amendment.  The Second Amendment protects a right

19  to "keep" and "bear" arms for lawful purposes, which the supreme

20  court has explained means both possessing them in your home and

21  wearing them at -- to be ready -- armed and ready for

22  confrontation.  So if somebody uses their firearm within the

23  contemplation of the text of the Second Amendment, anytime they

24  keep it at home for the purpose of self-defense or carry it

25  outside the home for purpose of self-defense.

1          And indeed, if you took the State's conception and

2     asked how often is a particular arm actually fired for self-

3     defense, I'm not sure we'd end up with any firearm protected by

4     the Second Amendment, because fortunately, most people very

5     rarely have to fire any type of firearm at would-be attackers;

6     they instead keep them and hone their skills with them at

7     places like shooting ranges and fortunately very rarely have to

8     actually fire them.  So I don't think that that's the right way

9     to think about the analysis.  If you look back at Heller,

10    Heller found that handguns satisfy the common-use test because

11    they are, "typically possessed for lawful purposes like self-

12    defense".

13         So I do think the right inquiry is to ask about

14    possession, about what people keep and carry for self-defense.

15    And here, again, we don't believe it's our burden.  We believe

16    it's the State's burden to prove common use.  But even thinking

17    it was our burden, the district court concluded that we'd

18    satisfied it as to all of the, so called, assault long guns

19    that are prohibited by the statute.

20         JUDGE BIBAS:  But you don't disagree that as to the

21    injunctive factors, setting aside the possibility of the second

22    half of merits, that you bear the burdens here?

23         MS. MURPHY:  We certainly bear the burdens.  But I --

24    if you look at --

25         JUDGE BIBAS:  How have you satisfied those burdens, as

1    I asked your friend on your side?

2         MS. MURPHY:  Sure.  I mean, we've satisfied them under

3    this Court's precedent, K.A. v. Pocono Mountain School

4    District, which says, "enforcement of an unconstitutional law

5    vindicates no public interest", and that laws that deprive

6    people of constitutional rights cause virtually per se

7    irreparable harm.  That is the law of this circuit as to

8    individual rights under the First Amendment.  And I can't

9    really understand any reason why it would be different as to

10   the Second Amendment.  I mean, people aren't -- don't have to

11   come in and show that they have zero First Amendments outlets

12   left.

13        JUDGE BIBAS:  But that approach basically collapses

14   everything into likelihood of success on the merits.

15        MS. MURPHY:  And I think when it comes to a law that

16   violates constitutional rights, violates individual

17   constitutional rights, that's basically correct.  I mean, it's

18   not that you don't have to satisfy the other two facts; it's

19   just that, absent an extraordinarily rare set of circumstances,

20   they're always going to be satisfied.  Because the constitution

21   has already done the public interest balancing and said, the

22   public interest lies in favor of protecting individual

23   constitutional rights.  That is, after all, why they're in the

24   constitution, to say, we're not going to allow for laws that

25   infringe upon these rights, even when it seems like they're in

1    the public interest.  And so I think it actually is just kind

2    of at odds with the whole notion of a Bill of Rights to think

3    that you could have --

4        JUDGE BIBAS:  Except that equity is as old as that, and

5    equity has that history.  And while there's a Second Amendment

6    interest here, but there's also a Seventh Amendment interest in

7    having jury trials remain available, at least in cases with

8    retrospective relief.

9        MS. MURPHY:  Sure.  And I mean, I suppose I would

10   just -- I thought about this and tried to look in preparing for

11   this argument.  I just, I can't find any law where a court has

12   ever said, yes, this law is unconstitutional, but we think it,

13   nonetheless, under the balance of equities should stand.  I

14   mean, that just doesn't happen.  Once a law is

15   unconstitutional, that necessarily means that it is causing

16   irreparable harm in preventing someone from exercising their

17   constitutional rights.  And it is not in the public interest to

18   have laws that violate constitutional rights.  And so --

19       JUDGE MONTGOMERY-REEVES:  Does it matter that we're in

20   a preliminary injunction context?

21       MS. MURPHY:  No.  I think what matters in a

22   preliminary injunction context is simply that the first piece

23   of the analysis is, of course, a likelihood of harm, so it's

24   likelihood of success.  So it's actually a little bit easier to

25   me than it is in the ultimate injunctive context.  But I do

1  think --

2       JUDGE MONTGOMERY-REEVES:  Why would that weaken the

3  need to show an irreparable harm?

4       MS. MURPHY:  I don't think it does weaken.  I think

5  the three remaining factors apply the same way, whether you're

6  in a preliminary or a permanent injunctive context.  And the

7  fact that you can really never say in the permanent injunctive

8  context that you hadn't satisfied the three remaining factors,

9  and that a court was going to leave an unconstitutional law on

10  the books or apply an unconstitutional law to somebody because

11  it had determined that it doesn't really harm them or doesn't

12  really serve the public interest to vindicate their

13  constitutional rights, I think that's pretty unthinkable in the

14  context of a permanent injunction.  And I don't know why the

15  analysis would be radically different just because it's a

16  preliminary injunction.  So it's not that they don't apply.  I

17  mean, all factors apply.  It's just --

18       JUDGE BIBAS:  Let's say that there's a twenty percent

19  chance that you're right on the merits.  You're saying that no

20  balancing needs to happen?

21       MS. MURPHY:  No, no, no.

22       JUDGE BIBAS:  That because there are harms on the

23  other side if it turns out that it's -- you don't win on the

24  merits.

25       MS. MURPHY:  If we're only twenty percent right on the

1    merits, you have a balance to draw between how strong our

2    likelihood of success is --

3            JUDGE BIBAS:  Right.

4            MS. MURPHY:  -- and the remaining factors.  But that's

5    just a matter of -- and I think if you really look at the kind

6    of rare First Amendment cases, where courts have said they're

7    leaving some room for the possibility that it's not a per se

8    satisfied, they're really cases where they're doubting whether

9    you actually have a particularly strong likelihood of success

10   on the merits.  I mean, the one --

11           JUDGE BIBAS:  When you read Winter v. NRDC --

12           MS. MURPHY:  Yes.

13           JUDGE BIBAS:  Granted, it's a statutory case, but the

14   court doesn't say, oh, this is just because it's just a

15   statutory right.  It's like, well, factors two, three, and

16   four, so we don't need to reach factor one.

17           MS. MURPHY:  I think it makes all the difference in

18   the world that Winter is a statutory case.  And I really do

19   think that if you look, you will have a very hard time finding

20   any cases where the supreme court or this court has said, yes,

21   we're pretty sure your constitutional rights, your individual

22   fundamental rights are being violated.  But too bad for you

23   because it's in the public interest to violate them.

24           JUDGE BIBAS:  We also have not established that

25   outside the First Amendment context.  And the question is what

```
 1    to do with it, all First Amendment or some, but do we expand

 2    the treatment of First Amendment rights, which might be

 3    characterized as exceptional, to every other provision?  And

 4    so many things can be recharacterized as due process

 5    issues under Section 1983.  You're inviting us to basically

 6    allow all those 1983 claimants, if they raise a constitutional

 7    right, to get an injunction right away.

 8            MS. MURPHY:  I think that this would be the wrong

 9    context in which to stop.  Because one thing we know is the

10    supreme court has said quite emphatically that the Second

11    Amendment is not a second-class right.  It has said that --

12            JUDGE BIBAS:  It's substantive protections, yes.

13            MS. MURPHY:  And it said that, and it has specifically

14    invoked First Amendment law in the context of explaining Second

15    Amendment law.  It talked about First Amendment law again in

16    Bruen in terms of talking about the historical approach.  It

17    talked about it in McDonald in terms of implying this is a real

18    meaningful fundamental right.  So it seems to me it would be

19    pretty problematic.  You can worry about the other cases when

20    they come.  But boy, to start here as saying, yeah, we're going

21    to treat this one differently seems pretty at odds with what

22    the court has said.

23            JUDGE BIBAS:  Okay.  Well, in Bruen, it's gone back to

24    history.  And it's said we're not supposed to apply the tiers

25    of scrutiny.
```

1          MS. MURPHY:  That's right.

2          JUDGE BIBAS:  Even though tiers of scrutiny persist in

3    some areas of First Amendment law.

4          MS. MURPHY:  They do.

5          JUDGE BIBAS:  You're not asking us to go and borrow

6    the First Amendment tiers of scrutiny and apply them.

7          MS. MURPHY:  Absolutely not.  But the Court

8    specifically looked to First Amendment jurisprudence when

9    explaining that it actually does do historical tradition in the

10   First Amendment context as well.  Particularly, in more recent

11   cases, like there they were invoking United States v. Stevens.

12   Which I think is actually instructive in that -- I mean, one of

13   the differences -- one of the biggest differences between First

14   Amendment and Second Amendment cases is, when it comes to First

15   Amendment cases, we have a lot of issues that have already been

16   resolved by the courts.  But when the court confronted in

17   Stevens an argument that a new category of speech was not

18   protected by the Second -- the First Amendment, there the

19   depictions of animal cruelty.  Once the court decided that

20   that, like, is at least a form of speech --

21          JUDGE BIBAS:  Right.

22          MS. MURPHY:  -- the burden shifted one hundred percent

23   to the Government, and it had to justify it by looking at

24   historical tradition.  So the court drew from that and said,

25   this really is the way we've done a lot of things in a lot of

1    other contexts and exactly how we should be doing it here in

2    the Second Amendment context, too.

3              JUDGE BIBAS:  Judge Roth, anything else?

4              JUDGE ROTH:  Nothing further.

5              JUDGE BIBAS:  All right.  We'll get you back on

6    rebuttal.

7              Mr. Ross, I guess, is going first.

8              MR. ROSS:  Thank you, Your Honor.  David Ross, Ross

9    Aronstam & Moritz on behalf of Defendants Appellees.

10             The district court's exercise of its discretion not to

11   preliminarily enjoin the statute banning guns whose only

12   difference from machine guns, according to the undisputed

13   record below, is the lack of fully automatic fire, can be

14   affirmed for three independent reasons.  First, the Court can

15   affirm the district court's finding that the plaintiffs failed

16   to establish the irreparable harm necessary to obtain a

17   preliminary injunction.  Second, the Court can reject the only

18   argument the plaintiffs made below, which is that assault

19   weapons and large capacity magazines are so common that

20   historical regulations are "immaterial", as they argued at page

21   11 of their reply brief below, and as they also argued to the

22   district court in oral argument.  And third, the Court can

23   affirm under various aspects of the full Bruen analysis.

24             Today, I will focus on the irreparable harm factors,

25   the sole argument that plaintiff presented below, and Bruen's

1    historical analysis.  My friend from New Jersey will focus on

2    the meaning of "in common use" and will explain why, as we

3    argued below, that provides an additional basis on which to

4    affirm the decision of the district court.

5         The undisputed record below is that the guns at issue

6    here share core performance characteristics with machine guns.

7         JUDGE BIBAS:  Let's talk about what your friend on the

8    other side pressed with some force, the First Amendment analogy

9    here.  So is the fact that they -- they're alleging that they

10   want to exercise Second Amendment rights mean that we shouldn't

11   be doing an independent, irreparable harm analysis?  That

12   ultimately, we need to focus on the merits.  And then if they

13   win on the merits or have a likelihood of success on the

14   merits, that's enough because in First Amendment contexts,

15   we've allowed that.

16        MR. ROSS:  We do not believe that even if they were

17   likely to prevail on the merits, which the district court did

18   not find, that that would be enough to establish preliminary

19   harm.  We don't believe that it all collapses.  Even in the

20   First Amendment context, a violation is not, per se, remedied

21   by a preliminary injunction.  It's true in other contexts as

22   well, including, for example, the equal protection context,

23   Construction (sic) Association of Western Pennsylvania v.

24   Kreps.  And if you look at the cases that they cite in the

25   First Amendment context, what you see is that there were

1    different interests that could not be remedied absent a

2    preliminary injunction.  So for example, in Ayers, what you had

3    was someone who wanted to send invitations to a Christmas

4    party.  And obviously, if that was delayed, there would be no

5    ability to remedy that.  In Lewis, the court noted that it was

6    focused on a potential remedy if the plaintiff prevailed, and

7    there, there would be no way for an individual to express

8    themselves -- their wearing long hair -- without a risk of

9    their constitutional rights being deprivated.  Here, we have

10   specific factual findings by the district court.  As Your Honor

11   noted, several of these plaintiffs already own assault weapons.

12   They all own guns.  And critically, the district court found

13   with respect to the irreparable harm factor, with respect to

14   the core purpose of the Second Amendment, one's right to armed

15   self-defense.  There are numerous other avenues available for a

16   plaintiff to exercise that right.

17           JUDGE BIBAS:  But that doesn't mean that their Second

18   Amendment rights couldn't be being infringed, right?  Just

19   because they have some guns doesn't mean that they don't have a

20   right to have other guns.

21           MR. ROSS:  No, it doesn't mean that there couldn't be

22   some infringement.  The court found it to be a very limited

23   infringement, at best.  And when one is weighing the factors

24   for purposes of a preliminary injunction, the degree of

25   infringement is a relevant consideration.

1          JUDGE BIBAS:  But how do we weigh the balance of

2     equities here?  And is it, does the public interest collapse

3     into it?  Because there's -- you argued below and you argue

4     that there's a public safety interest here.  But these

5     defendants -- these plaintiffs here, they want to have the

6     firearms for lawful purposes, including self-defense.  So how

7     do we weigh those?  The district court -- what does our

8     deference to the district court's weighing look like,

9     especially since the district court didn't really express it in

10    those terms?

11         MR. ROSS:  Well, I think how one -- the Court would

12    undertake that analysis is to actually look at the factual

13    record that was presented.  And in this case, you have a

14    factual record where the sole extent of the evidence that was

15    presented by the plaintiffs is four declarations, which

16    established that some of them already own assault weapons; they

17    all own guns.  And as the district court specifically found,

18    the types of weapons that they would like to purchase are

19    neither useful for, nor in fact, based upon the undisputed

20    record evidence before it, actually utilized in self-defense

21    situations.  It was on the basis of those -- and of course

22    there are numerous alternatives available.  So it was on the

23    basis of all of that that the court was able to balance -- I

24    should add one more thing.  I apologize.  The Court also had

25    below it and considered the devastating potential effects of

Page 26

1   having these weapons out there.  It had the declaration of Lucy

2   Allen with respect to the use of these weapons in mass

3   shootings.  It --

4        JUDGE BIBAS:  Okay.  But in Bruen, the Court did say,

5   look, once the Second Amendment has struck a balance, it's not

6   for courts to balance again.  Is that different because we're

7   in the preliminary injunctive context?  Because when it comes

8   to the scope of the right, we're not supposed to be balancing.

9        MR. ROSS:  No.  Bruen has struck a balance with

10  respect to the nature of the underlying inquiry.  We don't read

11  Bruen as suggesting that all -- the remainder of the

12  preliminary injunction inquiry collapses, and it simply becomes

13  a question of likelihood of success on the merits.

14  Particularly, as we noted, we're at the preliminary injunction

15  stage, not at the permanent injunction stage.

16        JUDGE MONTGOMERY-REEVES:  Your friends on the other

17  side said, well, that shouldn't make a difference.  The

18  irreparable harm analysis is the same in the preliminary

19  injunction and the permanent injunction stage.  What's your

20  response to that?

21        MR. ROSS:  Well, the -- once a plaintiff has

22  established that there is in fact a constitutional violation,

23  then, obviously, I think how the Court thinks about it has to

24  account for that.  But what we are talking about here is a

25  preliminary finding on a limited record.  And therefore, I

Page 27

1   think the analysis is different at the preliminary injunction

2   stage than it would be at the final injunction stage.

3           JUDGE MONTGOMERY-REEVES:  And then just thinking a

4   little bit more about irreparable harm and what that looks like

5   in a case like this.  If your friends on the other side had put

6   evidence in of that, like, what additional facts would we need

7   to see?  What additional facts would have needed to be offered

8   below to establish irreparable harm in a case like this?

9           MR. ROSS:  Sure.  So the plaintiffs could have

10  attempted -- they did not, but they could have attempted to

11  rebut the evidence that we presented with respect to both the

12  suitability of the weapons at issue for self-defense and their

13  actual use.  The Court had undisputed evidence in the

14  Yurgealitis Declaration that these weapons are not well suited

15  for self-defense.  It had undisputed record evidence from Lucy

16  Allen that these weapons are not in fact used for self-defense.

17  They could have attempted -- we wanted an evidentiary hearing.

18  The plaintiffs did not want that.  They could have attempted to

19  cross-examine them, to take issue with it, or to put in their

20  own experts on these points.  They chose to do none of that.

21          As I indicated, the weapons that are issue at (sic)

22  here share core performance features with machine guns.  They

23  have, as Yurgealitis said in his declaration, identical

24  performance capabilities and characteristics.  The only

25  difference between these weapons and machine guns is the lack

Page 28

1    of fully automatic fire.  As the Seventh Circuit said in the

2    Bevis opinion, the AR-15 is "almost the same gun as the M-16

3    machine gun."  Because they share common performance

4    capabilities and characteristics like machine guns, they are

5    designed to maximize lethality.  They can shoot through the

6    vests of law enforcement officers.  They can penetrate three-

7    eights-inch hardened steel, and when they are used, they cause

8    gruesome injuries.  It is therefore not surprising, as Lucy

9    Allen said in her declaration, that when these are used in mass

10   shootings, the number of fatalities and injuries increase

11   significantly.

12          Now, the supreme court has said in Heller that you can

13   ban machine guns.  And it talked about them as M-16s and the

14   like.  Justice Scalia said it would be startling to suggest

15   otherwise, and he went on to explain why it would be startling.

16   He did not talk about the number of machine guns.  In the very

17   same sentence, he said the reason that that would be startling

18   is because machine guns are useful in warfare.  And I would

19   note that with respect to the sole performance difference, the

20   lack of fully automatic fire, the undisputed record evidence

21   below from the Yurgealitis Declaration is that semi-automatic

22   fire is in fact the preferred method of fire for the Army in

23   combat situations.  And so these weapons, given that limited

24   difference, fall clearly within the "and the like" that the

25   supreme court was referring to when it said "M-16s and the

1    like" in Heller.

2        Now, with respect to the sole argument that the

3    plaintiffs presented below, they initially acknowledged in

4    their opening papers that Bruen required a historical inquiry.

5    In response to what the district called the defendant's robust

6    historical record, including affidavits from five experts,

7    including -- sorry, a declaration from five experts, including

8    Professor Spitzer, who talked about the historical tradition of

9    regulation.  The plaintiffs elected not to present any

10   evidence.  They pivoted on reply, abandoned that, and said that

11   because these guns are common, the historical tradition becomes

12   immaterial.  Plaintiffs had it right in their opening brief and

13   wrong in their reply.  Bruen teaches that the Second Amendment

14   protects only the carrying of weapons that are those --

15        JUDGE ROTH:  Let me get back to that point.  If this

16   case should proceed beyond the argument today, are the

17   plaintiffs still precluded from introducing any additional

18   evidence?

19        MR. ROSS:  They're not, Judge Roth.  This was solely

20   for purposes of the preliminary injunction.  Judge Andrews

21   specifically found that the findings that he was making were

22   applicable only with respect to the preliminary injunction.

23        So with respect to Bruen, we see in the structure that

24   Bruen contemplates that the in common-use analysis is part of

25   the textual inquiry.  It notes in Section 3-A of the opinion

1    that it was undisputed that the guns were in common use.  It

2    then went in Section 3-B to undertake the historical analysis.

3    Now, consistent with the plain language of the supreme court,

4    when it said that the Second Amendment protected the weapons

5    that are in common use, that only gets you to the, then -- the

6    constitutional inquiry.  So for example, in Heffner v. Murphy,

7    this court said -- a commercial speech case -- "the First

8    Amendment protects commercial speech".  It then went on to

9    consider the restrictions with respect to commercial speech and

10   found that some of those were valid, even though it was

11   protected speech.  And I would note critically, with respect to

12   the only argument that the plaintiffs presented below, that

13   even Judge Brennan, in his dissent in the Bevis case in the

14   Seventh Circuit at page 1211, rejected the idea that

15   commonality alone would foreclose the historical inquiry.  He

16   said it is not an on-off switch; that it does not bar the

17   government from regulating; and that even with respect to

18   popular weapons, the --

19        JUDGE ROTH:  Does "common use" include the additional

20   language for common use for self-defense?  In other words, in

21   considering common use, are we thinking about common use for

22   any legal purpose, or are we thinking -- are we required to

23   think about common use for self-defense?

24        MR. ROSS:  As we argued below to Judge Andrews, we

25   believe that in common use requires that the weapons be

1   actually used for self-defense.  And I understand that my

2   friend from New Jersey is going to have that as the focus of

3   his argument.  We have focused in our appeal on why even taking

4   Judge Andrews' -- he disagreed with that.  But why even taking

5   that construct, we would still prevail.

6           I would like to take a moment to discuss briefly two

7   critical factual findings with respect to the Second Amendment

8   inquiry, which is the finding that there is both unprecedented

9   societal concerns and dramatic technological changes.  Those

10   are factual findings subject to clear mistake, having presented

11   no evidence on them below.  The plaintiffs --

12           JUDGE BIBAS:  This is a very odd area, where there are

13   trial-type procedures and things, but at the same time, should

14   we be treating these, as your friends on the other side

15   suggest, as legislative facts?  Things where they ask us to

16   look at the records of other cases and declarations in other

17   cases?

18           MR. ROSS:  No, Your Honor.  We do not believe these

19   are legislative facts.  In fact, the very fact that they are

20   citing expert declarations that the plaintiffs in other cases

21   chose to submit to those courts, but that for whatever reason,

22   these plaintiffs chose not to submit here, is precisely

23   evidence that these are adjudicative facts.  It's exactly what

24   Bruen teaches in footnote 6, that this is for trial courts to

25   deal with on the record that is presented before them.  And the

1   factual findings with respect to unprecedented societal concern

2   and dramatic technical change are critical because it goes to

3   how the Court undertakes its analogical reasoning.

4           We know from Bruen that in no circumstances does the

5   Government need to find either a dead ringer or a historical

6   twin.  And we also know that in light of those factual

7   findings, you need to take an even more nuanced approach to

8   your examination of analogs and find something that is only

9   relevantly similar.  And the declaration of Professor

10  Spitzer -- which talks about the long historical tradition that

11  starts even before the founding of the nation, comes throughout

12  time into the 20th century -- it includes the 1934 Act, fits

13  well within that.  And we see this pattern of regulation

14  throughout history, as Professor Spitzer noted.  I mean, even

15  if we were to look, for example, in the founding era, we see

16  that Tennessee, Alabama, and Georgia in 1837 all passed laws

17  which made it either illegal to sell or imposed massive taxes,

18  the equivalent of thousands of dollars of taxes today, on Bowie

19  knives.  The Tennessee statute was entitled, an act to suppress

20  the sale and use of Bowie knives.  Alabama passed an act to

21  suppress the use of Bowie knives; Georgia did the same thing.

22          So we see numerous tradition -- numerous analogues

23  throughout history, instances in which, in response to the

24  concerns of violence, the threat to public safety, the risk of

25  disparate use and criminality -- we see numerous instances in

Page 33

1   which governments reacted in a variety of ways.  The statutes

2   that were passed here are entirely consistent with that.

3   They're consistent with the founding era of statute, they're

4   consistent with the 1934 act, and they should be affirmed on

5   that basis.

6          JUDGE BIBAS:  Thank you.

7          MR. ROSS:  Thank you, Your Honor.

8          Mr. Feigenbaum, take your time.  Whenever you're

9   ready.

10          MR. FEIGENBAUM:   May it please the Court.  Fifteen

11   states, representing almost forty percent of the U.S.

12   population, restrict assault weapons or LCMs, just as the

13   federal government did for ten years.  As Delaware has

14   explained this afternoon, there are at least three different

15   ways to affirm, and I will address each in turn, starting with

16   Judge Roth's questions about common use, turning to Judge

17   Montgomery-Reeves' questions about the history, and closing on

18   Judge Bibas' questions about irreparable harm.

19          Judge Roth, to your questions on common use, we have

20   two primary observations to make.  The first is that common use

21   is not and cannot be the exclusive criterion for Second

22   Amendment analysis.  And second is that appellants' circulation

23   test is the wrong way to think about common use.  On the

24   former, we believe that common use is part of the step one of

25   the Bruen analysis, where plaintiffs bear the burden.  And the

1    reason is twofold, both from the precedent and from the

2    evidence of original public meaning.

3         On the precedent, Bruen itself uses step-one language

4    to talk about the common use inquiry.  So at pages 2143 and

5    2144 of Bruen, it talks about arms in common use for self-

6    defense being the ones that are protected -- the ones that get

7    Second Amendment protection.  But whether something gets the

8    constitutional protection is the language of the original scope

9    of the right.  The text as originally understood.  You then

10   engage in an analogical inquiry based on the statutory history

11   to determine whether the particular restriction on that arm

12   falls inside or outside the historical tradition.  And so when

13   you're talking about the step-one analysis, what gets

14   protection, you're using exactly the kind of language like

15   "arms in common use".  And we know that it can't be step two

16   because neither Heller nor Bruen actually analyzed any state

17   statutes in engaging in the inquiry to decide whether a

18   particular arm is in common use or not as the appropriate test.

19   Instead, what they did is look at the usual sources of original

20   public meaning to understand the words that appear in the text,

21   and then they proceeded to actually engage with the analysis in

22   Bruen, dealing with the public carry right; in Heller, dealing

23   with the restriction on handguns, something that we don't see

24   going on in the way that plaintiffs would have this Court do

25   the analysis.

1          And I think the Seventh Circuit's decision in Bevis is

2    particularly helpful on this score.  The Seventh Circuit's

3    decision specifically walks through the relevant original

4    public-meaning evidence.  So the 1689 English Bill of Rights,

5    the state constitutions at the time, Blackstone, all of which

6    show that the specific Second Amendment right to bear arms was

7    about arms that facilitate armed self-defense.  And as we have

8    undisputed record evidence here, that doesn't include assault

9    weapons; that doesn't include large capacity magazines.

10          Judge Roth, to your other questions on common use, I

11    have two points.  What is the right test, and what is the right

12    denominator?  Meaning, are you looking at all lawful possible

13    purposes or are you looking at self-defense, specifically?  In

14    terms of what the proper test is, we don't understand how a

15    circulation or a tallying up of the number of arms in the

16    market could possibly be the appropriate test for four reasons.

17          First, I'm not aware of any constitutional right that

18    turns on looking at how many items exist in the marketplace and

19    give it constitutional protection based on a question like

20    that.  Second, a circulation test, as both Bevis and Ocean

21    State Tactical most recently made clear, is inherently

22    circular.  We know the test is circular because whether or not

23    something gets constitutional protection would turn on how many

24    exist in the market; and how many exist in the market would

25    turn on whether and when it was regulated.  So the reason

Page 36

1   machine guns are not as widespread in the market today -- Bevis

2   footnote 7 makes this clear -- is because they got restricted

3   first with registration requirements in 1934, and then with a

4   prohibition in 1986.  And so we know the reason we don't even

5   see more machine guns in circulation today is because they were

6   restricted.  But a law, as Judge Easterbrook put most

7   memorably, I would say, in Friedman -- a law can't be the

8   source of its own constitutional validity.  But that's the way

9   that their arrangement would ultimately work.  Third, the

10  approach that they take is incompatible with the agreement

11  everyone has that you can restrict machine guns.  Heller says

12  it would be startling that machine guns would get

13  constitutional protection.  This court in Palmetto said that

14  machine guns do not get constitutional protection.  And as a

15  result, we know that it can't just be a circulation test,

16  because we have 176,000 machine guns in civilian circulation

17  right now, an undisputed record finding the district court

18  made.  And again, there's no record evidence in this case at

19  the PI stage that would undermine that.  And then finally, we

20  also think a circulation test is inconsistent with Heller and

21  Bruen themselves.  Heller does not count how many handguns are

22  in circulation.  It talks about the features of a handgun that

23  make it useful for self-defense.  Palmetto, the Third Circuit's

24  decision, does not count the number of machine guns in

25  circulation.  It talks about the features that are useful in

1   warfare that aren't useful for self-defense.  Bruen does not

2   ever count up the number of weapons in public carry in deciding

3   the scope of the public carry right.  And Miller itself doesn't

4   count the number of short-barrel shotguns in circulation.  So

5   we think the test doesn't work.

6          One final point on common use to Judge Roth's question

7   about what the denominator is:  So the question about whether

8   it can include other lawful purposes, like collecting, or

9   target shooting, or hunting, or what have you, I'm not sure is

10  squarely presented in this case for two reasons.  First,

11  plaintiffs have not built a record at the preliminary

12  injunction stage that they actually want to use any of these

13  arms for purposes other than self-defense.  They haven't shown

14  a record of why they would want to use them for hunting.

15  Instead, the undisputed record evidence in this case from the

16  Yurgealitis Declaration shows that assault weapons and large

17  capacity magazines are not, in fact, useful for hunting. So

18  whatever the denominator is, I'm not sure it really matters

19  under a proper analysis in this case.  And I'm not sure it's

20  going to matter in the paradigmatic case either, because your

21  prototypical hunting rifle is going to be useful in self-

22  defense, in sharp contrast to the large capacity magazine or

23  the assault weapon.

24         But if this Court does reach that Second Amendment

25  question, we do think that the denominator is the self-defense

1   right.  Bruen says that, in engaging with historical

2   evidence -- to Judge Montgomery-Reeves' question -- you look at

3   the comparability of the burden on self-defense.  And so it

4   doesn't really make sense that common use would turn on

5   something like hunting or collecting, but the historical

6   inquiry would turn on something like self-defense.  And the

7   Bevis decision from the Seventh Circuit does a particularly

8   good job of situating the right in its original public meaning

9   and showing the original public meaning specifically yoked the

10  right to the self-defense right.  So that's everything I wanted

11  to say on the common use point.

12         Turning quickly to Judge Montgomery-Reeves' question

13  about the history, making sure I leave a minute or two for

14  irreparable harm at the end.  Two points to make here, building

15  on, I think, really helpful opinions, both from the Seventh

16  Circuit and the First Circuit; again the Bevis case and the

17  Ocean State Tactical case.  We have a historical tradition in

18  this country of regulating arms once they enter the civilian

19  market and once they become widespread enough that they need to

20  get restricted.  So the undisputed record evidence that we have

21  in this case dealing with the Bowie knives specifically

22  addresses to your question, Judge Montgomery-Reeves, exactly

23  how our historical tradition works.  It's not a circulation

24  test.  It's not the idea that once something enters the market,

25  you lose the ability to restrict it.  Instead, it's that once

Page 39

1    something enters the market, you have reason to want to

2    restrict it, and legislatures do restrict it.  So forty-two

3    states had various restrictions on Bowie knives, including

4    multiple restrictions that outright prohibited both manufacture

5    and sale.  Forty-three states restricted slung shots, again,

6    including a number of them that restricted manufacture or sale.

7    So whether it's carry or manufacture or sale or even possession

8    outright, they all reflect a national and long-standing

9    historical tradition of flexibility, of different states having

10   different responses to shared public safety problems, because

11   that is a part of the historical tradition we've always seen.

12   Not every state regulates in the same way.  Alaska, New Jersey,

13   and Delaware, and other states may have very different

14   approaches to some of these public safety questions, but our

15   historical tradition has always embraced that, going back to

16   the 19th century, the 18th century, and before.

17          Now, Judge Bibas, with the two minutes remaining, I do

18   want to talk about the irreparable harm questions that you

19   asked today and make two points.  First, what we heard today at

20   the podium is that plaintiffs have embraced fully the idea that

21   constitutional harm must always be per se irreparable harm

22   because they've built no record that they're suffering any

23   irreparable harm that goes beyond that.  This isn't a surprise.

24   In the appellants' opening briefs, they also stake their case

25   entirely on the idea constitutional harm is per se irreparable

Page 40

1    harm.  I don't think that can be quite right, partially because

2    this court has said that's not quite right in cases like Hohe

3    v. Casey and Anderson v. Davila.  I think it also can't be

4    right in large part because of Winter.

5          I understand that my friends on the other side are

6    trying to draw a distinction between statutory and

7    constitutional.  I'm not quite sure I understood the way they

8    were doing it.  The whole reason that agencies can't act beyond

9    the authority granted to them by statutes is our constitutional

10   understanding that the executive has to stay in the lanes the

11   legislature has provided.  So if the Army, in the case of

12   Winter, is violating NEPA, is going beyond what environmental

13   requirements would have them do, they are violating the

14   separation of powers, as I think my friends on the other side

15   would agree, because executive agents can't flout congressional

16   statutes.  And when you have that situation, you have Winter.

17   But Winter was very clear that the military exercises were

18   allowed to proceed without simply saying, merely because you

19   have a likelihood of success on the merits, we'll draw a line

20   then and collapse the entire inquiry.

21         I think it's especially important when we're thinking

22   about disrupting the status quo.  Both this court and the

23   Supreme Court have long made clear that disruptions on the

24   status quo require a little more attention, a little more

25   support at the preliminary injunction stage, especially when

1    you have, say, delays from the other party.  Which I'm not

2    saying about this case specifically, but it's something we see

3    all the time in constitutional litigation.  And I do think a

4    contrary rule would have significant problems, not just for the

5    parties, but for judicial economy, because it's going to

6    require courts to collapse PI inquiries into a single

7    likelihood of success factor every time.  And when it does the

8    likelihood of success on a limited record, this case is a

9    perfect example.  There is no record from the plaintiffs

10   dealing with some of these historical questions, these

11   technical questions, et cetera.  I do think that's a real risk

12   for courts, not just for parties.

13          And if I might go about twenty seconds over to answer

14   your question about Lewis, Judge Bibas.

15          JUDGE BIBAS:  Yes.

16          MR. FEIGENBAUM:  So I think you're asking about Lewis

17   v. Kugler.  And I just want to note in footnote 12 in that

18   opinion, the court was specifically talking as well about how

19   where as in this case it is alleged that First Amendment rights

20   have been chilled as a result of government action, a

21   presumption of irreparable harm is manifest.  So it's not even

22   clear that Lewis was fully disaggregating Fourth Amendment from

23   First Amendment, as opposed to perceiving some risk of chill in

24   that case from the behavior of the police that was being

25   challenged.  So it's not even obvious that Lewis alone -- and I

1    spot you that it's also fifty years ago in a one-off case --

2    stands for the proposition that all constitutional cases are

3    going to collapse into a single likelihood of success analysis.

4         So given Winter; given what we see in elections cases

5    like Purcell, which are also often constitutional, but

6    nevertheless, do not collapse into a likelihood of success; and

7    given that Lewis I don't think stands for that proposition, if

8    all plaintiffs are resting on is the idea that constitutional

9    harm is always irreparable harm per se, I just don't think

10   they've made their case.

11        JUDGE BIBAS:  Thank you.

12        MR. FEIGENBAUM:  Thank you.

13        JUDGE BIBAS:  Mr. Ohlendorf, rebuttal?

14        MR. OHLENDORF:  Thank you, Your Honor.  It's just a

15   few quick points.  First, on the irreparable harm and the

16   injunction factors.  I think even my friend on the other side

17   couldn't swallow the pill that a permanent injunction upon

18   finding an actual constitutional violation, a court could

19   decline to enter a permanent injunction of the violation

20   because it concluded that the other equitable factors didn't

21   favor that type of relief.

22        JUDGE BIBAS:  Sometimes a declaratory judgment

23   suffices and courts don't grant an injunction in that

24   situation.

25        MR. OHLENDORF:  Judge Bibas, I just can't conceive of

1   a rule that a First Amendment or Second Amendment violation --

2   a court would not enjoin an actual violation of one of those

3   constitutional rights because it concluded, it's just not

4   important enough; there's not enough tangible -- there's not

5   enough tangible harm here.

6           JUDGE BIBAS:  All right.  Well, what about your

7   friends skillfully alluding to your four-month delay in seeking

8   this relief?

9           MR. OHLENDORF:  Judge Bibas, I mean, number one, all

10  of the delay cases they cited did not involve constitutional

11  rights.  They involved patent disputes or monetary disputes of

12  that kind.  And they also involved much, much longer delays.  I

13  mean, in one of the cases was a three-year delay; and another

14  one, I think, was thirteen months.  So I think that just

15  doesn't factor into the analysis at all.

16          On common use, Your Honor, if I may, plainly, that is

17  part of the tradition prong under Bruen, not the text prong.  I

18  mean, I would love to hear -- I have yet to hear and I didn't

19  hear from my friends on the other side this morning what word

20  in the Second Amendment common use comes from as a matter of the

21  plain text or what Bruen called an analysis of the bare

22  text.  I mean, I have yet to heard an answer to that.  But we

23  do know from Heller where it does come from; it comes from two

24  historical traditions.  The tradition that the militia would

25  come into militia service bearing the arms typically in common

1   use, and the tradition that, conversely, governments could ban

2   the carrying of dangerous and unusual arms.  Those clearly are

3   historical analyses under Bruen's second test, not under its

4   textual test.  And Bruen itself says this.  It says, we drew

5   the common use standard from the historical tradition.

6          Finally, on history and tradition, if I may, Judge

7   Bibas, very quickly, just two points.  First, if this Court

8   does decide to look beyond common use, the historical analysis

9   has to be limited to the founding era.  That's what a panel of

10  this court held in the Lara case.  That's binding here, unless

11  the Court decides to take it en banc.  I haven't heard -- the

12  great bulk of the founding era laws they've cited below are

13  laws that apply to slaves, specifically.  I don't think those

14  can conceivably carry its burden.  This morning, my friend

15  mentioned three laws from the 1830s.  I think 1837 is too late.

16  I also would note, one of those was struck down by the Georgia

17  Supreme Court in Nunn as contrary to the Second Amendment.  So

18  I think plainly that does not suffice to bear the State's

19  burden either.

20          JUDGE BIBAS:  Okay.  I thank you, and you're entitled

21  to some rest, because we're no longer in the morning; we're in

22  the afternoon now.

23          Ms. Murphy?

24          MS. MURPHY:  Thank you.  If I can just supplement a

25  couple of points Mr. Ohlendorf made and then add a couple more.

1  Just the one other thing I would add on the injunctive relief

2  factors is, it's not just that I think it's right as a matter

3  of comparison to other constitutional rights.  And what you

4  heard basically this morning is, this isn't causing any harm.

5  It's not a big deal, because we're pretty confident you can

6  defend yourself with something else.  And if there's one thing

7  that Heller already addressed squarely, it was that question.

8  Heller said, and I quote, it is no answer to say that it's

9  permissible to ban the possession of handguns so long as the

10  possession of other firearms, like long guns, is allowed.  And

11  then it went on to say, it doesn't matter.  We hypothesize some

12  reasons why people might prefer something -- one type of

13  firearm to another.  But at the end of that paragraph, the

14  court says, whatever the reason, handguns are the most popular

15  weapon chosen for self-defense in the home, so a complete

16  prohibition is invalid.  So I don't think it's open to the

17  State to come in now and say, you know, it's all well and good

18  that you would like to have a semi-automatic rifle, but we

19  think you can do well enough with a revolver or whatever it is

20  that they think is permissible.

21        On the common use test, I would just point you -- Mr.

22  Feigenbaum pointed specifically to page 2143 of Bruen.  I'd

23  invite you to go read that paragraph, because before the

24  court uses the words "in common use", it specifically says,

25  drawing from this historical tradition, we explained in Heller

1    that the Second Amendment protects the carrying of weapons that

2    are in common use.  And if you look earlier at page 2128 of

3    Bruen, the Court again says, we found it fairly supported by

4    the historical tradition of prohibiting the carrying of

5    dangerous and unusual weapons; that the Second Amendment

6    protects the possession of weapons that are in common use at

7    the time.  So it's quite clear that the Court is drawing us to

8    the common use test, not from the word "arms", which of course

9    says nothing about common use, but from the historical

10   tradition of prohibiting dangerous and unusual weapons.

11        Now, that gets to the argument you heard about how,

12   well, yeah, the court may have said that lots of times, but

13   they couldn't possibly have meant it because it's a bad test

14   and it's circular and it doesn't work.  That just rests on a

15   misunderstanding of the test.  Because what the State continues

16   to overlook is, it has to be dangerous and unusual in order for

17   an arm to be banned.  Which means if a state comes in and just

18   bans something because it's new on the market, but what it's

19   banning is not materially different at all from things that are

20   already on the market, it's not abnormally dangerous in some

21   way that differentiates from other arms, then it's satisfied

22   the abnormally, unusually dangerous component.

23        So this whole idea of circularity is just built on a

24   false premise.  And I think you see that if you look back to

25   machine guns.  Everybody always wants to say, oh, machine guns

Page 47

1    were -- that just proves that this is all circular because the

2    only reason they're not common is because they were banned.   In

3    fact, they were banned because they weren't common.   They came

4    onto the market around 1921.   And there were thousands of

5    them available -- tens of thousands of them available.   If you

6    look to the declaration of the State's own expert, Professor

7    Spitzer explains nobody really wanted them.   There wasn't a big

8    rush to go buy these.   Instead, there was a big rush to ban

9    them.   By 1925, states started banning them.   Thirty-two states

10   had banned them by 1934, when the federal legislation came

11   along.   So what we saw is the reaction of Americans all across

12   the country was, we actually do think this is something new and

13   different that requires different treatment.   And that's

14   particularly notable given that by the time these submachine

15   guns, bearable automatic firearms, come onto the market in the

16   1920s, semi-automatic rifles like the ones we're talking about

17   here today had been on the market for more than thirty years,

18   and nobody was prohibiting them.   And even in the 1920s, when

19   the states -- a vast majority of the states started banning

20   these automatic weapons, they recognized the difference between

21   the two.   And only a handful of states impose any restrictions

22   on semi-automatics.   And if you study those restrictions and

23   what even Professor Spitzer had to say about them, you will

24   find that no more than at absolute most five had any kind of

25   ban on semi-automatic technology, and all but the District of

1  Columbia's was repealed or amended within a few decades.

2      JUDGE ROTH:  But if it's only recently in the last

3  twenty years that semi-automatic weapons have been used by

4  people in mass shootings who want to infect as much damage and

5  death as possible very quickly so that the use that has upset

6  people today was not a use that was recognized or was not a use

7  that was in actual use fifty years ago.  So don't we have to

8  consider -- don't we have to consider the present use or the

9  change of use of these weapons, not just the fact that they

10  originally appeared on the market shortly after World War I?

11      MS. MURPHY:  If that were the typical means for which

12  they were being used, I'd be with you.  But when less than one-

13  tenth of one percent, and probably even less than that, of

14  these firearms are being used by somebody for that purpose, and

15  the vast, vast, vast majority of people in this country of

16  people who own those weapons own them for lawful purposes like

17  self-defense, then Heller and Bruen teach that you cannot ban

18  them from the possession of law-abiding citizens because the

19  Second Amendment --

20      JUDGE ROTH:  You are saying, forget the fact that it's

21  only very few cases where they're used for these terrible

22  purposes; move onto something else.  There are people who are

23  concerned that they are used for these terrible purposes,

24  miniscule as it may be, is something that is needed to protect

25  all of us from those circumstances arising in our own life?

1          MS. MURPHY:  I very, very much appreciate the concern,

2     which is a concern that all of us share, Judge Roth.  But the

3     problem is that Heller considered very similar, indeed, some of

4     the same concerns.  There were amici there who made the same

5     arguments, that handguns should be prohibited because handguns

6     are the overwhelmingly common use of firearms in mass

7     shootings.  And what the Supreme Court said is, we will take

8     all of that as a given.  We are not going to dispute that the

9     problems you're talking about are real, but the Second

10    Amendment already struck the balance in favor of protecting the

11    rights of the law-abiding citizens to protect themselves

12    against the people who would use arms to cause them and their

13    loved ones harm.

14          JUDGE BIBAS:  Thank you, Counsel.

15          MS. MURPHY:  Thank you, Your Honor.

16          JUDGE BIBAS:  The case is submitted.  We'd like to ask

17    both sides to work together to produce a transcript and split

18    the cost.  And let's go off the record for a moment so we can

19    greet counsel at sidebar before our next case.

20          (Whereupon these proceedings were concluded at 2:42 PM)

21

22

23

24

25

Page 50

1

2                         C E R T I F I C A T I O N

3

4    I, Bridget Hearne, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _____

9    Bridget Hearne

10

11   eScribers

12   7227 North 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  March 19, 2024

16

17

18

19

20

21

22

23

24

25

**&**

**&**  2:3,6,9,13
  22:9

**0**

**08625**  2:18

**1**

**1001**  2:14
**11**  1:7 22:21
**112**  2:17
**12**  41:17
**1211**  30:14
**1313**  2:13
**15**  28:2
**1523**  2:4
**16**  28:2
**1634**  3:7
**1641**  3:7
**1689**  35:4
**16s**  28:13,25
**16th**  50:12
**176,000**  36:16
**1800**  1:21
**1801**  1:20
**1830s**  44:15
**1837**  32:16
  44:15
**18th**  39:16
**19**  50:15
**19103**  1:21
**1920s**  47:16,18
**1921**  47:4
**1925**  47:9
**1934**  32:12
  33:4 36:3

47:10
**1973**  7:4
**19801**  2:14
**1983**  20:5,6
**1986**  36:4
**19th**  39:16
**1:40**  1:6

**2**

**20036**  2:4
**2024**  1:7 50:15
**207**  50:12
**20th**  32:12
**2128**  46:2
**2143**  34:4
  45:22
**2144**  34:5
**22314**  2:7,10
**23**  8:6
**23-1633**  1:3,12
  3:6
**23-1634**  1:4,12
**23-1641**  1:4,12
**25**  2:16
**2:42**  49:20

**3**

**3**  29:25 30:2

**6**

**6**  31:24

**7**

**7**  36:2
**706**  2:6,10
**7227**  50:12
**777-6690**  1:22

**8**

**85020**  50:13
**888**  1:22

**a**

**abandoned**
  29:10
**abiding**  11:5
  13:21,22 48:18
  49:11
**ability**  10:12
  24:5 38:25
**able**  25:23
**abnormally**
  46:20,22
**absent**  16:19
  24:1
**absolute**  6:5
  47:24
**absolutely**
  12:11,21 21:7
**abuse**  9:2
**account**  26:24
**accurate**  50:5
**acknowledged**
  29:3
**acquire**  5:16
**act**  32:12,19,20
  33:4 40:8
**action**  41:20
**actual**  27:13
  42:18 43:2
  48:7
**actually**  13:18
  14:8 15:2,8
  17:1,24 19:9

21:9,12 25:12
  25:20 31:1
  34:16,21 37:12
  47:12
**add**  25:24
  44:25 45:1
**additional**  23:3
  27:6,7 29:17
  30:19
**address**  33:15
**addressed**  45:7
**addresses**
  38:22
**adjudicative**
  31:23
**adopt**  6:1 7:15
**affidavits**  29:6
**affirm**  22:15,23
  23:4 33:15
**affirmed**  22:14
  33:4
**afternoon**  3:5,9
  10:24 33:14
  44:22
**agencies**  40:8
**agents**  40:15
**ago**  7:1 42:1
  48:7
**agree**  8:17
  12:11,13 13:7
  40:15
**agreement**
  36:10
**ahead**  8:5

**al** 1:4,8 3:6,8
**alabama** 32:16
  32:20
**alaska** 39:12
**alexandria** 2:7
  2:10
**alleged** 41:19
**alleging** 23:9
**allen** 26:2
  27:16 28:9
**allocated** 4:19
**allow** 10:15
  16:24 20:6
**allowed** 23:15
  40:18 45:10
**alluding** 43:7
**alternatives**
  25:22
**amended** 48:1
**amendment** 6:1
  6:7,10,17 7:1,3
  7:4,22,23 8:2
  8:11 9:19,19
  10:11,13 12:23
  12:25 13:4
  14:18,18,23
  15:4 16:8,10
  17:5,6 19:6,25
  20:1,2,11,14,15
  20:15 21:3,6,8
  21:10,14,14,15
  21:18 22:2
  23:8,10,14,20
  23:25 24:14,18
  26:5 29:13

30:4,8 31:7
33:22 34:7
35:6 37:24
41:19,22,23
43:1,1,20
44:17 46:1,5
48:19 49:10
**amendment's**
  3:16
**amendments**
  16:11
**americans** 11:5
  13:21,21,22
  47:11
**amici** 11:18
  49:4
**amicus** 10:25
**amount** 14:16
**analogical** 32:3
  34:10
**analogs** 32:8
**analogues**
  32:22
**analogy** 23:8
**analyses** 44:3
**analysis** 12:24
  15:9 17:23
  18:15 22:23
  23:1,11 25:12
  26:18 27:1
  29:24 30:2
  33:22,25 34:13
  34:21,25 37:19
  42:3 43:15,21
  44:8

**analyzed** 34:16
**analyzing** 10:2
  12:22
**anderson** 40:3
**andrews** 29:20
  30:24 31:4
**animal** 21:19
**anjrpc** 3:17
**answer** 8:19
  9:11 10:7
  11:19,20 13:1
  41:13 43:22
  45:8
**anytime** 14:23
**anyway** 4:5
**apart** 5:1 7:3
**apologize** 25:24
**appeal** 1:10
  31:3
**appeals** 1:1
**appear** 34:20
**appearances**
  1:18 2:1
**appeared** 48:10
**appellants** 1:5
  2:2 3:8,11
  33:22 39:24
**appellate** 1:14
**appellee** 1:9
  2:11
**appellees** 22:9
**applicable**
  29:22
**applies** 7:4

**apply** 7:21
  10:19 18:5,10
  18:16,17 20:24
  21:6 44:13
**appreciate** 49:1
**approach**
  16:13 20:16
  32:7 36:10
**approaches**
  39:14
**appropriate**
  34:18 35:16
**ar** 28:2
**area** 31:12
**areas** 21:3
**argue** 25:3
**argued** 22:20
  22:21 23:3
  25:3 30:24
**argument** 8:12
  8:13,14,19
  9:22 11:23
  17:11 21:17
  22:18,22,25
  29:2,16 30:12
  31:3 46:11
**arguments**
  11:13,15 49:5
**arising** 48:25
**arm** 11:22,23
  12:2,7,15,15,24
  13:2,2 14:15
  15:2 34:11,18
  46:17

**armed**  14:21
   24:14 35:7
**arms**  3:19,23
   3:23,25 6:6
   9:23 10:4,9,15
   10:18,19 11:11
   11:19,21 12:3
   12:3,20,21
   13:6,19 14:13
   14:19 34:5,15
   35:6,7,15
   37:13 38:18
   43:25 44:2
   46:8,21 49:12
**army**  28:22
   40:11
**aronstam**  2:13
   22:9
**arrangement**
   36:9
**aside**  13:17
   15:21
**asked**  15:2 16:1
   39:19
**asking**  21:5
   41:16
**aspect**  12:23
**aspects**  22:23
**assault**  5:12
   14:10 15:18
   22:18 24:11
   25:16 33:12
   35:8 37:16,23
**association**  1:4
   3:6 23:23

**atom**  14:5
**attacker**  14:16
**attackers**  15:5
**attempted**
   27:10,10,17,18
**attention**  40:24
**attorney**  2:16
**authority**  40:9
**automatic**  4:1
   11:5,24 14:2
   14:10,13 22:13
   28:1,20,21
   45:18 47:15,16
   47:20,25 48:3
**automatically**
   6:2
**automatics**
   47:22
**available**  17:7
   24:15 25:22
   47:5,5
**avenue**  2:4
**avenues**  24:15
**aver**  5:17
**averred**  9:17
**aware**  35:17
**ayers**  24:2
**az**  50:13

**b**

**b**  30:2
**back**  10:23
   15:9 20:23
   22:5 29:15
   39:15 46:24

**bad**  19:22
   46:13
**balance**  5:5
   17:13 19:1
   25:1,23 26:5,6
   26:9 49:10
**balancing**
   16:21 18:20
   26:8
**ban**  3:22,25 6:8
   9:23 10:4,8,18
   10:18 13:5
   28:13 44:1
   45:9 47:8,25
   48:17
**banc**  44:11
**banned**  4:1
   5:15 11:6 13:3
   46:17 47:2,3
   47:10
**banning**  22:11
   46:19 47:9,19
**bans**  3:20 4:5
   46:18
**bar**  30:16
**bare**  43:21
**barrel**  37:4
**based**  25:19
   34:10 35:19
**basically**  16:13
   16:17 20:5
   45:4
**basis**  23:3
   25:21,23 33:5

**bear**  6:7 10:15
   11:11 14:19
   15:22,23 33:25
   35:6 44:18
**bearable**  3:18
   11:21 12:7,20
   47:15
**bearing**  43:25
**begins**  11:17
**behalf**  10:25
   22:9
**behavior**  41:24
**believe**  15:15
   15:15 23:16,19
   30:25 31:18
   33:24
**best**  12:9 24:23
**bevis**  28:2
   30:13 35:1,20
   36:1 38:7,16
**beyond**  29:16
   39:23 40:8,12
   44:8
**bibas**  1:15 4:6
   4:9,13,21,24
   5:1,4,5,8,11,17
   5:20,21,25 6:5
   6:24 7:10,20
   7:24 8:1 9:2,5
   10:20,22 11:3
   15:20,25 16:13
   17:4 18:18,22
   19:3,11,13,24
   20:12,23 21:2
   21:5,21 22:3,5

23:7 24:17
25:1 26:4
31:12 33:6,18
39:17 41:14,15
42:11,13,22,25
43:6,9 44:7,20
49:14,16
**big** 45:5 47:7,8
**biggest** 21:13
**bill** 17:2 35:4
**binding** 44:10
**bit** 17:24 27:4
**blackstone**
35:5
**blanket** 6:1
**bomb** 14:5
**books** 18:10
**borrow** 21:5
**bowie** 32:18,20
32:21 38:21
39:3
**box** 2:17
**boy** 20:20
**brennan** 30:13
**bridget** 2:25
50:4,9
**brief** 22:21
29:12
**briefly** 31:6
**briefs** 39:24
**brookins** 2:9
**bruen** 3:15,19
4:9,10,18 9:24
10:5,8,9,13
11:8,9,14,15,16

11:20 12:14,14
12:19 13:4,13
20:16,23 22:23
26:4,9,11 29:4
29:13,23,24
31:24 32:4
33:25 34:3,5
34:16,22 36:21
37:1 38:1
43:17,21 44:4
45:22 46:3
48:17
**bruen's** 22:25
44:3
**building** 38:14
**built** 37:11
39:22 46:23
**bulk** 7:19 44:12
**burden** 3:19
4:6,8,10,13,16
4:19,20,22
13:18 15:15,16
15:17 21:22
33:25 38:3
44:14,19
**burdens** 4:17
4:18 15:22,23
15:25
**buy** 47:8

**c**

**c** 3:1 50:2,2
**cabin** 14:15
**call** 6:8
**called** 3:5 5:13
5:13 15:18

29:5 43:21
**capabilities**
27:24 28:4
**capable** 12:6,10
12:17 14:5,8
**capacity** 5:13
22:19 35:9
37:17,22
**carry** 14:24
15:14 34:22
37:2,3 39:7
44:14
**carrying** 10:9
29:14 44:2
46:1,4
**case** 1:3,12 3:5
3:16,17 4:17
7:1,4,7,22 8:8
10:18 19:13,18
25:13 27:5,8
29:16 30:7,13
36:18 37:10,15
37:19,20 38:16
38:17,21 39:24
40:11 41:2,8
41:19,24 42:1
42:10 44:10
49:16,19
**cases** 7:3,7,19
7:20,23 8:2 9:4
17:7 19:6,8,20
20:19 21:11,14
21:15 23:24
31:16,17,20
40:2 42:2,4

43:10,13 48:21
**casey** 40:3
**cast** 6:4
**category** 21:17
**cause** 16:6 28:7
49:12
**causing** 17:15
45:4
**ceases** 11:23
**century** 7:1
32:12 39:16,16
**certain** 3:22
10:18
**certainly** 5:16
7:7 15:23
**certify** 50:4
**cetera** 41:11
**challenged**
41:25
**chance** 18:19
**change** 32:2
48:9
**changes** 31:9
**characteristics**
23:6 27:24
28:4
**characterized**
20:3
**chill** 41:23
**chilled** 41:20
**chose** 8:6 27:20
31:21,22
**chosen** 45:15
**christmas** 24:3

**circuit** 1:1,15
  1:15,16 16:7
  28:1 30:14
  38:7,16,16
**circuit's** 35:1,2
  36:23
**circular** 35:22
  35:22 46:14
  47:1
**circularity**
  46:23
**circulation**
  33:22 35:15,20
  36:5,15,16,20
  36:22,25 37:4
  38:23
**circumstances**
  16:19 32:4
  48:25
**cite** 23:24
**cited** 43:10
  44:12
**citing** 31:20
**citizens** 48:18
  49:11
**city** 4:16
**civilian** 36:16
  38:18
**claimants** 20:6
**class** 20:11
**clear** 14:12
  31:10 35:21
  36:2 40:17,23
  41:22 46:7

**clearly** 28:24
  44:2
**clement** 2:6,9
**clerk** 3:2,4,13
**closing** 33:17
**collapse** 7:10
  25:2 40:20
  41:6 42:3,6
**collapses** 16:13
  23:19 26:12
**collecting** 37:8
  38:5
**columbia's**
  48:1
**combat** 28:23
**come** 16:11
  20:20 43:23,25
  45:17 47:15
**comes** 11:20
  16:15 21:14
  26:7 32:11
  43:20,23 46:17
**commercial**
  30:7,8,9
**common** 3:24
  3:25 6:23,24
  7:2 11:11
  12:12,21 13:6
  13:22 15:10,16
  22:19 23:2
  28:3 29:11,24
  30:1,5,19,20,21
  30:21,23,25
  33:16,19,20,23
  33:24 34:4,5

  34:15,18 35:10
  37:6 38:4,11
  43:16,20,25
  44:5,8 45:21
  45:24 46:2,6,8
  46:9 47:2,3
  49:6
**commonality**
  30:15
**commonly** 9:23
  10:4 12:8,15
  13:20
**company** 1:20
**comparability**
  38:3
**compared** 14:3
**comparison**
  45:3
**complete** 45:15
**complex** 2:17
**component**
  46:22
**conceivably**
  44:14
**conceive** 42:25
**conception**
  14:17 15:1
**concern** 32:1
  49:1,2
**concerned**
  48:23
**concerns** 31:9
  32:24 49:4
**conclude** 9:18

**concluded**
  15:17 42:20
  43:3 49:20
**conclusion**
  11:13
**conclusive** 7:4
**confident** 45:5
**confrontation**
  14:22
**confronted**
  21:16
**congressional**
  40:15
**consider** 12:16
  30:9 48:8,8
**consideration**
  24:25
**considered**
  11:15,16 25:25
  49:3
**considering**
  30:21
**consistent** 3:20
  3:23 10:3 13:3
  14:17 30:3
  33:2,3,4
**constellation**
  6:23,24
**constitute** 9:20
  11:21
**constitution**
  16:20,24
**constitutional**
  6:23,25 7:23
  9:6,7,10,15

16:6,16,17,23
17:17,18 18:13
19:21 20:6
24:9 26:22
30:6 34:8
35:17,19,23
36:8,13,14
39:21,25 40:7
40:9 41:3 42:2
42:5,8,18 43:3
43:10 45:3
**constitutions**
35:5
**construct** 31:5
**construction**
23:23
**contemplates**
29:24
**contemplation**
14:23
**context** 6:17
9:20 17:20,22
17:25 18:6,8
18:14 19:25
20:9,14 21:10
22:2 23:20,22
23:25 26:7
**contexts** 22:1
23:14,21
**continues**
46:15
**contrary** 41:4
44:17
**contrast** 37:22

**conversely** 44:1
**cooper** 2:3
**core** 23:6 24:14
27:22
**correct** 4:24
7:20 8:15
12:21 16:17
**cost** 49:18
**counsel** 2:8 4:6
49:14,19
**count** 36:21,24
37:2,4
**countenanced**
10:16
**country** 38:18
47:12 48:15
**counts** 6:2
**couple** 44:25,25
**course** 9:14
17:23 25:21
46:8
**court** 1:1,10,20
3:10,21,25
6:11,21 8:2,21
8:24 9:13 10:1
14:20 15:17
17:11 18:9
19:14,20,20
20:10,22 21:7
21:16,19,24
22:14,17,22,22
23:4,17 24:5
24:10,12,22
25:7,9,11,17,23
25:24 26:4,23

27:13 28:12,25
30:3,7 32:3
33:10 34:24
36:13,17 37:24
40:2,22,23
41:18 42:18
43:2 44:7,10
44:11,17 45:14
45:24 46:3,7
46:12 49:7
**court's** 3:11,15
3:17 4:4,15 7:7
11:1,8 16:3
22:10,15 25:8
**courts** 7:8 19:6
21:16 26:6
31:21,24 41:6
41:12 42:23
**criminality**
32:25
**criterion** 33:21
**critical** 31:7
32:2
**critically** 24:12
30:11
**cross** 27:19
**cruelty** 21:19
**currently** 5:18
**curtail** 10:12

| d |
| --- |

**d** 2:3 3:1
**damage** 48:4
**dangerous** 44:2
46:5,10,16,20
46:22

**date** 50:15
**david** 2:12 22:8
**davila** 40:3
**day** 8:9
**dc** 2:4
**de** 2:14
**dead** 32:5
**deal** 31:25 45:5
**dealing** 12:17
34:22,22 38:21
41:10
**death** 48:5
**decades** 48:1
**decide** 34:17
44:8
**decided** 9:23
21:19
**decides** 44:11
**deciding** 37:2
**decision** 3:17
4:4,15 11:8
23:4 35:1,3
36:24 38:7
**decisions** 3:15
**declaration**
26:1 27:14,23
28:9,21 29:7
32:9 37:16
47:6
**declarations**
5:2,7,9,22 9:16
25:15 31:16,20
**declaratory**
42:22

decline 42:19
defend 45:6
defendant's
  29:5
defendants
  22:9 25:5
defense 9:24
  10:5 11:12,22
  12:2,3,7,10,15
  13:7,11,11,14
  13:14,16,23
  14:1,3,5,6,8,9
  14:11,24,25
  15:3,12,14
  24:15 25:6,20
  27:12,15,16
  30:20,23 31:1
  34:6 35:7,13
  36:23 37:1,13
  37:22,25 38:3
  38:6,10 45:15
  48:17
deference 25:8
definition
  12:20
degree 24:24
delaware 1:3,7
  1:11 3:6,19
  5:16 11:6,7
  33:13 39:13
delaware's
  3:25 4:1,5 8:9
delay 43:7,10
  43:13

delayed 24:4
delays 41:1
  43:12
delving 8:13
denominator
  35:12 37:7,18
  37:25
department 1:7
depends 14:14
depictions
  21:19
depravation
  6:1
deprivated
  24:9
deprive 16:5
description
  12:16,16
designed 28:5
detachable
  11:25
determination
  9:1
determine 8:24
  8:25 9:14
  10:14 34:11
determined
  3:22 18:11
determining
  6:22
devastating
  25:25
devoted 9:25
difference
  19:17 22:12

26:17 27:25
  28:19,24 47:20
differences
  21:13,13
different 16:9
  18:15 24:1
  26:6 27:1
  33:14 39:9,10
  39:13 46:19
  47:13,13
differentiates
  46:21
differently
  20:21
disaggregating
  41:22
disagree 15:20
disagreed 31:4
discretion 8:19
  8:21,24 9:3,18
  22:10
discretionary
  9:10
discuss 31:6
disparate 32:25
dispositive
  12:22
dispute 5:20
  8:5 49:8
disputed 9:17
  10:10
disputes 43:11
  43:11
disrupting
  40:22

disruptions
  40:23
dissent 30:13
distinction
  13:12 40:6
district 1:10,11
  1:11 3:24 4:4
  8:2 15:17 16:4
  22:10,15,22
  23:4,17 24:10
  24:12 25:7,8,9
  25:17 29:5
  36:17 47:25
doing 22:1
  23:11 40:8
dollars 32:18
doubting 19:8
dramatic 31:9
  32:2
draw 19:1 40:6
  40:19
drawing 45:25
  46:7
drew 21:24
  44:4
dssa 10:25
due 7:8 20:4
duke 2:6,10

**e**

e 2:5,12 3:1,1
  50:2
earlier 46:2
easier 17:24
easily 13:17,17

**easterbrook** 36:6

**ebay** 7:14

**economy** 41:5

**effects** 25:25

**effort** 11:9

**efforts** 11:12

**eights** 28:7

**either** 8:3 32:5 32:17 37:20 44:19

**elected** 29:9

**election** 8:4,4

**elections** 42:4

**embraced** 39:15,20

**emphatically** 20:10

**en** 44:11

**enforced** 8:10

**enforcement** 16:4 28:6

**engage** 34:10 34:21

**engaging** 34:17 38:1

**english** 35:4

**enjoin** 22:11 43:2

**enter** 38:18 42:19

**enters** 38:24 39:1

**entire** 40:20

**entirely** 33:2 39:25

**entitled** 32:19 44:20

**environmental** 40:12

**equal** 7:8 23:22

**equally** 7:21

**equitable** 7:15 42:20

**equities** 5:6 17:13 25:2

**equity** 7:13 17:4,5

**equivalent** 32:18

**era** 32:15 33:3 44:9,12

**erin** 2:5 10:24

**escribers** 50:11

**especially** 25:9 40:21,25

**esq** 2:3,5,9,12 2:15

**essentially** 6:14 6:16

**establish** 22:16 23:18 27:8

**established** 19:24 25:16 26:22

**et** 1:4,8 3:6,8 41:11

**evan** 1:11

**everybody** 46:25

**evidence** 5:1 25:14,20 27:6 27:11,13,15 28:20 29:10,18 31:11,23 34:2 35:4,8 36:18 37:15 38:2,20

**evidentiary** 27:17

**exactly** 22:1 31:23 34:14 38:22

**examination** 32:8

**examine** 27:19

**example** 23:22 24:2 30:6 32:15 41:9

**except** 17:4

**exceptional** 20:3

**exclusive** 33:21

**executive** 40:10 40:15

**exercise** 9:15 22:10 23:10 24:16

**exercises** 40:17

**exercising** 8:10 17:16

**exist** 35:18,24 35:24

**expand** 20:1

**expert** 31:20 47:6

**experts** 27:20 29:6,7

**explain** 23:2 28:15

**explained** 14:20 33:14 45:25

**explaining** 20:14 21:9

**explains** 47:7

**express** 24:7 25:9

**extent** 10:10 11:17 25:14

**extraordinarily** 16:19

**extraordinary** 7:12

**f**

**f** 50:2

**facilitate** 35:7

**fact** 4:11 13:17 13:25 14:5 18:7 23:9 25:19 26:22 27:16 28:22 31:19,19 37:17 47:3 48:9,20

**factor** 5:3 19:16 24:13 41:7 43:15

| | | | |
|---|---|---|---|
| **factors** 4:14,23 7:11 15:21 18:5,8,17 19:4 19:15 22:24 24:23 42:16,20 45:2 | **find** 6:25 17:11 23:18 32:5,8 47:24 | 41:19,23 42:15 43:1 44:7 | **founding** 32:11 32:15 33:3 44:9,12 |
| **facts** 16:18 27:6,7 31:15 31:19,23 | **finding** 19:19 22:15 26:25 31:8 36:17 42:18 | **fits** 32:12 | **four** 5:6 7:10 11:1 19:16 25:15 35:16 43:7 |
| **factual** 24:10 25:12,14 31:7 31:10 32:1,6 | **findings** 24:10 29:21 31:7,10 32:1,7 | **five** 9:25 29:6,7 47:24 | **fourth** 6:25 7:3 41:22 |
| **failed** 22:15 | **fire** 14:15,15 15:5,8 22:13 28:1,20,22,22 | **flat** 3:22 | **friedman** 36:7 |
| **fairly** 46:3 | | **flexibility** 39:9 | **friend** 16:1 23:1,7 31:2 42:16 44:14 |
| **fall** 28:24 | | **flout** 40:15 | |
| **falls** 34:12 | | **focus** 22:24 23:1,12 31:2 | |
| **false** 46:24 | **firearm** 4:2 11:23 14:22 15:3,5 45:13 | **focused** 24:6 31:3 | **friends** 26:16 27:5 31:14 40:5,14 43:7 43:19 |
| **fatalities** 28:10 | | **focusing** 8:12 | |
| **favor** 16:22 42:21 49:10 | **firearms** 3:18 5:10,11,18,19 10:9 11:18 25:6 45:10 47:15 48:14 49:6 | **follow** 10:17 | **full** 22:23 |
| **features** 11:24 27:22 36:22,25 | | **follows** 9:1 | **fully** 22:13 28:1 28:20 39:20 41:22 |
| **federal** 33:13 47:10 | | **footnote** 31:24 36:2 41:17 | |
| **feel** 14:7 | | **forbidden** 11:8 | **functionality** 11:25 |
| **feigenbaum** 2:15 33:8,10 41:16 42:12 45:22 | **fired** 15:2 | **force** 23:8 | **fundamental** 19:22 20:18 |
| | **first** 3:5 6:17 7:3,22,23 8:2 9:19 16:8,11 17:22 19:6,25 20:1,2,14,15 21:3,6,8,10,13 21:14,18 22:7 22:14 23:8,14 23:20,25 30:7 33:20 35:17 36:3 37:10 38:16 39:19 | **foreclose** 30:15 | |
| | | **forecloses** 11:9 | **fundamentally** 11:14 |
| | | **foregoing** 50:4 | **further** 6:21 22:4 |
| | | **forget** 48:20 | |
| **fifteen** 33:10 | | **form** 21:20 | |
| **fifty** 42:1 48:7 | | **former** 33:24 | **g** |
| **final** 27:2 37:6 | | **fortunately** 15:4,7 | **g** 3:1 |
| **finally** 36:19 44:6 | | **forty** 33:11 39:2,5 | **general** 2:16 |
| | | **forward** 6:8 | **georgia** 32:16 32:21 44:16 |
| | | **found** 6:25 15:10 24:12,22 25:17 29:21 30:10 46:3 | |

| | | | |
|---|---|---|---|
| **give** 35:19 | **greet** 49:19 | 26:18 27:4,8 | **historical** 3:20 |
| **given** 28:23 | **gruesome** 28:8 | 33:18 38:14 | 3:23 10:14 |
| 42:4,4,7 47:14 | **guess** 22:7 | 39:18,21,21,23 | 11:10,16 12:11 |
| 49:8 | **gun** 28:2,3 | 39:25 40:1 | 12:23 13:7 |
| **go** 8:5,9 13:1 | **guns** 15:18 | 41:21 42:9,9 | 20:16 21:9,24 |
| 21:5 41:13 | 22:11,12 23:5 | 42:15 43:5 | 22:20 23:1 |
| 45:23 47:8 | 23:6 24:12,19 | 45:4 49:13 | 29:4,6,8,11 |
| 49:18 | 24:20 25:17 | **harms** 18:22 | 30:2,15 32:5 |
| **goes** 32:2 39:23 | 27:22,25 28:4 | **harrisburg** | 32:10 34:12 |
| **going** 6:8 8:3,8 | 28:13,16,18 | 4:16 | 38:1,5,17,23 |
| 8:20 16:20,24 | 29:11 30:1 | **hear** 3:2 10:22 | 39:9,11,15 |
| 18:9 20:20 | 36:1,5,11,12,14 | 43:18,18,19 | 41:10 43:24 |
| 22:7 31:2 | 36:16,24 45:10 | **heard** 12:12 | 44:3,5,8 45:25 |
| 34:24 37:20,21 | 46:25,25 47:15 | 39:19 43:22 | 46:4,9 |
| 39:15 40:12 | | 44:11 45:4 | **history** 3:22 |
| 41:5 42:3 49:8 | **h** | 46:11 | 4:10,20 7:13 |
| **good** 3:9 10:24 | **hair** 24:8 | **hearing** 27:17 | 10:2,3 17:5 |
| 38:8 45:17 | **half** 7:1 15:22 | **hearne** 2:25 | 20:24 32:14,23 |
| **government** | **hampshire** 2:4 | 50:4,9 | 33:17 34:10 |
| 9:23 10:4 | **handful** 47:21 | **heffner** 30:6 | 38:13 44:6 |
| 21:23 30:17 | **handgun** 36:22 | **held** 3:25 9:24 | **hohe** 40:2 |
| 32:5 33:13 | **handguns** 14:4 | 10:4,5 13:20 | **home** 10:10 |
| 41:20 | 15:10 34:23 | 44:10 | 14:20,24,25 |
| **governments** | 36:21 45:9,14 | **heller** 3:15,21 | 45:15 |
| 33:1 44:1 | 49:5,5 | 9:22 10:4,16 | **homeland** 1:7 |
| **graham** 3:10 | **happen** 17:14 | 10:17,19 11:20 | **hon** 1:11,15,15 |
| **grant** 42:23 | 18:20 | 12:14 13:4,13 | 1:16 |
| **granted** 7:13 | **happy** 13:15 | 15:9,10 28:12 | **hone** 15:6 |
| 11:3 19:13 | **hard** 19:19 | 29:1 34:16,22 | **honing** 13:24 |
| 40:9 | **hardened** 28:7 | 36:11,20,21 | **honor** 3:9,14 |
| **gray** 3:8,10 | **harm** 5:3,5 | 43:23 45:7,8 | 7:6 10:24 22:8 |
| **great** 3:13 7:19 | 6:14,22 8:18 | 45:25 48:17 | 24:10 31:18 |
| 10:13 44:12 | 9:20 16:7 | 49:3 | 33:7 42:14 |
| **greater** 10:15 | 17:16,23 18:3 | **helpful** 35:2 | 43:16 49:15 |
| | 18:11 22:16,24 | 38:15 | |
| | 23:11,19 24:13 | | |

| | | | |
|---|---|---|---|
| **hughes** 2:17 | **increase** 28:10 | **injuries** 28:8,10 | **invoking** 21:11 |
| **hundred** 21:22 | **independent** | **injury** 5:23 6:3 | **involve** 8:2 9:6 |
| **hunting** 37:9 | 22:14 23:11 | 6:11 | 9:6 10:8 43:10 |
| 37:14,17,21 | **indicated** 27:21 | **inquiries** 41:6 | **involved** 10:9 |
| 38:5 | **individual** 16:8 | **inquiry** 4:10 | 43:11,12 |
| **hypothesize** | 16:16,22 19:21 | 12:6,19 15:13 | **involving** 7:20 |
| 45:11 | 24:7 | 26:10,12 29:4 | 9:5 10:18 |
| | **infect** 48:4 | 29:25 30:6,15 | **irreparable** 5:3 |
| **i** | **infer** 5:21 | 31:8 34:4,10 | 5:5,22 6:3,10 |
| **idea** 30:14 | **infringe** 16:25 | 34:17 38:6 | 6:14,22 8:18 |
| 38:24 39:20,25 | **infringed** 24:18 | 40:20 | 9:20 16:7 |
| 42:8 46:23 | **infringement** | **inside** 34:12 | 17:16 18:3 |
| **identical** 27:23 | 24:22,23,25 | **instance** 14:4 | 22:16,24 23:11 |
| **identify** 13:22 | **infringements** | **instances** 32:23 | 24:13 26:18 |
| **illegal** 32:17 | 10:15 | 32:25 | 27:4,8 33:18 |
| **immaterial** | **inherently** | **instructive** | 38:14 39:18,21 |
| 22:20 29:12 | 35:21 | 21:12 | 39:23,25 41:21 |
| **implying** 20:17 | **initial** 4:9 | **intangible** 9:7 | 42:9,15 |
| **important** | **initially** 29:3 | **integral** 12:2 | **issue** 3:18 9:10 |
| 13:12 40:21 | **injunction** 4:12 | 12:16 | 23:5 27:12,19 |
| 43:4 | 4:17 7:16 8:22 | **interest** 5:6 | 27:21 |
| **impose** 47:21 | 9:5 17:20,22 | 16:5,21,22 | **issues** 20:5 |
| **imposed** 32:17 | 18:14,16 20:7 | 17:1,6,6,17 | 21:15 |
| **inch** 28:7 | 22:17 23:21 | 18:12 19:23 | **items** 35:18 |
| **include** 30:19 | 24:2,24 26:12 | 25:2,4 | |
| 35:8,9 37:8 | 26:14,15,19,19 | **interests** 9:7 | **j** |
| **includes** 12:20 | 27:1,2 29:20 | 24:1 | **j** 1:11 2:17 |
| 32:12 | 29:22 37:12 | **introducing** | **jane** 1:16 |
| **including** 11:14 | 40:25 42:16,17 | 29:17 | **jeremy** 2:15 |
| 13:14 23:22 | 42:19,23 | **invalid** 45:16 | **jersey** 2:16 |
| 25:6 29:6,7,7 | **injunctive** 4:14 | **invitations** 24:3 | 23:1 31:2 |
| 39:3,6 | 4:23 15:21 | **invite** 45:23 | 39:12 |
| **incompatible** | 17:25 18:6,7 | **inviting** 20:5 | **job** 38:8 |
| 11:14 36:10 | 26:7 45:1 | **invoked** 20:14 | **john** 2:3 3:10 |
| **inconsistent** | | | **judge** 1:11,15 |
| 36:20 | | | 1:15,16 3:2,3 |

4:6,8,13,21,24
5:1,3,5,8,11,17
5:20,21,25 6:5
6:12,16,24
7:10,19,24 8:1
8:12,15,17,23
9:2,5,9,21 10:7
10:20,20,21,22
11:3 12:1,13
13:9,25 15:20
15:25 16:13
17:4,19 18:2
18:18,22 19:3
19:11,13,24
20:12,23 21:2
21:5,21 22:3,3
22:4,5 23:7
24:17 25:1
26:4,16 27:3
29:15,19,20
30:13,19,24
31:4,12 33:6
33:16,16,18,19
35:10 36:6
37:6 38:2,12
38:22 39:17
41:14,15 42:11
42:13,22,25
43:6,9 44:6,20
48:2,20 49:2
49:14,16
**judgment**  4:18
42:22
**judicial**  41:5

**jump**  7:17
**jurisprudence**
21:8
**jury**  17:7
**justice**  2:17
28:14
**justify**  3:20
21:23

**k**

**k.a.**  16:3
**keep**  6:7 10:16
11:11 14:19,24
15:6,14
**kind**  17:1 19:5
34:14 43:12
47:24
**kirk**  2:3
**knives**  32:19,20
32:21 38:21
39:3
**know**  5:14 6:4
6:8 7:6 18:14
20:9 32:4,6
34:15 35:22
36:4,15 43:23
45:17
**kreps**  23:24
**kugler**  41:17

**l**

**lack**  22:13
27:25 28:20
**lanes**  40:10
**language**  7:12
12:14 30:3,20

34:3,8,14
**lara**  44:10
**large**  5:13
22:19 35:9
37:16,22 40:4
**late**  44:15
**law**  4:1 6:6,9
6:18,20 7:7 8:9
10:3 11:5
13:21,22 16:4
16:7,15 17:11
17:12,14 18:9
18:10 20:14,15
20:15 21:3
28:6 36:6,7
48:18 49:11
**lawful**  3:24
11:12 13:6,10
13:14 14:19
15:11 25:6
35:12 37:8
48:16
**laws**  3:25 11:16
16:5,24 17:18
32:16 44:12,13
44:15
**lcms**  33:12
**leave**  18:9
38:13
**leaving**  19:7
**left**  16:12
**legal**  8:14,19
9:11 12:4,4
30:22

**legislation**
47:10
**legislative**
31:15,19
**legislature**
40:11
**legislatures**
39:2
**lengths**  10:13
**lethality**  28:5
**lewis**  24:5
41:14,16,22,25
42:7
**liaison**  2:8
**lie**  4:17
**lies**  16:22
**life**  48:25
**light**  32:6
**likelihood**  4:21
6:13 7:11,25
8:13,24,25
16:14 17:23,24
19:2,9 23:13
26:13 40:19
41:7,8 42:3,6
**likely**  23:17
**limited**  24:22
26:25 28:23
41:8 44:9
**limits**  10:11
**line**  40:19
**litigation**  41:3
**little**  17:24 27:4
40:24,24

**long** 15:18 24:8
  32:10 39:8
  40:23 45:9,10
**longer** 43:12
  44:21
**look** 9:11 13:8
  15:9,24 17:10
  19:5,19 23:24
  25:8,12 26:5
  31:16 32:15
  34:19 38:2
  44:8 46:2,24
  47:6
**looked** 3:21
  21:8
**looking** 21:23
  35:12,13,18
**looks** 27:4
**lose** 38:25
**lot** 8:2 21:15,25
  21:25
**lots** 46:12
**love** 43:18
**loved** 49:13
**lucy** 26:1 27:15
  28:8

**m**

**m** 28:2,13,25
**machine** 22:12
  23:6 27:22,25
  28:3,4,13,16,18
  36:1,5,11,12,14
  36:16,24 46:25
  46:25

**made** 11:23
  22:18 32:17
  35:21 36:18
  40:23 42:10
  44:25 49:4
**magazine**
  11:25 37:22
**magazines** 3:18
  5:10,13 11:7
  11:19 13:19
  22:19 35:9
  37:17
**majority** 47:19
  48:15
**make** 9:16
  26:17 33:20
  36:23 38:4,14
  39:19
**makes** 19:17
  36:2
**making** 29:21
  38:13
**manifest** 41:21
**manufacture**
  39:4,6,7
**march** 1:7
  50:15
**mariel** 2:9
**market** 1:20
  2:13,16 4:2
  35:16,24,24
  36:1 38:19,24
  39:1 46:18,20
  47:4,15,17
  48:10

**marketplace**
  35:18
**mass** 26:2 28:9
  48:4 49:6
**massive** 32:17
**materially**
  46:19
**matter** 3:16 4:4
  12:8 17:19
  19:5 37:20
  43:20 45:2,11
**matters** 12:6
  17:21 37:18
**maximize** 28:5
**mcdonald**
  20:17
**mean** 6:4,7
  7:16,20 8:8,18
  8:19,21 9:4,13
  9:15 14:14
  16:2,10,17
  17:9,14 18:17
  19:10 21:12
  23:10 24:17,19
  24:21 32:14
  43:9,13,18,22
**meaning** 23:2
  34:2,20 35:4
  35:12 38:8,9
**meaningful**
  20:18
**means** 14:20
  17:15 46:17
  48:11

**meant** 46:13
**memorably**
  36:7
**mentioned**
  44:15
**mercexchange**
  7:14
**merely** 40:18
**merits** 4:22
  7:11,18 15:22
  16:14 18:19,24
  19:1,10 23:12
  23:13,14,17
  26:13 40:19
**method** 28:22
**military** 40:17
**militia** 43:24,25
**miller** 37:3
**millions** 11:5,7
  13:20,21
**miniscule** 14:3
  48:24
**minute** 38:13
**minutes** 3:12
  11:1 39:17
**mistake** 31:10
**misundersta...**
  46:15
**moment** 6:12
  31:6 49:18
**monetary**
  43:11
**montgomery**
  1:15 6:12,17
  8:12,15,17 9:9

9:21 10:8 17:19 18:2 26:16 27:3 33:17 38:2,12 38:22
**month** 43:7
**months** 43:14
**moritz** 2:13 22:9
**morning** 43:19 44:14,21 45:4
**mountain** 16:3
**move** 48:22
**multiple** 39:4
**murphy** 2:5,6,9 10:22,24,25 11:4 12:5,18 13:13 14:12 15:23 16:2,15 17:9,21 18:4 18:21,25 19:4 19:12,17 20:8 20:13 21:1,4,7 21:22 30:6 44:23,24 48:11 49:1,15

**n**

**n** 2:13 3:1 50:2
**nation** 32:11
**national** 1:20 39:8
**nature** 26:10
**necessarily** 17:15

**necessary** 14:7 22:16
**need** 6:21 10:5 13:16 18:3 19:16 23:12 27:6 32:5,7 38:19
**needed** 27:7 48:24
**needs** 18:20
**neither** 25:19 34:16
**nepa** 40:12
**never** 18:7
**nevertheless** 42:6
**new** 2:4,16 10:2 21:17 23:1 31:2 39:12 46:18 47:12
**newly** 11:6
**nj** 2:18
**north** 50:12
**nos** 1:3,12
**notable** 47:14
**note** 28:19 30:11 41:17 44:16
**noted** 24:5,11 26:14 32:14
**notes** 29:25
**notion** 17:2
**november** 8:6
**nrdc** 19:11

**nssf** 10:25
**nuanced** 32:7
**number** 28:10 28:16 35:15 36:24 37:2,4 39:6 43:9
**numbers** 3:6
**numerous** 24:15 25:22 32:22,22,25
**nunn** 44:17
**nw** 2:4

**o**

**o** 3:1 50:2
**objections** 7:21
**observations** 33:20
**obtain** 5:9 22:16
**obtaining** 6:6
**obvious** 41:25
**obviously** 24:4 26:23
**ocean** 35:20 38:17
**odd** 31:12
**odds** 17:2 20:21
**offered** 27:7
**office** 2:16
**officers** 28:6
**oh** 19:14 46:25
**ohlendorf** 2:3 3:8,9,10,14 4:8 4:15,24 5:3,8

5:14,19,24 6:4 6:16 7:6,19,25 8:8,15,23 9:4 9:13 10:7 42:13,14,25 43:9 44:25
**okay** 5:17 7:10 20:23 26:4 44:20
**old** 17:4
**once** 12:24 17:14 21:19 26:5,21 38:18 38:19,24,25
**one's** 24:14
**ones** 34:6,6 47:16 49:13
**open** 45:16
**opening** 29:4 29:12 39:24
**opinion** 28:2 29:25 41:18
**opinions** 38:15
**opposed** 13:11 41:23
**oral** 22:22
**order** 46:16
**original** 34:2,8 34:19 35:3 38:8,9
**originally** 34:9 48:10
**outlets** 16:11
**outright** 39:4,8

| | | | |
|---|---|---|---|
| **outside** 10:10 | 39:11 40:4 | **perfect** 41:9 | 22:15,18 24:11 |
| 14:25 19:25 | 43:17 | **performance** | 25:5,15 27:9 |
| 34:12 | **partially** 40:1 | 23:6 27:22,24 | 27:18 29:3,9 |
| **overlook** 46:16 | **particular** | 28:3,19 | 29:12,17 30:12 |
| **overstatement** | 14:15,16 15:2 | **period** 6:2 | 31:11,20,22 |
| 7:2 | 34:11,18 | **permanent** | 33:25 34:24 |
| **overwhelmin...** | **particularly** | 7:16 18:6,7,14 | 37:11 39:20 |
| 49:6 | 19:9 21:10 | 26:15,19 42:17 | 41:9 42:8 |
| **own** 11:5,7 | 26:14 35:2 | 42:19 | **please** 3:10 |
| 24:11,12 25:16 | 38:7 47:14 | **permissible** | 33:10 |
| 25:17 27:20 | **parties** 3:4 41:5 | 45:9,20 | **pm** 49:20 |
| 36:8 47:6 | 41:12 | **permission** | **pocono** 16:3 |
| 48:16,16,25 | **party** 24:4 41:1 | 3:11 11:1 | **podium** 39:20 |
| **owned** 13:20 | **passed** 8:4 | **persist** 21:2 | **point** 10:21 |
| **owning** 13:22 | 32:16,20 33:2 | **ph** 3:10 | 29:15 37:6 |
| **p** | **past** 6:19 | **philadelphia** | 38:11 45:21 |
| **p** 3:1 | **patent** 43:11 | 1:21 | **pointed** 45:22 |
| **p.m.** 1:6 | **patience** 3:5 | **phoenix** 50:13 | **points** 27:20 |
| **p.o.** 2:17 | **pattern** 32:13 | **pi** 36:19 41:6 | 35:11 38:14 |
| **pa** 1:21 | **penetrate** 28:6 | **piece** 17:22 | 39:19 42:15 |
| **page** 1:18 | **pennsylvania** | **pill** 42:17 | 44:7,25 |
| 22:20 30:14 | 23:23 | **pis** 7:12 | **police** 41:24 |
| 45:22 46:2 | **people** 11:11 | **pistols** 5:15 | **popular** 4:2,3 |
| **pages** 9:25 10:1 | 15:4,14 16:6 | 11:6 | 30:18 45:14 |
| 34:4 | 16:10 45:12 | **pivoted** 29:10 | **population** |
| **palmetto** 36:13 | 48:4,6,15,16,22 | **places** 15:7 | 33:12 |
| 36:23 | 49:12 | **plain** 3:17 30:3 | **possessed** |
| **panel** 1:14 44:9 | **perceiving** | 43:21 | 15:11 |
| **papers** 29:4 | 41:23 | **plainly** 3:18 | **possessing** |
| **paradigmatic** | **percent** 18:18 | 43:16 44:18 | 14:20 |
| 37:20 | 18:25 21:22 | **plaintiff** 22:25 | **possession** 10:8 |
| **paragraph** | 33:11 48:13 | 24:6,16 26:21 | 15:14 39:7 |
| 45:13,23 | **percentage** | **plaintiffs** 5:9 | 45:9,10 46:6 |
| **part** 12:2,18 | 14:2 | 5:11,15 8:10 | 48:18 |
| 29:24 33:24 | | 9:14,16 10:25 | |

| | | | |
|---|---|---|---|
| **possibility** 15:21 19:7 | **present** 29:9 48:8 | **proceed** 6:21 29:16 40:18 | **protecting** 11:10 16:22 49:10 |
| **possible** 35:12 48:5 | **presented** 22:25 25:13,15 | **proceeded** 34:21 | **protection** 7:8 23:22 34:7,8 |
| **possibly** 35:16 46:13 | 27:11 29:3 30:12 31:10,25 | **proceeding** 4:7 **proceedings** | 34:14 35:19,23 36:13,14 |
| **potential** 24:6 25:25 | 37:10 | 49:20 50:5 | **protections** 20:12 |
| **powers** 40:14 | **pressed** 23:8 **presume** 7:23 | **process** 7:8 20:4 | **protects** 14:18 29:14 30:8 |
| **precedent** 7:22 16:3 34:1,3 | 8:1 | **produce** 49:17 **professor** 29:8 | 46:1,6 |
| **precisely** 31:22 | **presumption** 7:5 41:21 | 32:9,14 47:6 47:23 | **prototypical** 37:21 |
| **precluded** 29:17 | **presumptions** 7:15 | **prohibit** 11:9 **prohibited** | **prove** 13:16 15:16 |
| **predominantly** 12:8 | **presumptively** 12:25 | 15:19 39:4 49:5 | **proves** 47:1 |
| **prefer** 45:12 | **pretty** 18:13 19:21 20:19,21 | **prohibiting** 46:4,10 47:18 | **provided** 40:11 **provides** 23:3 |
| **preferred** 28:22 | 45:5 | **prohibition** 36:4 45:16 | **provision** 20:3 **public** 5:6 16:5 |
| **preliminarily** 22:11 | **prevail** 23:17 31:5 | **prong** 6:13,14 9:12 43:17,17 | 16:21,22 17:1 17:17 18:12 |
| **preliminary** 4:11,14,16 | **prevailed** 24:6 **preventing** 6:6 | **proof** 4:6,8,13 13:18 | 19:23 25:2,4 32:24 34:2,20 |
| 7:16 8:22 9:5 17:20,22 18:6 | 6:18 8:10 17:16 | **proper** 35:14 37:19 | 34:22 35:4 37:2,3 38:8,9 |
| 18:16 22:17 23:18,21 24:2 | **prevents** 6:20 **primary** 33:20 | **proposition** 42:2,7 | 39:10,14 |
| 24:24 26:7,12 26:14,18,25 | **probably** 48:13 **problem** 49:3 | **protect** 9:7 48:24 49:11 | **purcell** 42:5 **purchase** 25:18 |
| 27:1 29:20,22 37:11 40:25 | **problematic** 20:19 | **protected** 6:6 10:11,12 12:25 | **purpose** 12:4 14:24,25 24:14 |
| **premise** 46:24 **preparing** | **problems** 39:10 41:4 49:9 | 15:3 21:18 30:4,11 34:6 | 30:22 48:14 |
| 17:10 | **procedures** 31:13 | | **purposes** 3:24 9:24 11:12 |

12:5 13:6,10
13:14 14:19
15:11 24:24
25:6 29:20
35:13 37:8,13
48:16,22,23
**put** 5:1,6 27:5
27:19 36:6

**q**

**qualify** 3:18
7:9 11:19
**qualifying** 13:2
**question** 9:11
9:11,22 10:16
11:20 12:1
13:1,9 19:25
26:13 35:19
37:6,7,25 38:2
38:12,22 41:14
45:7
**questions** 33:16
33:17,18,19
35:10 39:14,18
41:10,11
**quick** 42:15
**quickly** 38:12
44:7 48:5
**quite** 20:10
40:1,2,7 46:7
**quo** 40:22,24
**quote** 45:8

**r**

**r** 3:1 50:2

**radically** 18:15
**raise** 20:6
**raised** 7:21
**ranges** 13:24
15:7
**rare** 16:19 19:6
**rarely** 15:5,7
**reach** 19:16
37:24
**reacted** 33:1
**reaction** 47:11
**read** 13:13
19:11 26:10
45:23
**reading** 14:1
**ready** 14:21,21
33:9
**real** 20:17
41:11 49:9
**really** 6:13 16:9
18:7,11,12
19:5,8,18
21:25 25:9
37:18 38:4,15
47:7
**reason** 13:22
16:9 28:17
31:21 34:1
35:25 36:4
39:1 40:8
45:14 47:2
**reasoning** 32:3
**reasons** 22:14
35:16 37:10
45:12

**rebut** 27:11
**rebuttal** 3:12
10:23 11:2
22:6 42:13
**recent** 21:10
**recently** 35:21
48:2
**recharacterized** 20:4
**recognized** 47:20 48:6
**record** 8:7
22:13 23:5
25:13,14,20
26:25 27:15
28:20 29:6
31:25 35:8
36:17,18 37:11
37:14,15 38:20
39:22 41:8,9
49:18 50:5
**records** 31:16
**reeves** 1:15
6:12,17 8:12
8:16,17,23 9:9
9:21 10:8
17:19 18:2
26:16 27:3
33:17 38:2,12
38:22
**referring** 28:25
**reflect** 39:8
**registration** 36:3

**regulated** 35:25
**regulates** 39:12
**regulating** 30:17 38:18
**regulation** 13:5
29:9 32:13
**regulations** 22:20
**reilly** 4:16
**reject** 22:17
**rejected** 30:14
**relevant** 12:22
24:25 35:3
**relevantly** 32:9
**relief** 17:8
42:21 43:8
45:1
**remain** 17:7
**remainder** 26:11
**remaining** 18:5
18:8 19:4
39:17
**remedied** 23:20
24:1
**remedies** 7:12
**remedy** 24:5,6
**repealed** 48:1
**reply** 22:21
29:10,13
**reporter** 9:25
10:1
**reporting** 1:20

**representing** 33:11
**requests** 9:5
**require** 8:1
40:24 41:6
**required** 29:4
30:22
**requirements** 36:3 40:13
**requires** 30:25
47:13
**reserve** 3:12
11:1
**resist** 11:13
**resolved** 10:17
21:16
**respect** 24:13
24:13 26:2,10
27:11 28:19
29:2,22,23
30:9,11,17
31:7 32:1
**response** 26:20
29:5 32:23
**responses** 39:10
**rest** 11:13
44:21
**resting** 42:8
**restrict** 33:12
36:11 38:25
39:2,2
**restricted** 13:3
36:2,6 38:20
39:5,6

**restriction** 10:9
34:11,23
**restrictions** 30:9 39:3,4
47:21,22
**rests** 46:14
**result** 36:15
41:20
**retrospective** 17:8
**reversed** 4:5
**review** 9:3
**revolver** 45:19
**richard** 2:17
**richards** 1:16
**rifle** 4:3 37:21
45:18
**rifles** 4:1 5:15
11:6 47:16
**right** 6:2,14,25
8:14 9:10
10:15,16,22
11:11 14:18
15:8,13 18:19
18:25 19:3,15
20:7,7,11,18
21:1,21 22:5
24:14,16,18,20
26:8 29:12
34:9,22 35:6
35:11,11,17
36:17 37:3
38:1,8,10,10
40:1,2,4 43:6
45:2

**rights** 6:23 7:2
8:11 9:6,7,15
9:19 16:6,8,16
16:17,23,25
17:2,17,18
18:13 19:21,22
20:2 23:10
24:9,18 35:4
41:19 43:3,11
45:3 49:11
**ringer** 32:5
**risk** 24:8 32:24
41:11,23
**robust** 29:5
**room** 19:7
**ross** 2:12,13
22:7,8,8,8
23:16 24:21
25:11 26:9,21
27:9 29:19
30:24 31:18
33:7
**roth** 1:16 3:2,3
10:20,21 12:1
12:13 13:9,25
22:3,4 29:15
29:19 30:19
33:19 35:10
48:2,20 49:2
**roth's** 33:16
37:6
**rounds** 14:16
**rule** 6:1 41:4
43:1

**rush** 47:8,8

**s**

**s** 3:1
**safety** 1:7 25:4
32:24 39:10,14
**sale** 32:20 39:5
39:6,7
**satisfied** 13:17
15:18,25 16:2
16:20 18:8
19:8 46:21
**satisfy** 6:12
15:10 16:18
**saw** 47:11
**saying** 6:16,21
18:19 20:20
40:18 41:2
48:20
**says** 6:18 12:19
16:4 36:11
38:1 44:4,4
45:14,24 46:3
46:9
**scalia** 28:14
**school** 16:3
**scope** 26:8 34:8
37:3
**score** 35:2
**scrutiny** 20:25
21:2,6
**se** 6:9,10 7:9
16:6 19:7
23:20 39:21,25
42:9

**second** 3:16 4:2
4:10 5:24 6:1,7
6:10 8:9,11
9:19 10:11,12
12:23,25 13:3
14:18,18,23
15:4,21 16:10
17:5 20:10,11
20:14 21:14,18
22:2,17 23:10
24:14,17 26:5
29:13 30:4
31:7 33:21,22
34:7 35:6,20
37:24 43:1,20
44:3,17 46:1,5
48:19 49:9
**seconds** 41:13
**section** 20:5
29:25 30:2
**security** 1:7
**see** 1:18 3:2
23:25 27:7
29:23 32:13,15
32:22,25 34:23
36:5 41:2 42:4
46:24
**seeking** 43:7
**seems** 16:25
20:18,21
**seen** 39:11
**self** 9:24 10:5
11:12,22 12:2
12:3,7,10,15
13:7,10,11,14

13:14,15,23,25
14:3,5,6,8,9,10
14:24,25 15:2
15:11,14 24:15
25:6,20 27:12
27:15,16 30:20
30:23 31:1
34:5 35:7,13
36:23 37:1,13
37:21,25 38:3
38:6,10 45:15
48:17
**sell** 32:17
**semi** 4:1 11:5
11:24 14:13
28:21 45:18
47:16,22,25
48:3
**send** 24:3
**sense** 38:4
**sensitive** 8:3
**sentence** 28:17
**separation**
40:14
**serve** 18:12
**service** 43:25
**set** 16:19
**setting** 13:17
15:21
**settled** 7:22
**seventh** 17:6
28:1 30:14
35:1,2 38:7,15
**several** 24:11

**share** 23:6
27:22 28:3
49:2
**shared** 39:10
**sharp** 37:22
**shifted** 21:22
**shifts** 3:19
**shoot** 28:5
**shooting** 13:24
15:7 37:9
**shootings** 26:3
28:10 48:4
49:7
**short** 37:4
**shortly** 48:10
**shotguns** 11:6
37:4
**shots** 39:5
**show** 5:9 16:11
18:3 35:6
**showing** 9:16
38:9
**shown** 37:13
**shows** 37:16
**sic** 23:23 27:21
**side** 16:1 18:23
23:8 26:17
27:5 31:14
40:5,14 42:16
43:19
**sidebar** 49:19
**sides** 49:17
**significant** 41:4
**significantly**
28:11

**similar** 32:9
49:3
**simple** 10:7
**simply** 10:17
11:24 12:3,20
17:22 26:12
40:18
**single** 41:6 42:3
**situating** 38:8
**situation** 40:16
42:24
**situations**
25:21 28:23
**skillfully** 43:7
**skills** 13:24
15:6
**slaves** 44:13
**sliding** 13:9
**slung** 39:5
**societal** 31:9
32:1
**sole** 22:25
25:14 28:19
29:2
**solely** 29:19
**somebody**
14:22 18:10
48:14
**sorry** 29:7
**source** 36:8
**sources** 34:19
**sparingly** 7:13
**speak** 6:18,19
8:3

| | | | |
|---|---|---|---|
| **speaking** 6:19 | **started** 47:9,19 | **stephanos** 1:15 | **suffices** 42:23 |
| **specific** 24:10 | **starting** 33:15 | **stevens** 21:11 | **suggest** 7:17 |
| 35:6 | **startling** 28:14 | 21:17 | 28:14 31:15 |
| **specifically** | 28:15,17 36:12 | **stop** 20:9 | **suggesting** |
| 20:13 21:8 | **starts** 32:11 | **straightforward** | 11:17 26:11 |
| 25:17 29:21 | **state** 1:3 3:6 | 3:16 | **suggests** 7:14 |
| 35:3,13 38:9 | 4:10 11:17,18 | **street** 1:20 2:6 | 11:18 |
| 38:21 41:2,18 | 14:14 34:16 | 2:10,13,16 | **suitability** |
| 44:13 45:22,24 | 35:5,21 38:17 | 50:12 | 27:12 |
| **speech** 21:17 | 39:12 45:17 | **strong** 19:1,9 | **suite** 1:21 2:14 |
| 21:20 30:7,8,9 | 46:15,17 | **struck** 26:5,9 | 50:12 |
| 30:11 | **state's** 10:11 | 44:16 49:10 | **suited** 27:14 |
| **spend** 10:5 | 11:9,12 13:18 | **structure** 29:23 | **summary** 4:17 |
| **spitzer** 29:8 | 15:1,16 44:18 | **study** 47:22 | **supplement** |
| 32:10,14 47:7 | 47:6 | **subject** 31:10 | 44:24 |
| 47:23 | **states** 1:1,10,11 | **submachine** | **support** 40:25 |
| **split** 49:17 | 9:25 13:5 | 47:14 | **supported** 46:3 |
| **spoken** 6:19 | 21:11 33:11 | **submit** 4:9 6:9 | **suppose** 17:9 |
| **sportsmens** 1:3 | 39:3,5,9,13 | 31:21,22 | **supposed** 5:21 |
| 3:6 | 47:9,9,19,19,21 | **submitted** | 7:15,17 20:24 |
| **spot** 42:1 | **status** 40:22,24 | 49:16 | 26:8 |
| **squarely** 37:10 | **statute** 15:19 | **substance** 8:14 | **suppress** 32:19 |
| 45:7 | 22:11 32:19 | **substantive** | 32:21 |
| **stage** 26:15,15 | 33:3 | 20:12 | **supreme** 3:14 |
| 26:19 27:2,2 | **statutes** 33:1 | **success** 4:22 | 3:21 10:1 11:8 |
| 36:19 37:12 | 34:17 40:9,16 | 6:13 7:11,25 | 14:19 19:20 |
| 40:25 | **statutory** 19:13 | 8:13,25 9:1 | 20:10 28:12,25 |
| **stake** 39:24 | 19:15,18 34:10 | 16:14 17:24 | 30:3 40:23 |
| **stand** 17:13 | 40:6 | 19:2,9 23:13 | 44:17 49:7 |
| **standard** 9:3 | **stay** 40:10 | 26:13 40:19 | **sure** 14:9 15:3 |
| 44:5 | **steel** 28:7 | 41:7,8 42:3,6 | 16:2 17:9 |
| **standing** 39:8 | **step** 4:9,19,20 | **suffering** 5:22 | 19:21 27:9 |
| **stands** 42:2,7 | 33:24 34:3,13 | 39:22 | 37:9,18,19 |
| **start** 20:20 | 34:15 | **suffice** 44:18 | 38:13 40:7 |

**surprise** 39:23
**surprising** 28:8
**swallow** 42:17
**switch** 30:16

**t**

**t** 50:2,2
**tactical** 35:21
  38:17
**take** 13:15
  27:19 31:6
  32:7 33:8
  36:10 44:11
  49:7
**talk** 23:7 28:16
  34:4 39:18
**talked** 20:15,17
  28:13 29:8
**talking** 13:19
  14:13 20:16
  26:24 34:13
  41:18 47:16
  49:9
**talks** 12:14
  32:10 34:5
  36:22,25
**tallying** 35:15
**tamika** 1:15
**tangible** 43:4,5
**target** 37:9
**taxes** 32:17,18
**teach** 11:21
  13:4 48:17
**teaches** 11:10
  29:13 31:24

**technical** 32:2
  41:11
**technological**
  31:9
**technology**
  47:25
**telling** 6:15
**tells** 12:24
**temporary** 6:8
**ten** 33:13
**tennessee** 32:16
  32:19
**tens** 47:5
**tenth** 48:13
**term** 14:14
**terms** 6:5 13:5
  20:16,17 25:10
  35:14
**terrible** 48:21
  48:23
**test** 10:19
  12:11 15:10
  33:23 34:18
  35:11,14,16,20
  35:22 36:15,20
  37:5 38:24
  44:3,4 45:21
  46:8,13,15
**text** 3:17 4:9,19
  14:17,23 34:9
  34:20 43:17,21
  43:22
**textual** 12:5,19
  29:25 44:4

**thank** 11:4 22:8
  33:6,7 42:11
  42:12,14 44:20
  44:24 49:14,15
**thanks** 3:4
**thing** 20:9
  25:24 32:21
  45:1,6
**things** 13:23
  20:4 21:25
  31:13,15 46:19
**think** 7:2 8:20
  8:23 9:17 12:6
  12:18 13:12,15
  13:16 14:7,13
  15:8,9,13
  16:15 17:1,2
  17:12,21 18:1
  18:4,4,13 19:5
  19:17,19 20:8
  21:12 25:11
  26:23 27:1
  30:23 33:23
  35:1 36:20
  37:5,25 38:15
  40:1,3,14,21
  41:3,11,16
  42:7,9,16
  43:14,14 44:13
  44:15,18 45:2
  45:16,19,20
  46:24 47:12
**thinking** 15:16
  27:3 30:21,22
  40:21

**thinks** 26:23
**third** 1:1 22:22
  36:9,23
**thirteen** 43:14
**thirty** 9:25 47:9
  47:17
**thought** 17:10
**thousands**
  32:18 47:4,5
**threat** 32:24
**three** 5:12 18:5
  18:8 19:15
  22:14 28:6
  33:14 39:5
  43:13 44:15
**threshold** 12:5
  12:19
**tiers** 20:24 21:2
  21:6
**time** 3:12 4:3
  6:2 8:3 10:6
  19:19 31:13
  32:12 33:8
  35:5 41:3,7
  46:7 47:14
**times** 14:2,15
  46:12
**today** 4:2 13:6
  22:24 29:16
  32:18 36:1,5
  39:19,19 47:17
  48:6
**together** 49:17
**took** 15:1

**tracks** 4:17
**tradition** 3:20
  3:23 10:2,3,14
  11:10 12:11,23
  13:8 21:9,24
  29:8,11 32:10
  32:22 34:12
  38:17,23 39:9
  39:11,15 43:17
  43:24 44:1,5,6
  45:25 46:4,10
**traditions**
  43:24
**transcribed**
  2:25
**transcript**
  49:17 50:4
**treat** 20:21
**treating** 31:14
**treatment** 20:2
  47:13
**trenton** 2:18
**trial** 4:18 8:6,7
  31:13,24
**trials** 17:7
**tried** 17:10
**true** 4:21,25
  23:21 50:5
**trying** 40:6
**turn** 33:15
  35:23,25 38:4
  38:6
**turning** 33:16
  38:12

**turns** 18:23
  35:18
**twenty** 10:1
  18:18,25 41:13
  48:3
**twin** 32:6
**two** 3:12 13:12
  16:18 19:15
  31:6 33:20
  34:15 35:11
  37:10 38:13,14
  39:2,17,19
  43:23 44:7
  47:9,21
**twofold** 34:1
**type** 4:2 13:2
  15:5 31:13
  42:21 45:12
**types** 3:22
  10:18 13:19
  25:18
**typical** 48:11
**typically** 15:11
  43:25

| u |
|---|

**u.s.** 33:11
**ultimate** 17:25
**ultimately**
  23:12 36:9
**unconstitutio...**
  16:4 17:12,15
  18:9,10
**under** 3:14,19
  4:15,18 10:12
  11:8 16:2,8

17:13 20:5
  22:23 37:19
  43:17 44:3,3
**underlying**
  26:10
**undermine**
  36:19
**understand**
  9:22 14:1 16:9
  31:1 34:20
  35:14 40:5
**understanding**
  40:10
**understood**
  34:9 40:7
**undertake**
  25:12 30:2
**undertakes**
  32:3
**undisputed**
  22:12 23:5
  25:19 27:13,15
  28:20 30:1
  35:8 36:17
  37:15 38:20
**united** 1:1,10
  1:11 9:25
  21:11
**unprecedented**
  31:8 32:1
**unthinkable**
  18:13
**unusual** 44:2
  46:5,10,16

**unusually**
  46:22
**upholding** 4:4
**upset** 48:5
**use** 3:24,25
  11:12 12:9,12
  12:21 13:6
  14:6,14,17
  15:10,16 23:2
  26:2 27:13
  29:24 30:1,5
  30:19,20,21,21
  30:23,25 32:20
  32:21,25 33:16
  33:19,20,23,24
  34:4,5,15,18
  35:10 37:6,12
  37:14 38:4,11
  43:16,20 44:1
  44:5,8 45:21
  45:24 46:2,6,8
  46:9 48:5,6,6,7
  48:8,9 49:6,12
**used** 11:22 12:1
  12:3,3,7,8,9,10
  12:15 13:10,11
  13:25 14:2,4,6
  14:8,9,10
  27:16 28:7,9
  31:1 48:3,12
  48:14,21,23
**useful** 25:19
  28:18 36:23,25
  37:1,17,21

**uses** 14:22 34:3
45:24
**using** 13:23
34:14
**usual** 34:19
**utilized** 25:20

**v**

**v** 1:6 4:16 7:14
16:3 19:11
21:11 23:23
30:6 40:3,3
41:17
**va** 2:7,10
**valid** 30:10
**validity** 36:8
**variety** 33:1
**various** 22:23
39:3
**vast** 47:19
48:15,15,15
**veritext** 1:20
**vests** 28:6
**vindicate** 18:12
**vindicates** 16:5
**violate** 17:18
19:23
**violated** 19:22
**violates** 16:16
16:16
**violating** 40:12
40:13
**violation** 6:10
7:23 9:18
23:20 26:22
42:18,19 43:1

43:2
**violations** 7:8,8
**violence** 32:24
**virtually** 16:6

**w**

**walks** 35:3
**wallach** 1:11
**want** 5:16 6:20
23:10 25:5
27:18 37:12,14
39:1,18 41:17
48:4
**wanted** 24:3
27:17 38:10
47:7
**wants** 14:14
46:25
**war** 48:10
**warfare** 28:18
37:1
**washington** 2:4
**way** 5:25 15:8
18:5 21:25
24:7 33:23
34:24 36:8
39:12 40:7
46:21
**ways** 6:20 33:1
33:15
**we've** 16:2
21:25 23:15
39:11
**weaken** 18:2,4
**weapon** 37:23
45:15

**weapons** 5:12
14:2,4,10
22:19 24:11
25:16,18 26:1
26:2 27:12,14
27:16,21,25
28:23 29:14
30:4,18,25
33:12 35:9
37:2,16 46:1,5
46:6,10 47:20
48:3,9,16
**wearing** 14:21
24:8
**weigh** 25:1,7
**weighing** 24:23
25:8
**went** 9:24
10:13 28:15
30:2,8 45:11
**western** 23:23
**widespread**
36:1 38:19
**wilmington**
2:14
**win** 8:20 18:23
23:13
**winter** 19:11
19:18 40:4,12
40:16,17 42:4
**wish** 5:9
**word** 12:20
43:19 46:8
**words** 12:2
30:20 34:20

45:24
**work** 36:9 37:5
46:14 49:17
**works** 38:23
**world** 19:18
48:10
**worry** 20:19
**wrong** 20:8
29:13 33:23

**y**

**yeah** 20:20
46:12
**year** 43:13
**years** 33:13
42:1 47:17
48:3,7
**yoked** 38:9
**york** 10:3
**yurgealitis**
27:14,23 28:21
37:16

**z**

**zero** 16:11